No. 2024-1189

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

VALEO NORTH AMERICA, INC.,
*Plaintiffs-Appellant,*

v.

UNITED STATES, ALERIS ROLLED PRODUCTS, INC., ARCONIC
CO., COMMONWEALTH ROLLED PRODUCTS INC., CONSTELLIUM
ROLLED PRODUCTS RAVENSWOOD, LLC, JUPITER ALUMINUM
CO., JW ALUMINUM COMPANY, NOVELIS CORPORATION,
ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET
TRADE ENFORCEMENT WORKING GROUP,
*Defendants-Appellees,*

_____

On Appeal from the United States Court of International Trade,
No. 1:21-cv-001581, Chief Judge Mark A. Barnett.

_____

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## VALEO NORTH AMERICA, INC.

Weronika Bukowski
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Phone: (212) 530-1930
wbukowski@crowell.com

Daniel Cannistra
Pierce Lee
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004

# CERTIFICATE OF INTEREST

Counsel for Valeo North America, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Valeo North America, Inc.

2. **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Valeo Bayen
Valeo International Holding, BV

4.  **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

John Anwesen

5.  **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6.  **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  January 26, 2024

_/s/ Weronika Bukowski_
Weronika Bukowski

# TABLE OF CONTENTS

INTRODUCTION ...................................................................... 1

STATEMENT OF RELATED CASES ...................................... 1

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF THE ISSUES ............................................ 2

STATEMENT OF THE CASE ............................................... 2

STATEMENT OF FACTS ..................................................... 5

I.     The Heat -Treated T-Series Sheet ............................... 5

II.    Alloy Registration with the Aluminum Association ..................... 6

III.   The Scope Proceedings.................................................. 8

IV.    The CIT Remands the Final Scope Ruling in *Valeo I* .................. 9

V.     The Department's Scope Redetermination................................. 11

VI.    The CIT sustained the Scope Redetermination in *Valeo II*........................................... 14

SUMMARY OF ARGUMENT ................................................ 16

ARGUMENT ...................................................................... 17

I.     Standard of Review .................................................... 17

II.    Legal Framework for Scope Proceedings..................................... 19

III.   Commerce Failed to Follow the Legal Framework for Scope Rulings as Set Out in its Regulations ............................... 21

IV.    The Scope Language of the Orders Unambiguously Excludes Valeo's T-Series Aluminum Sheet................................ 23

       A.     The Language of the Orders is Unambiguous ................... 23

       B.     Commerce Failed to Interpret the Scope Language of the Orders Consistently with Trade

Usage and Industry Standards as Required by
Law ........................................................................ 26

    1.    *Commerce Improperly Found that "Designate" is a
General Term* ...................................................28

    2.    *Commerce's Interpretation of the Scope Language is
Vague and Internally Inconsistent* ..............................31

C.    Commerce Failed to Appropriately Interpret the
Term "Common" Within the Scope Language ................... 33

V.    Commerce's Use of a Separate Rate Application to
Extrapolate a Scope Determination is Unsupported
Substantial Evidence and Contrary to Law ............................... 35

A.    (K)(1) Sources Must Be Public, Coherent, and
Ascertainable ........................................................ 35

B.    Alcha's Separate Rate Application is Not a Public
Source and the Separate Rate Determination
Does Not Provide Clear and Ascertainable
Standards ............................................................. 37

C.    Commerce Improperly Used the Separate Rate
Determination to Substitute the Language of the
Scope .................................................................. 41

D.    Except For Alcha's Separate Rate Determination,
Commerce Disavows Alcha's Submissions as
Having any Relevancy to Scope ......................................... 42

VI.    Commerce Misinterpreted the Relevance of Heat
Treatment to the Scope of the Orders ...................................... 43

VII.    Commerce Must Revoke Its Previous Customs
Instructions. ................................................................... 45

CONCLUSION ........................................................................ 48

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegheny Bradford Corp. v. U.S.*,
  342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004)......................................24

*Am. Silicon Techs. v. United States*,
  334 F.3d 1033 (Fed. Cir. 2003)...........................................................18

*Ams Assocs., Inc. v. U.S.*,
  737 F.3d 1338 (Fed. Cir. 2013)....................................................47, 48

*Arcelormittal Stainless Belg. N.V. v. U.S.*,
  694 F.3d 82 (Fed. Cir. 2012)........................................................*passim*

*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002)..............................................20, 24, 41

*Fedmet Res. Corp. v. United States*,
  755 F.3d 912 (Fed. Cir. 2014).............................................................26

*Glob. Commodity Grp. LLC v. United States*,
  709 F.3d 1134 (Fed. Cir. 2013)....................................................18, 41

*Holford USA Ltd. v. U.S.*,
  912 F.Supp. 555 (Ct. Int'l Trade 1995)..............................................25

*Huaiyin Foreign Trade Corp. (30) v. U.S.*,
  322 F.3d 1369 (Fed. Cir. 2003)...........................................................47

*Litton Sys. v. Honeywell, Inc.*,
  87 F.3d 1559 (Fed. Cir. 1996), rev'd on other grounds, 520
  U.S. 1111 (1997)..................................................................................18

*Meridian Prods., LLC v. United States*,
  851 F.3d 1375 (Fed. Cir. 2017)....................................................18, 19

*Mid Continent Nail Corp. v. United States*,
  725 F.3d 1295 (Fed. Cir. 2013)...................................................*passim*

*Morton v. Ruiz,*
 415 U.S. 199 (1974)..............................................................................36

*NEC Corp. v. Dep't of Commerce,*
 74 F.Supp.2d 1302 (Ct. Int'l Trade 1999)............................................24

*NLRB v. Bell Aerospace Co.,*
 416 U.S. 267 (1974)..............................................................................36

*OMG, Inc. v. United States,*
 321 F. Supp. 3d 1262 (Ct. Int'l Trade 2018), *remanded to*
 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019), *aff'd on other*
 *grounds* 972 F.3d 1358 (Fed. Cir. 2020)................................................26

*Peer Bearing Co.-Changshan v. United States,*
 766 F.3d 1396 (Fed. Cir. 2014)............................................................17

*Shenyang Yuanda Aluminum Indus. v. U.S.,*
 776 F.3d 1351 (Fed. Cir. 2015)............................................................23

*Star Pipe Products v. U.S.,*
 981 F.3d 1067 (Fed. Cir. 2020)....................................................36, 40

*Sunpreme Inc. v. U.S.,*
 946 F.3d 1300 (Fed. Cir. 2020)............................................................46

*United Steel and Fasteners, Inc. v. U.S.,*
 947 F.3d 794 (Fed. Cir. 2020)..............................................................46

*Valeo North America, Inc. v. United States,* 610 Fed. Supp.
 1322 (Ct. Int'l Trade 2022).............................................................*passim*

*Valeo North America, Inc. v United States,*
 No. 21-581, Slip Op. 23-157 (Ct. Int'l Trade Nov. 8, 2023).........*passim*

*Walgreen Co. v. U.S.,*
 620 F.3d 1350 (Fed. Cir. 2010)............................................................23

*Whirlpool Corp. v. United States,*
 890 F.3d 1302 (Fed. Cir. 2018)............................................................18

*Yepes-Prado v. INS,*
  10 F.3d 1363 (9th Cir. 1993) ................................................................19

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(vi) ...........................................................19

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................18

28 U.S.C. § 1295(a)(5) .......................................................................1

44 U.S.C. § 1507 ..............................................................................37

**Other Authorities**

19 C.F.R. § 35.225(d) ......................................................................46

19 C.F.R. § 351.225 .....................................................................12, 40

19 C.F.R. § 351.225(e) ....................................................................46

19 C.F.R. § 351.225(k) .............................................................16, 21, 23

19 C.F.R. § 351.225(k)(1)...........................................................*passim*

62 Fed. Reg. 27,296 (May 19, 1997)...................................................47

86 Fed. Reg. 52,300 (Sept. 20, 2021) ...............................................20

88 Fed. Reg. 67,069 (Sept. 29, 2023) ...............................................20

*Common Alloy Aluminum Sheet From the People's Republic*
  *of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813
  (Feb. 8, 2019).......................................................................2, 3, 33

*Common Alloy Aluminum Sheet From the People's Republic*
  *of China: Countervailng Duty Order*, 84 Fed. Reg. 2,157
  (Feb. 6, 2019).......................................................................2, 3, 33

*Common Alloy Aluminum Sheet from China,*
  Inv. Nos. 701-TA-591 and 731-TA-1399, USITC Pub. 4861
  (Jan. 2019).................................................................................44

# INTRODUCTION

On behalf of Plaintiff-Appellant Valeo North America, Inc. ("Appellant" or "Valeo"), we respectfully submit this opening brief in accordance with Federal Rule of Appellate Procedure 28, Federal Circuit Rule 28.

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiff-Appellant is not aware of any other appeal in or from this action previously before this or any other appellate court. Appellant's counsel is unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

# JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1295(a)(5), this Court possesses subject matter jurisdiction over the appeal from the final judgment and accompanying opinion and order of the Court of International Trade ("CIT") entered on November 8, 2023. *Valeo North America, Inc. v United States*, No. 21-581, Slip Op. 23-157 (Ct. Int'l Trade Nov. 8, 2023) ("*Valeo II*"). Appx00018–00038. [1] The CIT issued *Valeo II* after a remand

---

[1] "Appx_" refers to pages of the Joint Appendix.

1

proceeding by Commerce and an earlier decision. *Valeo North America, Inc. v. United States*, 610 Fed. Supp. 3d 1322 (Ct. Int'l Trade 2022) ("*Valeo I*"). Appx00003–00017.

On November 17, 2023, within sixty days of the CIT's final judgment, Appx0001–00002, Valeo timely filed its notice of appeal pursuant to Federal Circuit Rule 4. Appx00163–00164.

## STATEMENT OF THE ISSUES

1. Whether the CIT erred in sustaining the U.S. Department of Commerce's ("Commerce" or "the Department") determination that Appellant's heat-treated T-series aluminum sheet is within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China, where the Department's determination was not in accordance with law, unsupported by substantial evidence, and was otherwise unreasonable and unlawful.

## STATEMENT OF THE CASE

In 2019, Commerce published antidumping and countervailing duty orders on aluminum common alloy sheet from China. *See Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813 (Feb. 8, 2019) ("*AD Order*");

*Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order* 84 Fed. Reg. 2,157 (Feb. 6, 2019) ("*CVD Order*") (collectively, the "Orders"). Each antidumping duty and countervailing duty order contains a narrative description that defines the merchandise covered by the proceeding. This narrative description outlines the "scope" of the order, and merchandise falling within the narrative description is "in-scope" merchandise.

The scope language of the Orders is as follows:

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

*AD Order*, 84 Fed. Reg. at 2,815; *CVD Order*, 84 Fed. Reg. at 2,158.

Commerce may issue a scope ruling to clarify what imported merchandise is covered by the scope of an order. Typically, an interested party, such as a U.S. importer, initiates a scope inquiry by submitting a scope ruling request to Commerce.

3

Valeo submitted a scope ruling request to Commerce on May 1, 2020 to confirm its T-series aluminum sheet is outside the scope of the Orders. Appx00177. Valeo thereafter submitted three additional successive scope ruling requests providing additional information supporting that its heat-treated T-series aluminum sheet is not covered by the scope of the Orders. Appx00459, Appx00645, Appx00792. On October 15, 2021, Commerce issued a scope ruling finding that Valeo's T-series aluminum sheet was covered by the scope of the Orders (the "Final Scope Ruling"). Appx01246.

On November 12, 2021, Valeo appealed the Final Scope Ruling. *See* Appx00170. The CIT found that the Final Scope Ruling was unsupported by substantial evidence and remanded the ruling to Commerce. *Valeo I* at 1343. Appx00013.

On June 20, 2023, Commerce filed a Scope Redetermination with the CIT. Appx00039. On November 8, 2023, the CIT sustained the Final Scope Ruling, as modified by the Department's Scope Redetermination. *Valeo II* at 21. Appx00038. This appeal follows.

## STATEMENT OF FACTS

### I.   The Heat -Treated T-Series Sheet

Valeo imports heat-treated T-series aluminum sheet from China to manufacture sophisticated components for automotive heat exchangers, ventilation, and air conditioning systems. Appx01249. Heat-treated T-series sheet is a proprietary aluminum product. The T-series sheet was developed by Valeo and its suppliers to be uniquely light weight, high strength, and highly corrosion resistant. Appx00181.

In order to achieve these unique characteristics, the T-series sheet is composed of a proprietary and highly-engineered aluminum composition that adds copper, manganese, titanium, and nickel. *See id.*

The T-series sheet was developed to meet the automotive industry's rapid move towards vehicle light-weighting; i.e., building cars and trucks that are less heavy as a way to achieve better fuel efficiency and handling. *Id.*

The T-series sheet is classified under HTSUS subheading 7606.12.3091 (aluminum alloys, not clad, heat-treatable industrial alloys). Appx01249. Its aluminum core is a proprietary alloy that is unregistered with the Aluminum Association. Appx01250.

## II.    Alloy Registration with the Aluminum Association

The Aluminum Association publishes a numerical designation system for wrought aluminum and wrought aluminum alloys. *See* Appx00864–00901 (the "*Teal Sheets*"). This publication, referred to as the Aluminum Association specifications or the "Teal Sheets," is the defining source for designations and chemical composition limits for wrought aluminum and wrought aluminum alloys and is relied upon in a number of standards and specifications worldwide.

In the Teal Sheets, aluminum grades are designated by four numbers and are grouped into "series" that have the same major alloying additions and properties. The first digit in the grade number indicates the general family, which share a major alloying component. When referring collectively to that specific family, the last three digits are shown as the letter X. For example, 5XXX indicates the 5000 series of aluminum alloys. Appx00897. The last three digits contemplate a unique, registered alloy. The series groupings in the Teal Sheets are as follows:

2.  Alloy Groups [1, 2, 3, 6]

The first of the four digits in the designation indicates the alloy group as follows:

Aluminum, 99.00 percent and greater ................................................................ 1xxx
Aluminum alloys grouped by major alloying elements

    Copper .......................................................................................... 2xxx
    Manganese. .................................................................................. 3xxx
    Silicon. ......................................................................................... 4xxx
    Magnesium .................................................................................. 5xxx
    Magnesium and Silicon ............................................................... 6xxx
    Zinc. ............................................................................................ 7xxx
    Other elements ........................................................................... 8xxx
Unused series .................................................................................. 9xxx

Appx00897.

Per the Teal Sheets, "[a] numerical designation" that is assigned "should only be used to indicate an aluminum or an aluminum alloy having chemical composition limits <u>identical</u> to those registered." *Id.* (emphasis added). "Designations that could be mistaken for a designation described" in the Teal Sheets "shall not be used for unregistered wrought aluminum or wrought aluminum alloys." Appx00899.

Because of its proprietary and highly-engineered nature, the composition of the T-series sheet differs from all aluminum and aluminum alloys registered with and designated by the Aluminum Association. *See* Appx01250. Put differently, the T-series sheet is unregistered and not designated by the Aluminum Association. Therefore, while the aluminum core of the T-series sheet has a major alloying element of manganese, it is not a 3XXX-series alloy.

## III.   The Scope Proceedings

On May 1, 2020, Valeo submitted its first scope ruling request explaining that the T-series aluminum sheet is outside of the scope of the Orders.  Appx00177. On June 5, 2020, August 7, 2020, and March 24, 2021, Valeo provided supplemental information and revised ruling requests in response to inquiries from Commerce. Appx00459, Appx00645, Appx00792.

Valeo argued in its scope ruling requests that its T-series sheet is outside of the scope of the Orders for a variety of reasons. Principally, Valeo argued that the plain language of the Orders provides that the scope only covers specific types of aluminum sheet that is "manufactured from a 1XXX-. 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association." *See* Appx01251–01252. Consequently, because the T-series sheet is not designated as a registered alloy under the Teal Sheets, it is outside the scope of the Orders.  *See id.*

On October 15, 2021, Commerce determined that Valeo's T-series sheet was covered by the scope of the Orders. Appx01246. Despite finding that the T-series sheet is unregistered and not designated under the Teal Sheets, Commerce concluded the T-series sheet is within the scope of the

Orders because it "is a multialloy, clad aluminum sheet produced from an aluminum core that has a primary alloying element of manganese" which Commerce considered a "3XXX-series core." Appx01256, Appx01259. Commerce reasoned that because the primary alloying element of the T-series sheet core is manganese, it is considered a 3XXX-series alloy. Appx01259. Again, the T-series sheet is not designated in the 3XXX-series nor any other series published by in the Teal Sheets. *See id*. Its chemistry is unique.

## IV.   The CIT Remands the Final Scope Ruling in *Valeo I*

Valeo appealed the Final Scope Ruling to the CIT. Appx00163.

On December 21, 2022, the CIT remanded the Final Scope Ruling to Commerce, holding that the Department's "scope interpretation exceeded the limits of a {19 C.F.R. § 351.225}(k)(1) analysis and is unsupported by substantial evidence." *Valeo I* at 1335. Appx00008.

In *Valeo I*, the CIT found that: "{t}he phrase '3XXX-series' is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,'" and that "the latter phrase aids in the interpretation of the former." *Id*. Because neither phrase was defined in the scope, the CIT found it was ambiguous. The CIT explained that:

The scope is ambiguous, however, as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with the four-digit designations assigned by the Aluminum Association.

*Id.*

After finding that the language of the scope is ambiguous, the CIT stated that the Department's "reliance on the Teal Sheets to interpret '3XXX-series' to include unregistered alloys fails to account for the Teal Sheets as a whole." *Id.* As the CIT explained, "{t}he Teal Sheets contain 'designations and chemical composition limits for wrought aluminum and wrought aluminum alloys *registered with* The Aluminum Association.'" *Id.* "Thus, from the outset, the Teal Sheets use the term 'designation' to refer to registered alloys." *Id.* The CIT further stated that "when read as a whole, the Aluminum Association's use of '3' in '3XXX' in the list of alloy groups indicates a major alloying element of manganese while contemplating the addition of three more digits to complete the four-digit designation" and that "Commerce has not identified anything in the Teal Sheets that indicates the Aluminum Association applies this framework

to unregistered alloys." *Id.* at 1335–36. Appx00008–00009 (emphasis added).

The CIT thereby concluded that "Commerce's interpretation of the phrase '3XXX-series' in conjunction with 'as designated by the Aluminum Association' to include unregistered aluminum alloys with a major alloying element of manganese . . . is unsupported by substantial record evidence." *Id.* at 1337–38. Appx00009.

## V.    The Department's Scope Redetermination

On June 20, 2023, Commerce filed a scope redetermination with the CIT amending the Final Scope Ruling. Appx00039–00162 (the "Scope Redetermination"). On remand Commerce recognized that the Teal Sheets offered guidance on "industry usage of the term '3XXX-series'" and found that the Teal Sheets "weigh{} in favor of finding that the scope of the *Orders* is limited to registered alloys . . . with four-digit designations assigned by the Aluminum Association." Appx00082, Appx00085. In compliance with *Valeo I*, Commerce noted that the "Teal Sheets, as a whole, use{} the word 'designation' to refer to alloys with a four-digit designation from the Aluminum Association." Appx00080.

However, Commerce found that the Teal Sheets were not dispositive because "{t}he term '3XXX-series' is an industry-specific term defined only by the industry publication *Teal Sheets*" but that "the term 'designate' is a general term that may be used in the common vernacular." *Id.* Commerce referred to the Merriam Webster dictionary that defines "'designate' among other things as 'to point out the location of.'" *Id.* Commerce thereby determined that "the dictionary definition of the term 'designate' does not require the term to be used in reference to a four-digit alloy designation from the Aluminum Association." *Id.*

In sum, in light of this definition of "designate" that does not apply specifically to the aluminum industry, Commerce found the scope was ambiguous as to "whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association." Appx000081.

Commerce then examined (k)(1) sources pursuant to 19 C.F.R. § 351.225 to address this ambiguity. Appx00081–00086. The Scope

Redetermination weighed two so-called (k)(1) sources: the Teal Sheets and a separate rate determination of a third party's unrelated product from the underlying antidumping investigation. *See* Appx00081–00082, Appx00086.

With respect to the Teal Sheets, Commerce found they weigh "in favor of finding that the scope of the Orders is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association." Appx00082.

The second "(k)(1)" source, the separate rate determination, was a determination in response to Jiangsu Alcha Aluminum Co., Ltd. and Alcha International Holdings Limited's (collectively "Alcha") separate rate application (the "Separate Rate Determination"). Appx00082–00083. Commerce placed excerpts from these separate rate applications on the record during the remand proceedings. Appx01446. Alcha is a third part unrelated to Valeo and does not export T-series aluminum sheet.

The Scope Redetermination discusses Alcha's separate rate application and the Separate Rate Determination, though it discusses certain of Alcha's confidential information. *See* Appx00083–00084. Commerce stated that Alcha submitted a separate rate application, that

Alcha's confidential application identified an alloy as subject merchandise, and that this alloy did not correspond with any registered alloys in the Teals Sheets. *Id.* Commerce thereafter reasoned that because Commerce determined that Alcha was entitled to a separate rate, "Commerce's separate rate determination indicated that Commerce understood the scope {of the Orders} to cover any alloy groups (including unregistered alloys)." Appx00084.

Weighing the Teal Sheets and the Separate Rate Determination, Commerce concluded that it would give greater weight to the Separate Rate Determination. Appx00086. However, Commerce found that the two k(1) factors were not dispositive in resolving the ambiguity in the scope of the Orders and next assessed various (k)(2) factors. Appx00093. Applying the k(2) factors, Commerce again determined that the T-series aluminum sheet is within the scope of the orders.  Appx00162.

## VI.   The CIT sustained the Scope Redetermination in *Valeo II*

The CIT sustained the Scope Redetermination in *Valeo II* and found that "Commerce offered a reasoned explanation for its conclusion that the *Teal Sheets* was not dispositive." *Valeo II* at 12. Appx00029. The CIT also

found the Department's use of Alcha's separate rate application and the Separate Rate Determination was proper. *Id.* at 14. Appx00031–00034.

    This appeal follows.

**SUMMARY OF ARGUMENT**

Commerce's remand determination would overturn more than 10 years of black-letter law related to scope inquiries. At issue in this matter is the appropriate framework when determining if a particular product is within the scope of an antidumping or countervailing order. Scope determinations for particular products generally proceed in the following order: Initially, Commerce examines the relevant scope language. If the language is ambiguous, Commerce next interprets the scope with the aid of the sources set forth in the Department's regulations, known as the "k(1)" factors. If those materials are dispositive, Commerce issues a final scope ruling, but if they are not dispositive, Commerce considers the factors stated in subsection (k)(2) of the regulation. 19 C.F.R. § 351.225(k).

In resolving scope questions, Commerce's first obligation is to examine the scope language for ambiguity, while recognizing and interpreting terms consistent with their trade usage. As explained by this Court, Commerce must first examine the plain language of an antidumping or countervailing duty order, determine if it is ambiguous, and define relevant terms based upon customary trade usage. *See*

*Arcelormittal Stainless Belg. N.V. v. U.S.*, 694 F.3d 82, 88 (Fed. Cir. 2012) ("antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry"). This is often referred to as a k(0) analysis.

While Commerce casts this case as based on the factual circumstances of the particular product, it fails to apply the above well-established legal framework. The industry standards in this case are not ambiguous as the scope language itself specifies the governing standards. Because Commerce reaches beyond the express scope language to rely on a non-public, unpublished source unrepresentative of customary trade usage, Commerce's Scope Redetermination is unlawful and unsupported by substantial evidence.

## ARGUMENT

## I.    Standard of Review

This Court will "review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014). "Thus, without affording any deference to the Court of

International Trade, this court reassesses the administrative record for 'substantial evidence' and for consistency 'with law.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003); 19 U.S.C. § 1516a(b)(1)(B)(i).

With respect to scope rulings in particular, the Court will "uphold a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'" *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). In evaluating such a ruling, this Court has emphasized that "Commerce may not . . . interpret the scope of an order contrary to the order's terms or in such a way so as to change the scope of the order." *Glob. Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013). "Commerce's inquiry begins with the Orders' scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation . . . The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018). "De novo" in this context means review without deference to Commerce's determination. *Accord Litton*

*Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 1566 n.1 (Fed. Cir. 1996), rev'd on other grounds, 520 U.S. 1111 (1997) ("By use of the term de novo, this court means that it does not defer to the 'lower court ruling or agency decision in question.'") (quoting *Yepes-Prado v. INS*, 10 F.3d 1363, 1367 n.5 (9th Cir. 1993)). The separate "question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382.

Accordingly, this Court affords no deference to the CIT or Commerce when considering whether the scope language of an antidumping or countervailing duty order is unambiguous.

## II. Legal Framework for Scope Proceedings

Congress granted Commerce the authority to issue scope rulings to clarify "whether a particular type of merchandise is within the class or kind of merchandise described in an existing" antidumping or countervailing duty order. 19 U.S.C. § 1516a(a)(2)(B)(vi).

In resolving scope questions, Commerce must first examine the plain language the scope of an antidumping or countervailing duty order, determine if it is ambiguous, and define relevant terms based upon customary trade usage. *Arcelormittal Stainless Belg. N.V. v. U.S.*, 694

F.3d 82, 88–89 (Fed. Cir. 2012). Scope language must not be interpreted devoid of any consideration of the way the language of the order is used in the relevant industry. As this Court has observed, "{b}ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." *Id.* at 88. Indeed, the scope language is the "cornerstone" of Commerce's analysis and "a predicate for the interpretative process." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). If the language of the scope is unambiguous, it governs.

If the language of the scope is ambiguous, then the other sources listed in 19 C.F.R. § 351.225(k)[2] may be consulted. *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013); *ArcelorMittal*, 694 F.3d at 87. First, 19 C.F.R. § 351.225(k) directs Commerce to consider the "k(1) factors," which include "[t]he descriptions of the merchandise contained in the petition, the initial investigation,

---

[2] 19 C.F.R. § 351.225(k) was amended in 2021, 86 Fed. Reg. 52,300 (Sept. 20, 2021), and 2023, 88 Fed. Reg. 67,069 (Sept. 29, 2023). Because Valeo's scope ruling request was submitted prior to the effective date of the amended versions of the regulation, the original version of 19 C.F.R. § 351.225(k) applies to this action.

and the determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1). If the k(1) factors listed above are not dispositive, Commerce may consider additional "k(2)" factors. *Id.* § 351.225(k)(2).

## III. Commerce Failed to Follow the Legal Framework for Scope Rulings as Set Out in its Regulations

The underlying Scope Redetermination was unsupported by substantial evidence and contrary to law because Commerce failed to identify any appropriate (k)(1) factors and therefore unlawfully assessed (k)(2) factors. The Department's regulations require scope determinations to proceed in the following order:

<u>First</u>, Commerce examines the relevant scope language guided by context and industry custom. If the scope language is unambiguous, the inquiry ends here. *See ArcelorMittal*, 694 F.3d at 89–90.

<u>Second</u>, if the language is ambiguous, Commerce interprets the scope with the aid of the (k)(1) factors. *See* 19 C.F.R. § 351.225(k)(1). If those materials are dispositive, Commerce issues a final scope ruling.

<u>Third</u>, if the (k)(1) factors are not dispositive, Commerce considers the factors set out in subsection (k)(2) of the regulation. *See id.* § 351.225(k).

21

Commerce veered away from this framework in the Scope

Redetermination. As a threshold matter, Commerce found that the

scope language was ambiguous. Appx00143.

Commerce next turned to a (k)(1) analysis. Appx00081. Pursuant

to 19 C.F.R. § 351.225(k)(1), Commerce may consider the following

materials in a (k)(1) analysis: "{t}he descriptions of the merchandise

contained in the petition, the initial investigation, and the

determinations of {Commerce} (including prior scope determinations)

and the {International Trade} Commission." Neither of the so-called

(k)(1) sources Commerce assesses in the Scope Redetermination (i.e.,

the Teal Sheets and the Separate Rate Determination) were proper

under 19 C.F.R. § 351.225(k)(1).

Commerce misuses the Teal Sheets as a quasi-definitional and

(k)(1) source. *See* Appx00080–00082. This is inconsistent with

Commerce's regulations on scope rulings and therefore unsupported by

substantial evidence. *See* 19 C.F.R. § 351.225(k). The Teal Sheets provide

the common meaning of the phrase "as designated by the Aluminum

Association" and reflect the language in the Orders themselves. In the

Scope Redetermination, however, Commerce appears to attempt to use

22

the Teal Sheets both as a definitional source and a (k)(1) source, muddling the framework as set out by the regulations.

The Separate Rate Determination, as discussed in greater detail below in Section V, is also not an appropriate (k)(1) factor under Commerce's regulations. Appx00082–00084. Commerce's use of the Separate Rate Determination is therefore contrary to law.

In sum, Commerce failed to properly assess or identify <u>any</u> (k)(1) factors before moving to a (k)(2) analysis. The Scope Redetermination is therefore unsupported by substantial evidence and contrary to law.

## IV. The Scope Language of the Orders Unambiguously Excludes Valeo's T-Series Aluminum Sheet

### A. The Language of the Orders is Unambiguous

The language of the scope is the "cornerstone" of any scope determination. *See Walgreen Co. v. U.S.*, 620 F.3d 1350, 1357 (Fed. Cir. 2010); *see also, e.g., Shenyang Yuanda Aluminum Indus. v. U.S.*, 776 F.3d 1351, 1357 (Fed. Cir. 2015). Commerce cannot "interpret{} an order in a manner contrary to the order's terms." *Allegheny Bradford Corp. v. U.S.*, 342 F. Supp. 2d 1172, 1182 (Ct. Int'l Trade 2004) (citing *Duferco Steel*, 296 F.3d at 1094–95).

In *Valeo I*, the CIT held that the scope language of the Orders was ambiguous. Specifically, the CIT found that:

> The scope is ambiguous, however, as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with the four-digit designations assigned by the Aluminum Association.

*Valeo I* at 1335. Appx00008.

However, the CIT's analysis of the Teal Sheets resolves the ambiguity in the language that it identified. *See id.*, at 1335–36. Appx00008–00009. As explained by the CIT, "from the outset, the Teal Sheets use the Term 'designation' to refer to registered alloys." *Id.*, at 1335. Appx00008. "{W}hen read as a whole, the Aluminum Association's use of "3" in "3XXX" in the list of alloy groups indicates a major alloying element of manganese while contemplating the addition of three more digits to complete the four-digit designation." *Id.*

The Teal Sheets, as a definitional source, may be used to interpret the scope language of an antidumping or countervailing duty order. *NEC Corp. v. Dep't of Commerce*, 74 F. Supp. 2d 1302, 1307 (Ct. Int'l Trade 1999) ("In determining the common meaning of a term, courts may and

do consult dictionaries, scientific authorities, and other reliable sources of information, including testimony of record.") (quoting *Holford USA Ltd. v. U.S.*, 912 F. Supp. 555, 561 (Ct. Int'l Trade 1995)). Thus, in applying the CIT's analysis of the Teal Sheets to the terms of the scope, its language becomes clear.

Read in conjunction with the Teal Sheets, the scope language itself defines what is meant by "as designated." "As designated" means "as designated *by* the Aluminum Association." There is <u>no</u> other industry-specific definitional source that Commerce identified that calls this reading into question. *See Valeo I* at 1335 n.20. Appx00008, Appx00015.

Rather than focusing on the scope language itself, Commerce unlawfully ignores the conjunctive "by" in the scope language and impermissibly broadens the use of the word "designated." In contrast, the CIT in *Valeo I* rightfully found "as designated by the Aluminum Association" to be a single phrase for interpretation. *See Valeo I* at 1335 ("The phrase '3XXX-series' is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,'" and that "the latter phrase aids in the interpretation of the former"). Appx00008.

To determine the plain meaning of "as designated by the Aluminum Association," Commerce must refer to aluminum designations in the Teal Sheets and must look at the language of the scope as a whole. Upon proper review of the language of the Orders, the language of the scope is unambiguous.

## B. Commerce Failed to Interpret the Scope Language of the Orders Consistently with Trade Usage and Industry Standards as Required by Law

The Department's interpretation of the scope language is inconsistent with trade usage and industry standards. As this Court has stated, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *Arcelormittal*, 694 F.3d at 88. "Because the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." *Id.; see also Fedmet Res. Corp. v. United States,* 755 F.3d 912, 920–21 (Fed. Cir. 2014); *OMG, Inc. v. United States,* 321 F. Supp. 3d 1262, 1269 (Ct. Int'l Trade 2018), *remanded to* 389 F. Supp. 3d 1312 (Ct. Int'l Trade 2019),

*aff'd on other grounds* 972 F.3d 1358 (Fed. Cir. 2020) ("Trade usage further supports the conclusion that OMG's zinc anchors are not nails.").

In *ArcelorMittal*, this Court held that Commerce may draw upon industry or trade usage of a scope term in discerning that term's plain meaning. *See* 694 F.3d at 88, 90 (Finding the scope language to be unambiguous when read in light of industry practice). Here, similarly Commerce is required to look to the Teal Sheets to interpret the scope of the orders. The Teal Sheets provide the necessary context that give meaning to the terms used in the Orders as the international standard on aluminum alloy designation.

There is no dispute as to the interpretation of the Teal Sheets. Commerce agrees that, "{i}n reading Teal Sheets as a whole . . . this source supports the interpretation that scope term '3XXX-series' is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association." Appx00081–00082. Therefore, Commerce affirmatively found that the scope term "3XXX-series" is limited to registered alloys, i.e., designated alloys. However, Commerce abandoned the Teal Sheets and went on to inexplicably find that the term "3XXX-series" expands to include

unregistered alloys when followed by the modifier "as designated by the Aluminum Association."  This is finding is unsupported by substantial evidence because it is inconsistent the with plain language of the scope of the Orders. Simply put, when interpreting the scope language of the Orders in the context of trade usage of the relevant industry, there is only one possible interpretation.

Commerce attempts to avoid this inevitable conclusion with several flawed findings that are each unsupported by substantial evidence or otherwise contrary to law. As discussed in further detail below, Commerce (1) improperly found that the word "designate" is a general term as opposed to an industry term, and (2) ignored its surrounding language to reach a belabored result inconsistent with the language of the orders.

### 1. *Commerce Improperly Found that "Designate" is a General Term*

The Scope Redetermination concluded that the scope language of the Orders is ambiguous because "'designate' is a general term that may be used in the common vernacular." Appx00080. This finding is incorrect and therefore unsupported by substantial evidence.

As discussed above, there is a single industry-specific definitional source in the administrative record: the Teal Sheets. And, "designate" has a clear industry meaning upon review of the Teal Sheets. As the CIT explained, "{t}he Teal Sheets contain 'designations and chemical composition limits for wrought aluminum and wrought aluminum alloys *registered with* The Aluminum Association.'" *Valeo I* at 1335. Appx00008. "Thus, from the outset, the Teal Sheets use the term 'designation' to refer to registered alloys." *Id.*

"Designate" is an industry-specific term. Indeed, it is surrounded by industry-specific terms in the scope, as Commerce acknowledges. Appx00080 ("The term '3XXX-series is an industry specific term defined only by the industry publication Teal Sheets"). Similarly, "designate" is used in the Teal Sheets as well.

In a bid to argue that "designate" is a general term uninformed by the Teal Sheets, Commerce found that the Teal Sheets use the term "designation" but that the scope uses the term "designate," which may be defined differently as "to point out the location of." Appx00080 ("For instance, Merriam Webster dictionary defines 'designate' among other things as 'to point out the location of.'"). In short, Commerce found that

it could not rely exclusively on the Teal Sheets because the scope uses the term "designate" instead of "designation." *See id.*

There are several issues with the reasoning. Most importantly, "designate" is not a phrase that appears in isolation. The phrase in the scope language, when read in context, is "as designated by the Aluminum Association." Moreover, Commerce itself acknowledges that "designate" is preceded by the industry term "3XXX-series."  When read in that context, there is only one possible interpretation of this language. Designate, whether in the present tense, the past tense, or in its noun form can only have a single meaning when read in the context of the scope language. To avoid this inevitability, Commerce attempts to take a disjointed approach in the Scope Redetermination, breaking up the language of the scope and interpreting it in isolation

Furthermore, the Teal Sheets do not solely use the term "designation" in referring to its system of designating registered alloys. For example, the Teal Sheets state: "{t}his recommendation describes a four-digit numerical system for *designating* wrought aluminum and wrought alloys." Appx00897. (emphasis added). Commerce's argument therefore mischaracterized the Teal Sheets.

Even assuming the Teal Sheets on their face are not enough, there are other definitional sources specific to the industry Commerce ignored that confirm this point. For example, note 6 to Chapter 76 of the Harmonized Tariff Schedule of the United States ("HTSUS") explains that "{f}or the purposes of statistical reporting numbers," including HTSUS subheading 7606.12.3091 (the heading under which the T-series sheet is classified), "'heat-treatable industrial alloys' refers to aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are *designated as series 6xxx in the Aluminum Association's specifications of registered alloys*." Appx00957 (emphasis added). It is clear that industry use of the term "designated" refers to the Teal Sheets, also referred to as the Aluminum Association's specifications.

> ### 2. *Commerce's Interpretation of the Scope Language is Vague and Internally Inconsistent*

On its face, Commerce's interpretation of the scope language is convoluted, internally inconsistent, and vague.

Commerce explains in the Scope Redetermination that "designate" can be interpreted as a general term used in the common vernacular identifying the "the location of the alloy series definitions." Appx00081–

00082. Commerce reasoned that "the phrase 'as designated by the Aluminum Association' in the scope language, directs us to the location of the alloy series definitions where we could interpret . . . a 3XXX-series alloy as having a major alloying of manganese . . . ." Appx00081.

In so reasoning, Commerce fails to specify exactly where the location of the alloy series definition is or what definitions it is referring to. Indeed, if Commerce were to expand on this reasoning it would run into the very same issue as discussed above: the definitions of the alloy series (which are located in the Teal sheets) contemplate "the addition of three more digits to complete the four-digit designation" of the alloy. *See Valeo I* at 1335. Appx00008.

Moreover, as held in *Valeo I* and adopted by Commerce, the term "3XXX-series" is already limited to registered alloys which, presumably, would be part of the definition that Commerce is referring to. *See id.* Commerce itself found that "based on the Teal Sheets recommendation . . . the first digit {in 3XXX-series} identifies the alloy series contemplates the addition of three more digits to account for a complete four-digit registration. Appx00141. Even applying Commerce's belabored interpretation of the scope language, the location of the alloy series

definitions still notate three X's in each series "contemplating the addition of three more digits to complete the four-digit designation." *See Valeo I* at 1335. Appx00008. *See also* Appx00897.

### C. Commerce Failed to Appropriately Interpret the Term "Common" Within the Scope Language

Commerce failed to appropriately interpret the term "common," which is embedded in the scope language. The scope of the orders covers "aluminum *common* alloy sheet (*common* alloy sheet)." *AD Order*, 84 Fed. Reg. at 2,815; *CVD Order*, 84 Fed. Reg. at 2,158 (emphasis added).

In its scope ruling request, Valeo argued that the term "common" should be interpreted with the plain meaning "known to the community" based on its dictionary definition. Appx01253. Valeo also argued that this unambiguous term controls the scope inquiry at issue because it confirms that the scope only covers designated alloys. In the Final Scope Ruling, Commerce rejected the plain meaning of "common" and noted that the preliminary scope determination from the initial investigation stated that "{t}he scope includes all products which meet the physical description of the scope and do not otherwise qualify for an exclusion." Appx01266. Commerce's position fails to explicitly state whether or not the term "common" in the scope is ambiguous and in effect deprives this

33

scope term of any meaning. Therefore, Commerce's failure to interpret the term amounts to unlawful modification to the scope language.

The CIT did not reach this issue in *Valeo I*. *Valeo I* at 1338 n.27 ("The court does not reach Valeo's arguments concerning the meaning of the term "common" . . . Valeo's arguments implicate the meaning of the scope terms subject to the remand and thus, the court will defer resolution of them, to the extent they remain live, until Commerce issues its remand redetermination.") Appx00010, Appx00016.

On remand, Valeo once again raised this issue. Appx00056, Appx00138.  In the Scope Redetermination, Commerce rejected Valeo's arguments but again failed to explicitly find whether or not the word "common" is ambiguous and give any meaning to the scope term. *See* Appx00138–Appx00139.

These arguments were not addressed in *Valeo II* despite the CIT stating in *Valeo I* that "the court will defer resolution {of this issue}, to the extent they remain live, until Commerce issues its remand redetermination." *Valeo I* at 1338 n.27. Appx00010, Appx00016.

**V.    Commerce's Use of a Separate Rate Application to Extrapolate a Scope Determination is Unsupported Substantial Evidence and Contrary to Law**

In its Scope Redetermination, Commerce unlawfully adopted a third party's confidential submission unrelated to scope (Alcha's separate rate application[3]), as an alternative k(1) source to create a "competing" k(1) source to the Teal Sheets. Appx00082–00083. The resulting conflict, according to Commerce, necessitated recourse to a k(2) analysis. Appx00086, Appx00093. Commerce's adoption of a confidential submission, unrelated to scope, and unrelated to any party to this proceeding is unlawful.

**A.    (K)(1) Sources Must Be Public, Coherent, and Ascertainable**

The Department's regulations only allow three types of sources to be considered in a (k)(1) analysis: the descriptions of merchandise contained in the petition, the investigation, and determinations of Commerce and the International Trade Commission. 19 C.F.R. § 351.225(k)(1). To be a valid k(1) source, Commerce, and the public, must be able to draw ascertainable standards from the source and that

---

[3] Commerce placed Alcha's separate rate application on the record on remand before the CIT. Appx01446.

source must provide information publicly available at the time the order was issued. *Mid Continent Nail Corporation v. U.S.*, 725 F.3d 1295, 1304 (Fed. Cir. 2013). Prior determinations of Commerce (including scope determinations) may be relied upon "so long as these prior determinations were publicly available at the time" the order was issued. *Id.* Rulings that were not publicly available at the time an order was issued cannot be used to articulate new interpretive criteria in a scope determination. *See id.* Moreover, public source information must provide clear and ascertainable standards to be a valid k(1) source. *Star Pipe Products v. U.S.*, 981 F.3d 1067, 1074 (Fed. Cir. 2020). Public, coherent, contemporaneous guidance is necessary to provide importers with "adequate notice of what conduct is regulated by the order," before "imposing a significant exaction in the form of an antidumping duty." *Mid Continent Nail*, 725 F.3d at 1300 (quotations omitted).

While the Administrative Procedure Act does not forbid agencies from using adjudicative proceedings to develop new interpretations of statutes, regulations, or orders, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974), it does require agencies "to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations," s*ee Morton v.*

*Ruiz*, 415 U.S. 199, 232 (1974)). *Cf.* 44 U.S.C. § 1507 (providing that "{a} document required by {law} to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it" until it is so published).

**B.     Alcha's Separate Rate Application is Not a Public Source and the Separate Rate Determination Does Not Provide Clear and Ascertainable Standards**

While prior determinations may be relevant under 19 C.F.R. § 351.225(k)(1), such relevancy is extinguished when those determinations are not public or do not provide clear and ascertainable standards. Therefore, Alcha's separate rate application and Commerce's subsequent Separate Rate Determination must be disregarded as a k(1) source.

*Valeo II* incorrectly found Commerce's reliance on the Separate Rate Determination proper, reasoning that "[w]hile Commerce placed copies of the separate rate *application* by a respondent in the investigation {on the record} . . . Commerce relied on its *determination* with respect to the separate rate application as a (k)(1) source." *Valeo II* at 14. Appx00031. While it is true that Commerce did rely on its Separate Rate Determination, the critical fact Commerce relies on for its use as a

(k)(1) source is the numerical code of an alloy that is confidential. To be clear; the Separate Rate Determination in and of itself contains <u>no</u> discussion of the scope language nor the issue of unregistered alloys and designations.[4]    Indeed, this is why Commerce needed to place new, confidential information on the record. Commerce's Separate Rate Determination is meaningless when read in isolation. The determination must be read in conjunction with the new, confidential information placed on the record (i.e., Alcha's separate rate application) to have any apparent relevance to this action.

The Separate Rate Determination is thereby not an interpretative source for considering a scope issue because it lacks any discussion about a scope issue. Since the Separate Rate Determination lacks any discussion, analysis, or explanation about a scope issue, it is not an *interpretative* source. To find that this Separate Rate Determination is a

---

[4] *See* Scope Redetermination at 43 ("In the Final AD Determination, Commerce determined that the export-producer combination of Alcha International and Jiangsu Alcha was entitled to a separate rate.") (citing *Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-than-Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination,* 83 Fed. Reg. 29,088 (June 22, 2018) and accompanying Preliminary Decision Memorandum). Appx00083.

public determination putting exporters on notice that their merchandise is subject to the Orders is therefore unsupported by substantial evidence.

Courts have cautioned Commerce against using *ad hoc* determinations that do not provide an "ascertainable standard that would allow importers to predict how Commerce would treat their {imported} products." *Mid Continent Nail*, 725 F.3d at 1305. The Separate Rate Determination provides no ascertainable standards. In fact, it provides no standards at all and no specific or general guidance regarding scope, or even suggests that it is in any way related to scope. As such, the determination must be disregarded as a k(1) source.

*Valeo II* found Valeo's reliance on this Court's precedent to be inapposite because the cases in question dealt with mixed media. *Valeo II* at 15 ("Valeo again relies on Federal Circuit opinions governing Commerce's mixed media analysis, which, as stated above, is analytically distinct.") Appx00032. However, regardless of the products at issue, the proposition that Commerce must use public source information in order to provide coherent and ascertainable standards applies generally. This is not limited to mixed media. Indeed, in *Mid Continent Nail*, this Court found that (k)(1) determinations must be public: "In some cases, this

39

guidance may be found in the third of the (k)(1) criteria—'the {prior} determinations of {Commerce} (including prior scope determinations),' *see* 19 C.F.R. § 351.225(k)(1)—so long as these prior determinations were publicly available at the time that the antidumping order was issued." 725 F.3d at 1304. Furthermore, published guidance "must provide a clear and ascertainable standard" to enable importers to predict how Commerce would treat their products. *Star Pipe Prods. v. United States*, 981 F.3d 1067 (Fed. Cir. 2020).

These are foundational principles that Commerce is required to follow here as well. An importer would not be able to ascertain whether or not an unregistered alloy was within the scope of the Orders based on Commerce's Separate Rate Determination unless they had access to Alcha's confidential information.

Finally, *Valeo II* also stated that certain of Valeo's arguments asked the CIT to reweigh the evidence, i.e., Commerce's separate rate application. *Valeo II* at 15–16 ("The fact that Commerce ultimately decided to give little weight to the separate rate determination does not mean that Commerce may not consider the separate rate determination at all."). Appx00032–00033. However, Valeo did not ask the CIT, nor

does it ask this Court, to re-weigh record evidence. Valeo argues, for various reasons, that the Separate Rate Determination is not a proper (k)(1) source and relying upon it, as Commerce did, is contrary to law. In *Valeo I*, the CIT found that Commerce improperly relied on a different piece of evidence, the Weritz Declaration, and found Commerce's use of the declaration contrary to law. *Valeo I*, at 1337–1338. Appx00009. Finding that evidence that Commerce relies on is contrary to law is squarely within the role of the courts. *See id.*

### C. Commerce Improperly Used the Separate Rate Determination to Substitute the Language of the Scope

As discussed above, when read properly, the scope of the Orders has a clear meaning in the industry context.

In evaluating a scope ruling, this Court has emphasized that "Commerce may not . . . interpret the scope of an order contrary to the order's terms or in such a way so as to change the scope of the order." *Glob. Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013). Furthermore, as stated in *Duferco Steel*, 296 F.3d at 1097, while review of k(1) materials may provide valuable guidance as to the interpretation of the final order, they cannot substitute for the language in the order itself. As such, the common meaning of the language governs

above any other factor. In the Scope Redetermination, Commerce improperly substituted the Separate Rate Determination for the plain language of the scope.

### D. Except For Alcha's Separate Rate Determination, Commerce Disavows Alcha's Submissions as Having any Relevancy to Scope

Despite basing its entire analysis on competing k(1) sources derived from inferences on  Alcha's separate rate application, Commerce, incredibly, disavowed any conclusions associated with the specific Alcha aluminum alloy referenced in the Remand Redetermination, i.e., the grade serving as the basis for Commerce's scope determination.

Commerce reasoned that because Valeo did not cite any information indicating that Alcha filed a scope inquiry for this specific alloy grade, "it is not possible for Commerce's analysis to infer that Alcha's {} alloy is included within the scope of the Orders based on Alcha's non-existent participation in a scope inquiry." Appx00148.

Thus, on one hand, Commerce claims that that Alcha's treatment of one particular alloy provides meaningful industry guidance regarding scope, but then admits that that it is "not possible for Commerce's analysis to infer that Alcha's {} alloy is included within the scope of the

Orders." Given that admittedly Commerce cannot, and did not, make any finding related to scope concerning Alcha's alloy, its claim that Commerce's analysis of Alcha's separate rate application and the related Separate Rate Determination is unsupported by substantial evidence and contrary to law.

## VI.  Commerce Misinterpreted the Relevance of Heat Treatment to the Scope of the Orders

A question in this proceeding is whether T-series sheet is manufactured from a 3xxx-series core. Heat-treatment is relevant to this question because the term "3xxx-series" refers to non-heat-treatable alloys. The T-series sheet is manufactured using a three-step heat treatment process. Appx01250.

In the Scope Redetermination, Commerce found that the phrase "heat-treatment" means "solution heat-treatment" and that the phrase "heat-treatable alloy" refers to "an alloy that can undergo solution heat-treatment." Appx00065. Commerce addressed whether the T-series aluminum sheet undergoes solution heat-treatment and found that it does not. Appx00065–00069. Instead, Commerce determined that Valeo's T-series sheet "undergoes a combination of annealing and cold-working"

that did not preclude classification as a 3XXX-series alloy. Appx00069. The CIT sustained this finding in *Valeo II*. *Valeo II* at 17. Appx00034.

While lengthy, Commerce's analysis of heat treatment in the Scope Redetermination is unsupported by substantial evidence. *See* Appx00065–00077. 3xxx-series alloys are non-heat-treatable. The Aluminum Association specifically lists 3xxx-series under non-heat-treatable alloys in its informational material entitled "Aluminum Alloys 101." Appx00903–00906. In the underlying investigation, the ITC specifically stated heat-treated aluminum was not within the scope of the Orders.[5] Further, the CIT held, "to the extent that the record shows that 3XXX-series alloys are not heat-treatable, . . . the record does not indicate that there are exceptions within the 3XXX-series alloys." *Valeo I* at 1340. Appx00011.

---

[5] *Valeo I* at 1340 ("[H]owever, heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope.") (quoting *Common Alloy Aluminum Sheet from China,* Inv. Nos. 701-TA-591 and 731-TA-1399, USITC Pub. 4861 (Jan. 2019) (Final) ("USITC Pub. 4861") at I-18 ("USITC Pub. 4861")). Appx00011.

See *Common Alloy Aluminum Sheet from China,* Inv. Nos. 701-TA-591 and 731-TA-1399, USITC Pub. 4861 (Jan. 2019) (Final) ("USITC Pub. 4861") at I-18 ("USITC Pub. 4861").

Commerce did not question the Court's finding in *Valeo I*. In fact, Commerce used the CIT's finding for support that a registered 3XXX-series alloy (selected for comparison to the core layer of T-series sheet) is non-heat-treatable. Appx00075. However, Commerce made a contradictory finding that the record does not "indicate that the scope excludes heat-treatable sheet." Appx00078. First, this statement misdescribes the issue in this proceeding, which is whether 1XXX, 3XXX, and 5XXX alloys referenced in the scope are commonly known a non-heat-treatable alloys. The scope does not *exclude* heat-treatable sheets; it only *covers* aluminum series that are non-heat-treatable. Second, Commerce's statement is factually incorrect because all alloys in the enumerated series are non-heat-treatable. The record does not indicate that there are exceptions within the three series referenced in the scope.

## VII.  Commerce Must Revoke Its Previous Customs Instructions.

Commerce must revoke its previous instructions to the U.S. Customs and Border Protection ("Customs"). These instructions have been sent to Customs based on Commerce's final scope ruing dated October 15, 2021. However, the CIT held the scope ruling unlawful. Since

45

there is no lawful basis for the Customs instructions, Commerce must revoke them.

On February 15, 2023, Commerce initiated a scope inquiry under 19 C.F.R. § 351.225(e). Under § 351.225(l), when Commerce conducts a scope inquiry under subsection (e), it may only issue Customs instructions when the inquiry has been *initiated*. This Court has held that § 351.225(l) "does not allow suspension of liquidation before a scope inquiry." *United Steel and Fasteners, Inc. v. U.S.*, 947 F.3d 794, 801 (Fed. Cir. 2020); *see also Sunpreme Inc. v. U.S.*, 946 F.3d 1300 (Fed. Cir. 2020). Therefore, suspension of liquidation prior to February 15, 2023 is unlawful.

Commerce claims that "{w}hile Commerce initiated a broader scope inquiry under 19 C.F.R. § 351.225(e) on remand, this does not disturb Commerce's authority to suspend liquidation pursuant to a final scope ruling under 19 C.F.R. § 35.225(d)." Appx00137. However, the Court's remand order *does*. The CIT's decision has rendered the final scope ruling unlawful and the continued suspension of liquidation of and obligation to post cash deposits for Valeo's entries dating back to October 15, 2021, unlawful.

Commerce further claims that "the initiation of the scope inquiry would continue the suspension of liquidation pursuant to the Final Scope Ruling" because § 351.225(l) permits continued suspension when "the product in question is already subject to suspension." Appx00137, Appx00161. However, the reason why the product is already subject to suspension is because Commerce issued Customs instructions based on the unlawful final scope ruling.

Commerce is not required "to initiate a formal scope inquiry when the meaning and scope of an existing antidumping order is clear." *Ams Assocs., Inc. v. U.S.*, 737 F.3d 1338, 1344 (Fed. Cir. 2013), citing *Huaiyin Foreign Trade Corp. (30) v. U.S.*, 322 F.3d 1369, 1378–79 (Fed. Cir. 2003). However, a formal initiation of a scope inquiry represents "a finding by the Department that it cannot resolve the issue on the basis of the plain language of the scope description or the clear history of the original investigation."[6] "Accordingly, when Commerce 'clarifies' the scope of an existing antidumping duty order that has an unclear scope, the suspension of liquidation and imposition of antidumping cash deposits

---

[6] *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,328 (May 19, 1997).

may not be *retroactive* but can only take effect "on or after the date of the initiation of the scope inquiry." *AMS Assocs.*, 737 F.3d at 1344.

Here, Commerce initiated a scope inquiry on February 15, 2023. The initiation of the scope inquiry required a finding by Commerce that the scope is unclear. In the prior scope ruling, Commerce found that the scope is clear and did not require a scope inquiry. Commerce cannot rely on conflicting findings to make inconstant decisions. It would be arbitrary, capricious, and otherwise unlawful for Commerce to find that the scope is clear so that retroactive suspension from the date of the final scope ruling is justified and *then* decide that the scope is unclear so that a formal scope inquiry permitting a k(2) analysis can be initiated. Commerce simply cannot have it both ways.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Court reverse the judgment of the Court of International Trade

and vacate as unlawful Commerce's scope ruling that Valeo's T-series aluminum sheet is covered by the scope of the Orders.

> */s/ Weronika Bukowski*
> Dan Cannistra
> Pierce Lee
> CROWELL & MORING LLP
> 1001 Pennsylvania Ave., N.W.
> Washington, D.C. 20004-2595
>
> Weronika Bukowski
> CROWELL & MORING LLP
> Two Manhattan West
> 375 Ninth Avenue
> New York, NY 10001
> Phone: (212) 530-1930
> wbukowski@crowell.com
>
> *Counsel for Valeo North America Inc.*

# **ADDENDUM**

# <u>TABLE OF CONTENTS</u>

**Addendum Page**

Judgment (Nov. 8, 2023), ECF No 75............................Appx00001–00002

Opinion and Order,
    610 F. Supp. 3d 1322 (CIT 2022) ..............................Appx00003–00017

Opinion and Order,
    Slip Op. 23-157 (CIT Nov. 8, 2023)............................Appx00018–00038

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| VALEO NORTH AMERICA, INC., |
| Plaintiff, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, ET AL., |
| Defendant-Intervenors. |

Before: Mark A. Barnett, Chief Judge
Court No. 21-00581

**<u>JUDGMENT</u>**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion it is hereby:

**ORDERED** that the Final Scope Ruling issued in connection with the antidumping duty and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China, ECF No. 18-6 (public version),[1] as amended by the

---

[1] The confidential version of the Final Scope Ruling is contained in Tab 26 of the Confidential Joint Appendix, ECF No. 40.

Court No. 21-00581                                                          Page 2

Confidential Final Results of Redetermination Pursuant to Court Remand, ECF No. 61-

1, is **SUSTAINED.**

/s/      Mark A. Barnett____
Mark A. Barnett, Chief Judge

Dated: <u>November 8, 2023  </u>
       New York, New York

610 F.Supp.3d 1322
United States Court of International Trade.

VALEO NORTH AMERICA, INC., Plaintiff,
v.
UNITED STATES, Defendant,
and
Aluminum Association Common Alloy
Aluminum Sheet Trade Enforcement
Working Group, et al., Defendant-Intervenors.

Slip Op. 22-152
|
Court No. 21-00581
|
December 21, 2022

**Synopsis**
**Background:** Importer filed suit challenging scope ruling by Department of Commerce, determining that heat-treated T-series aluminum sheet was covered by antidumping duty (ADD) and countervailing duty (CVD) orders on common alloy aluminum sheet from the People's Republic of China.

**Holdings:** The Court of International Trade, Mark A. Barnett, Chief Judge, held that:

scope of ADD and CVD orders was ambiguous;

Commerce's finding that phrase "3XXX-series," in ADD and CVD orders, included unregistered alloys, was not supported by substantial evidence;

Commerce's determination that importer's heat-treated T-series aluminum sheet was a clad product was supported by substantial evidence;

Commerce's finding that heat-treatability was irrelevant to whether importer's product was within scope of ADD and CVD orders was not supported by substantial evidence;

importer waived its challenge to one ex parte memorandum issued by Commerce; and

another ex parte memorandum challenged by importer was sufficient on its face.

Remanded.

**Procedural Posture(s):** Review of Administrative Decision.

**Attorneys and Law Firms**

**\*1326** Daniel J. Cannistra, Crowell & Moring LLP, of Washington, DC, argued for Plaintiff. With him on the brief was Pierce J. Lee.

Alison S. Vicks, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Kyle S. Beckrich, Trial Attorney. Of counsel on the brief was Leslie M. Lewis, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Joshua R. Morey and John M. Herrmann, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor. With them on the brief was Paul C. Rosenthal.

**OPINION AND ORDER**

Barnett, Chief Judge:

This action involves a challenge to a U.S. Department of Commerce ("Commerce" or "the agency") scope determination for the antidumping duty ("ADD") and countervailing duty ("CVD") orders on common alloy aluminum sheet ("CAAS") from the People's Republic of China ("China"). *See* Compl., ECF No. 4; *Common Alloy Aluminum Sheet From the People's Republic of China,* 84 Fed. Reg. 2,813 (Dep't Commerce Feb. 8, 2019) (ADD order); *Common Alloy Aluminum Sheet From the People's Republic of China,* 84 Fed. Reg. 2,157 (Dep't Commerce Feb. 6, 2019) (CVD order) (together, "the *China CAAS Orders*"); [1] Confid. Final Scope Ruling Determination: Valeo's Heat Treated T-Series Aluminum Sheet, A-570-073, C-570-074 (Oct. 15, 2021) ("Final Scope Ruling"), CR 15, PR 40, CJA Tab 26. [2]

Plaintiff Valeo North America, Inc. ("Valeo") challenges Commerce's determination that its T-series aluminum sheet is covered by the scope of the *China CAAS Orders.* Confid. Mot. for Pl. [Valeo] for J. on the Agency R., ECF No. 23, and

Valeo North America, Inc. v. United States, 610 F.Supp.3d 1322 (2022)

accompanying Confd. Pl.'s Mem. in Supp. of **\*1327** Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 23-2; Pl.'s Reply Mem in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Reply"), ECF No. 35. Defendant United States ("the Government") and Defendant-Intervenors [3] urge the court to sustain Commerce's scope ruling. Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Opp'n"), ECF No. 30; Confd. Def.-Ints.' Resp. Br. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def-Ints.' Opp'n"), ECF No. 31. For the following reasons, the court remands Commerce's Final Scope Ruling.

## BACKGROUND

### I. Legal Framework for Scope Determinations

Because the descriptions of merchandise covered by the scope of an antidumping or countervailing duty order must be written in general terms, questions may arise as to whether a particular product is included within the scope of an order. *See* 19 C.F.R. § 351.225(a) (2020). [4] When such questions arise, Commerce's regulations direct it to issue "scope rulings" that clarify whether the product is in-scope. *Id.* Although there are no specific statutory provisions that govern Commerce's interpretation of the scope of an order, Commerce is guided by case law and agency regulations. *See Meridian Prods., LLC v. United States,* 851 F.3d 1375, 1381 (Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language. *See, e.g., OMG, Inc. v. United States,* 972 F.3d 1358, 1363 (Fed. Cir. 2020). If the scope language is unambiguous, "the plain meaning of the language governs." *Id.* If, however, the language is ambiguous, Commerce interprets the scope "with the aid of" the sources set forth in 19 C.F.R. § 351.225(k)(1) (referred to as a "(k)(1) analysis" or the "(k)(1) sources"). *Meridian Prods.,* 851 F.3d at 1382 (citation omitted). Subsection (k)(1) directs Commerce to consider the descriptions of the subject merchandise in the petition, initial investigation, and prior determinations by Commerce (including scope determinations) or the U.S. International Trade Commission ("ITC"). 19 C.F.R. § 351.225(k)(1). If the (k)(1) sources are dispositive, Commerce may issue its ruling based solely on the party's application and the (k)(1) sources. 19 C.F.R. § 351.225(d). [5] In all other cases, Commerce will initiate a scope inquiry and may consider the factors enumerated in subsection (k) (2) of the regulation (referred to as "the (k)(2) factors").

*See Meridian Prods.,* 851 F.3d at 1382 (citing 19 C.F.R. § 351.225(k)(2)); [6] *see also* **\*1328** 19 C.F.R. § 351.225(e) (providing for Commerce to initiate a scope inquiry).

### II. Administrative Proceedings and Procedural History

Commerce issued the *China CAAS Orders* in February 2019. 84 Fed. Reg. at 2,813; 84 Fed. Reg. at 2,157. The scope of the *China CAAS Orders* covers, *inter alia:*

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

84 Fed. Reg. at 2,815; 84 Fed. Reg. at 2,158-59. [7]

On May 1, 2020, Valeo submitted its first scope ruling request. Req. for Scope Ruling on Heat-Treated T-Series Aluminum Sheet, Case No. A-570-073 (May 1, 2020) ("First Ruling Req."), CR 1, PR 1, CJA Tab 1. The domestic interested parties ("DIPs")—Defendant-Intervenors here— filed comments on the First Ruling Request. Domestic Industry's Resp. to Scope Ruling Request by Valeo Group (May 27, 2020) ("First DIPs Cmts."), CR 2-4, PR 9-11, CJA Tab 2. On June 3, 2020, Commerce rejected the First Ruling Request as improperly filed pursuant to Commerce's regulations. Rejection of Reqs. for a Scope Inquiry on Heat-Treated T-Series Aluminum Sheet (June 3, 2020), PR 12, CJA Tab 3.

On June 4, 2020, Valeo resubmitted its scope ruling request. Req. for Scope Ruling on Heat-Treated T-Series Aluminum Sheet, Case No. A-570-073 (June 4, 2020) ("Second Ruling Req."), CR 5, PR 14, CJA Tab 5. On June 12, 2020, Commerce held a telephone conference with counsel for the DIPs and placed on the record a summary of the *ex parte* meeting. Tel. Meeting Re: Scope Inquiry on Valeo Group's Heat-Treated T Series CAAS (June 17, 2020) ("June 17 *Ex Parte* Mem."), PR 16, CJA Tab 7. Valeo and the DIPs submitted various filings regarding Valeo's application. Rebuttal Cmts. to Pet'rs' Cmts. on Valeo's Scope Ruling Req. (June 15, 2020) ("Valeo Rebuttal Cmts."), CR 6, PR 15, CJA Tab 6; [DIPs] Resp. to [Valeo's] Rebuttal Cmts. (June 25, 2020) ("Second DIPs Cmts."), CR 7, PR 17, CJA Tab 8; Resp. to the [DIPs] Cmts. on Valeo's Rebuttal Cmts. (July 9, 2022), PR 22, CJA Tab 10.

On July 20, 2020, Commerce issued a supplemental questionnaire to Valeo seeking additional information about the T-series aluminum sheet. Suppl. Questionnaire on Heat-Treated T-series Aluminum Sheet (July 20, 2020), CR 9, PR 23, CJA Tab 11. Commerce requested that Valeo explain why its T-series aluminum sheet **\*1329** should not be considered a clad product when Valeo described the product as containing both "a 'center layer' " and "outer layers." *Id.* at 3, Qu. 4.

On August 7, 2020, Valeo resubmitted its application. Req. for Scope Ruling and Resp. to Suppl. Questionnaire on Heat-Treated T-Series Aluminum Sheet, Case No. A-570-073 (August 7, 2020) ("Third Ruling Req."), CR 10, PR 24, CJA Tab 12. The DIPs responded to Valeo's application. [DIPs] Resp. to [Valeo's] Resubmitted Scope Ruling Request (Aug. 24, 2020) ("Third DIPs Cmts."), CR 11, PR 25, CJA Tab 13. On February 3, 2021, Commerce rejected Valeo's Third Ruling Request and again requested additional information. Second Suppl. Questionnaire on Heat-Treated T-Series Aluminum Sheet (Feb. 3, 2021), CR 12, PR 30, CJA Tab 17.

On March 24, 2021, Valeo submitted its scope request. [Resp. to] Req. for Add'l Info., Case No. A-570-073 (March 23, 2021) ("Fourth Ruling Req."), CR 13, PR 31, CJA Tab 18.[8] Commerce accepted this request as a complete scope ruling application. *See* Final Scope Ruling at 2.

On April 19, 2021, Commerce held a virtual meeting with counsel for the DIPs and memorialized the *ex parte* meeting on the record. Meeting with Couns. for the Domestic Indus.

(Apr. 22, 2021) ("Apr. 22 *Ex Parte* Mem."), PR 33, CJA Tab 19. On May 11, 2021, Valeo requested additional information about the *ex parte* meeting, and, on May 27, 2021, Commerce responded. *See* Resp. to Dep't's Mem. Regarding Pet'r's *Ex Parte* Meeting (May 11, 2021), CR 14, PR 35, CJA Tab 21; Letter from Commerce to Valeo Group (May 27, 2021) ("May 27 Commerce Ltr."), PR 36, CJA Tab 22.

During the administrative proceeding, Commerce issued seven extensions of the regulatory deadline for issuing its scope determination. *See* Final Scope Ruling at 2 & nn.9, 13. On October 15, 2021, Commerce issued its Final Scope Ruling.[9]

Commerce issued its affirmative decision pursuant to 19 C.F.R. § 351.225(d) and (k)(1). *See id.* at 10. Commerce concluded that Valeo's T-series aluminum sheet is covered by the scope of the *China CAAS Orders* because it "is a flat aluminum product" with a thickness of "6.3 mm or less, but greater than 0.2 mm," and "is a multi-alloy, clad aluminum sheet produced from an aluminum core that has a primary alloying element of manganese, i.e., a 3XXX-series core." *Id.* at 11. Discussed further below, Commerce's determination turned on whether Valeo's T-series aluminum sheet constitutes a clad product and whether it has a 3XXX-series core.

### Clad Product

In the underlying proceeding, Valeo asserted that its product should be considered **\*1330** heat-treated and excluded from the scope. *See id.* at 11. Valeo argued that "a clad product" has "discrete layers of distinct metals and alloys that are metallurgically bonded." *Id.* at 11 & n.91 (citing Second Ruling Req. at 10). Valeo distinguished a clad product from a heat-treated product, which Valeo described as "a singular, not composite, aluminum product" in which "the individual layers los[e] their original chemistries" during heat treatment such that a "new alloy" is formed "with a unique chemistry." *Id.* at 12 & n.93 (citing Second Ruling Req. at 10).

The DIPs argued that Valeo's product is instead a clad product covered by the scope. *Id.* at 11. The DIPs argued that "thermal treatment" may result in "some diffusion between the core and cladding layer" such that "it is not the case that each layer [of a clad product] retains its original chemistry." *Id.* at 12 & n.95 (citing First DIPs Cmts. at 8-9; Third DIPs Cmts. at 4). Commerce credited the DIPs argument regarding the potential for diffusion in a clad product because it was supported by

documentation from the Aluminum Association. *Id.* at 12 & n.96 (citing First DIPs Cmts. at 9; Third DIPs Cmts. at 4). [10]

Commerce considered whether "Valeo's T-series aluminum sheet should be considered a clad or heat-treated product," and concluded that it is a clad product. *Id.* at 12. [11] Commerce based this finding on evidence that the constituent "layers [of Valeo's T-series aluminum sheet] maintain their separate chemistries because the phases of diffused alloys have a larger manganese content toward the center ... and a larger silicon content toward the surface." *Id.* at 12 & n.101 (citing Fourth Ruling Req., Attach. II, Qu. 11). Commerce found that Valeo had not shown that the "integration between the outer layer and center core of T-series aluminum sheet" exceeded that which could be ascribed to a clad product. *Id.* at 12-13.

### 3XXX-Series / As Designated by the Aluminum Association

Valeo argued that its product is manufactured "from a proprietary alloy core" that cannot be considered a 3XXX-series core and is, therefore, out-of-scope. *Id.* at 13. Valeo further argued that the phrase "as designated by the Aluminum Association" would be rendered superfluous if Commerce interpreted the scope "to include unregistered alloys." *Id.* at 14. Commerce rejected both arguments.

Commerce explained that the Aluminum Association uses "a four-digit numerical system for designating registered aluminum alloys," pursuant to which "[t]he first of the four digits in the designation system indicates the alloy group, also called the series." *Id.* at 11. The alloys are "grouped by majoring alloying elements" as indicated in the following chart, reproduced from Commerce's scope ruling:

**\*1331**

| Aluminum, 99.00 percent and greater ...1xxx |
| --- |
| Aluminum alloys grouped by majoring alloying elements |

| | |
| --- | --- |
| Copper ...2xxx | |
| Manganese ... 3xxx | |
| Silicon ...4xxx | |
| Magnesium ...5xxx | |
| Magnesium and Silicon ...6xxx | |
| Zinc ...7xxx | |
| Other elements ...8xxx | |
| Unused series ...9xxx.[87] | |

*Id.* at 11 & n.87 (citing Second Ruling Req., Ex. 3 at 28); *see also id.* at 13-14 & nn.104-05 (citing same). [12] Commerce relied on the Teal Sheets to find that Valeo's proprietary

core "corresponds to 3xxx-series aluminum alloy because the major alloying element is manganese." *Id.* at 14 & n. 106 (citing Third Ruling Req., Attach. 2 at 3).

Commerce disagreed with Valeo that Aluminum Association designations are limited to registered alloys. *Id.* at 14. Commerce relied on a declaration issued by the Aluminum Association's Vice President for Standards and Technology to find "that an alloy with a principal alloying element corresponding to the Aluminum Association's alloy series is generally referred to by the applicable series designation" even when the alloy is unregistered. *Id.* at 14 & n.111 (citing First DIPs Cmts., Attach. 6 (Decl. of John Weritz (May 27, 2020) ("Weritz Decl.")) ¶ 7).

Consistent with this interpretation, Commerce found that the phrase "as designated by the Aluminum Association" refers solely "to the <u>series</u> of the aluminum alloy" and clarifies the meaning of "a 1xxx, 3xxx, or 5xxx-series alloy." *Id.* at 14. Commerce stated that this interpretation of the scope language is consistent with documentation in the underlying ADD and CVD investigations in which "Commerce refer[red] to a four-digit numerical designation as a 'specific-alloy' and a one-digit alloy series as an 'alloy' and as a 'series alloy.' " *Id.* at 15 & n.115 (citing Factual Information Relevant to the Final Scope Ruling Determination: Valeo's Heat-Treated T-Series Aluminum Sheet (Oct. 15, 2021) ("Commerce Factual Information"), Attach. 1 (Mem. Re: Prod. Characteristics for the [ADD] Investigation of [CAAS] from [China] (Feb. 1, 2018) ("Prod. Characteristics Mem.")), PR 41, CJA Tab 27). [13]

Commerce also addressed Valeo's argument that because the Aluminum Association **\*1332** "classifies 3xxx ... series aluminum alloys as non-heat-treatable," Valeo's proprietary core cannot be considered a 3xxx-series alloy because it is heat-treated. *Id.* at 17. Commerce noted that Valeo has not established that its product is heat-treated, but that even if it had, evidence demonstrates that the Aluminum Association determines the series in which an "alloy falls based on its aluminum content and/or principal alloying agent" and not on heat-treatability. *Id.* at 17 & n.127 (citing Weritz Decl.). Further, while the ITC, in its injury report, stated that "heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope," *id.* at 17 & n.129 (citing Second Ruling Req. at 13–14), [14] Commerce found that the ITC's statement did not demonstrably apply "beyond the alloy series that the ITC identified as heat-treatable (e.g., 6xxx-series)," *id.* at 18. Commerce acknowledged the ITC's characterization of "1xxx, 3xxx, and 5xxx-series alloys [as]

non heat‑treatable," *id.* at 17 & nn.130-31 (citing, *inter alia,* USITC Pub. 4861 at I‑13), and that additional record evidence is consistent with the ITC's characterization, *id.* at 18 & n.133 (citing Second DIPs Cmts., Attach. 1 (Decl. of John Weritz (June 24, 2020) ("Second Weritz Decl.")) ¶ 7).

Lastly, Commerce rejected Valeo's argument that the term "common" should be defined as "known to the community" and Valeo's corresponding argument that the scope therefore excludes proprietary alloys. *Id.* at 21 & n.152 (citing Second Ruling Req. at 16). Commerce explained that "[t]he scope includes all products which meet the physical description of the scope and do not otherwise qualify for an exclusion." *Id.* at 21. [15]

On November 12, 2021, Valeo commenced this action. Summons, ECF No. 1; Compl. Valeo's motion is fully briefed, and the court heard oral argument on November 10, 2022. Docket Entry, ECF No. 46.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2) (B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2018), [16] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial **\*1333** evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

"[W]hether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that [the court] review[s] de novo. *Meridian Prods.,* 851 F.3d at 1382. Whether a product is covered by the language of the scope is "a question of fact reviewed for substantial evidence." *Meridian Prods.,* 851 F.3d at 1382; *see also OMG, Inc.,* 972 F.3d at 1363-64 (discussing the standard of review).

"Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders." *King Supply Co., LLC v. United States,* 674 F.3d 1343, 1348 (Fed. Cir. 2012). Nevertheless, "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States,* 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citation omitted).

## DISCUSSION

Valeo raises several challenges to Commerce's determination. As discussed herein, Valeo argues that Commerce (1) exceeded the bounds of a (k)(1) analysis; (2) failed to adequately support its findings (a) that the term "3XXX‑series" covers unregistered alloys, (b) that T‑series aluminum sheet is a clad product rather than a heat‑treated product, or (c) that any such heat‑treatment does not remove T‑series aluminum sheet from classification as a 3XXX‑series alloy; and (3) failed to disclose factual information presented in purportedly unlawful *ex‑parte* meetings. *See* Pl.'s Mem. at 15-20, 22-39; Pl.'s Reply at 3-15, 17-23.

Valeo's arguments concerning Commerce's reliance on 19 C.F.R. § 351.225(k)(1) and determination not to initiate a scope inquiry are relevant to Valeo's arguments concerning the lack of record support for Commerce's determination that the term "3XXX‑series" covers unregistered alloys. Thus, the court discusses those issues together. The court then addresses Valeo's arguments concerning Commerce's interpretation of the term "clad" and the relevance of heat‑treatment. Next, the court addresses Commerce's *ex parte* communications.

### I. Commerce's Interpretation of the Phrase "3XXX‑Series Core"

This issue comprises two parts: whether Commerce's interpretation of the scope terms "3XXX‑series core" in conjunction with "as designated by the Aluminum Association" is in accordance with the law governing a (k)(1) analysis and whether Commerce supported its interpretation with substantial evidence.

#### A. Parties' Contentions

Valeo contends that Commerce's determination was unlawful insofar that Commerce exceeded the limits of a (k)(1) analysis in resolving Valeo's ruling request. Pl.'s Mem. at 15-20; *see also* Pl.'s Reply at 4-5. [17] Valeo acknowledges that Commerce may consult trade usage to interpret scope terms, *see id.* at 20 (citing **\*1334** *ArcelorMittal Stainless Belgium N.V. v. United States,* 694 F.3d 82, 88 n.8 (Fed. Cir. 2012)), but contends that Commerce went beyond (k)(1) sources to define and apply scope and non‑scope terms, *see* Pl.'s Mem. at 19-20. Valeo also faults Commerce for relying on the Weritz Declaration based on the Aluminum Association's status as a

domestic interested party and defendant-intervenor here. Pl.'s Reply at 19.

Valeo further contends that Commerce's interpretation of the term "3xxx-series" to include unregistered alloys is unsupported by substantial evidence. Pl.'s Mem. at 22. Valeo argues that the "Aluminum Association nomenclature system is limited to registered alloys and the chemical content of registered designations." *Id.* at 22; *see also id.* at 23-24. Valeo asserts that its proprietary alloy core "is not designated by the Aluminum Association as a 3xxx-series alloy" or a defined variation thereof, and, thus, Commerce impermissibly expanded the scope of the *China CAAS Orders* to include Valeo's product. *Id.* at 27; *see also* Pl.'s Reply at 6-8. [18]

The Government contends that Commerce issued its ruling in compliance with 19 C.F.R. § 351.225(d) because it relied solely on the scope terms, (k)(1) sources, and Valeo's scope application. *See* Def.'s Opp'n at 24. The Government further contends that Commerce's reliance on "industry standards" to interpret scope terms and consideration of record evidence was lawful and consistent with Commerce's obligation to "make its determination based on the entire record." *Id.* at 25. The Government contends that Commerce permissibly analyzed certain characteristics of Valeo's T-series aluminum sheet to address the distinctions Valeo drew between its product and the subject merchandise. *See id.* at 27-28. [19] The Government also contends that Commerce permissibly relied on the Weritz Declaration as "evidence of the industry standard" in conjunction with the product characteristics memorandum from the investigation to support its scope interpretation. *Id.* at 31-33.

Defendant-Intervenors likewise contend that Commerce properly relied on Aluminum Association publications and "information on the physical characteristics of Valeo's merchandise" contained in Valeo's submissions to issue its ruling. Def-Ints.' Opp'n at 15. Defendant-Intervenors further contend that any delay in Commerce's issuance of the scope ruling stemmed from Valeo's failure to issue "a clear scope ruling application" and the need for "additional information." *Id.*

### B. Analysis

As noted above, whether an ambiguity exists is a question of law that the court considers *de novo.* **\*1335** *Meridian*

*Prods.*, 851 F.3d at 1382. The phrase "3XXX-series" is not defined in the scope except in reference to the phrase "as designated by the Aluminum Association," which is also undefined. Commerce is correct that the latter phrase aids in the interpretation of the former. *See* Final Scope Ruling at 14. The scope is ambiguous, however, as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association. For the reasons discussed below, Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence.

First, Commerce's reliance on the Teal Sheets to interpret "3XXX-series" to include unregistered alloys fails to account for the Teal Sheets as a whole. *See* Final Scope Ruling at 13–14. [20] The Teal Sheets contain "designations and chemical composition limits for wrought aluminum and wrought aluminum alloys *registered with* The Aluminum Association. Numerical designations are assigned in accordance with the Recommendation—International Designation System for Wrought Aluminum and Wrought Aluminum Alloys," which is printed on pages 31 to 32 of the Teal Sheets (referred to herein as the "Recommendation"). Foreword to the Teal Sheets (emphasis added). Thus, from the outset, the Teal Sheets use the term "designation" to refer to registered alloys. Note 1 to the Recommendation "describes a four-digit numerical system for designating wrought aluminum and wrought aluminum alloys." *Id.* at 31. Note 2 to the Recommendation lists the alloy groups recognized by the Aluminum Association and states that "[t]he *first* of the four digits *in the designation* indicates the alloy group." *Id.* (emphasis added). In Note 4, the Recommendation states that "[t]he alloy designation in the 2xxx through 8xxx groups is determined by the alloying element ... present in the greatest mean percentage." *Id.* The Recommendation then goes on to explain the basis for the second, third, and fourth digits in the designation. *Id.* Thus, when read as a whole, the Aluminum Association's use of "3" in "3XXX" in the list of alloy groups indicates a major alloying element of manganese while contemplating the addition of three more digits to complete the four-digit designation. *See id.* [21] Accordingly, while it *may* be true that an aluminum **\*1336** alloy containing a major alloying element of manganese that is submitted to the Aluminum Association for a designation would receive a designation in the 3XXX-series, Commerce has not identified

anything in the Teal Sheets that indicates the Aluminum Association applies this framework to unregistered alloys.

Commerce next relied on the Weritz Declaration to buttress its interpretation. *See* Final Scope Ruling at 14. Commerce's reliance on the Weritz Declaration as evidence of trade usage of the phrase "3XXX-series" is, however, unlawful and unsupported by substantial evidence.

"A petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation." *Fedmet Res. Corp. v. United States,* 755 F.3d 912, 921 (Fed. Cir. 2014). Moreover, "(k)(1) sources are afforded primacy in the scope analysis ... because interpretation of the language used in the orders must be based on the meaning given to that language *during the underlying investigations.*" *Id.* (emphasis added). While Commerce— and the court—may consider trade usage to ascertain the intended meaning of scope terms, *see ArcelorMittal,* 694 F.3d at 88 & n.8, the Weritz Declaration is not a trade publication of the type considered in *ArcelorMittal.*[22] Instead, the declaration was prepared by an interested party specifically for purposes of the scope proceeding. *See* Weritz Decl. ¶¶ 3-5. Commerce failed to acknowledge the source of the declaration, instead referring to the document generally as "[r]ecord information," Final Scope Ruling at 14, and thus failed to adequately support the agency's reliance on the declaration as an indicator of trade usage that properly informs the intended meaning of the scope terms. *Cf. Mid Continent Nail Corp. v. United States,* 725 F.3d 1295, 1303-04 (Fed. Cir. 2013) (finding "subsequent comments made by the petitioners" irrelevant "under subsection 351.225(k)(1)" when "Commerce did not address the comments during the investigation").[23] Commerce's reliance on the Weritz Declaration is therefore unlawful.

Additionally, the Weritz Declaration's attempt to connect Aluminum Association designations (and, thus, the meaning **\*1337** of the phrase "as designated by the Aluminum Association") to an alloy series or group alone and, thereafter, to unregistered alloys based on the primary alloying element that *would be considered* when the alloy is submitted for a designation, *see* Weritz Decl. ¶¶ 6-7, is undermined by the manner in which the Aluminum Association uses the term "designation" in the Teal Sheets, as set forth above. Commerce's findings in reliance on the Weritz Declaration are therefore unsupported by substantial evidence.[24]

Lastly, Commerce's reliance on the product characteristics memorandum fails to persuade the court that Commerce's interpretation was supported by substantial evidence. *See* Final Scope Ruling at 15. In the cited memorandum, Commerce requested information from the respondents in the underlying investigation. *See* Prod. Characteristics Mem. at 1. In Field Number 2.1, titled "Specific Alloy," Commerce asked respondents to "[r]eport the appropriate series grade number for the aluminum sheet (e.g., 3003)." *Id.* at 3. In Field Number 3.1, titled "Alloy," Commerce requested respondents to "[r]eport the code based on the requirements of the appropriate grade series noted above." *Id.* at 4. Commerce provided the following information to guide reporting:

| DESCRIPTION: | 1000 = All 1000-series alloys |
| | 3000 = All 3000-series alloys |
| | 5000 = All 5000-series alloys, unless code 5500 applies |
| | 5500 = All 5000-series alloys for which the minimum required percentage content of magnesium is over 3.00 percent (regardless of the actual magnesium content) (e.g., 5083, 5086, etc.) |

*Id.*

Commerce found support in Field Number 3.1 through its use of the phrase "series alloy." Final Scope Ruling at 15. Commerce contrasted its use of series-based reporting in Field Number 3.1 with its use of the phrase "specific alloy" in Field Number 2.1 to find that the phrase "series alloy" in the scope means "a one-digit alloy series" and not "a specific four-digit numerical alloy designation." *Id.* Field Number 3.1 does not, however, indicate that Commerce contemplated the respondents reporting alloys lacking a four-digit code in accordance with the referenced codes and series. In fact, Commerce's reference to specific four-digit codes in the description (5500, 5083, 5086) indicates the opposite. *See* Prod. Characteristics Mem. at 4. Moreover, while Commerce used the phrases "series alloy" and "3XXX-series" in the scope, it did so in conjunction with the phrase "as designated by the Aluminum Association." The product characteristics memorandum does not address or contain the latter phrase and, thus, does not "definitively answer the scope question." *Sango Int'l L.P.,* 484 F.3d at 1379.

In sum, Commerce's interpretation of the phrase "3XXX-series" in conjunction **\*1338** with "as designated by the Aluminum Association" to include unregistered aluminum alloys with a major alloying element of manganese is unlawful insofar as Commerce relied on the Weritz Declaration and is unsupported by substantial record evidence.[25] Commerce's Final Scope Ruling is therefore remanded.[26] On remand, if Commerce continues to rely on (k)(1) sources, it must reconsider and further explain its

ruling pursuant to 19 C.F.R. § 351.225(d) consistent with this opinion. Alternatively, Commerce may determine to conduct a scope inquiry pursuant to 19 C.F.R. § 351.225(e). [27]

## II. Commerce's Discussion of the Relevance of Heat-Treatment

Commerce examined Valeo's arguments concerning heat-treatment both in the context of addressing the distinction between clad and non-clad products and when responding to Valeo's argument that 3XXX-series alloys are not heat-treatable. The court discusses these issues, and the need for further explanation, in tandem.

### A. Parties' Contentions

Valeo contends that Commerce impermissibly regarded heat-treatment and cladding as mutually exclusive. Pl.'s Mem. at 28-29, 31. Valeo further contends that the record establishes that its T-series aluminum sheet is heat-treated and not simply annealed, and that, because its product is heat-treated, it is out-of-scope regardless of whether it is a clad product. *Id.* at 29-31.

By way of support, Valeo points to statements by the ITC during the investigation. Valeo contends that Commerce failed to consider the ITC's assertion that "heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope." Pl.'s Mem. at 34 (citing USITC Pub. 4861 at I-18). Valeo also contends that the ITC's statement indicates that "heat-treated aluminum sheet," such as Valeo's, is out of scope, and that the ITC explicitly characterized 3XXX-series alloys as "non-heat-treatable." *Id.* at 35.

The Government contends that substantial record evidence supports Commerce's **\*1339** determination that Valeo's T-series aluminum sheet is a clad product despite "some diffusion between the core and cladding layer." Def.'s Opp'n at 18. According to the Government, the distinction Commerce drew between clad products and heat-treated products was "responsive to Valeo's arguments that its product is not clad because it is heat-treated," *id.* at 20, and, in fact, that Commerce recognized that Valeo's T-series aluminum sheet "undergoes heat-treatment processes," *id.*

The Government further contends that Commerce considered and correctly interpreted the ITC's findings not to imply an exclusion for heat-treated 3XXX-series series alloys.

*Id.* at 35-36. The Government argues that record evidence demonstrates that the Aluminum Association links alloys with groups or series "based on its aluminum content and/or principal alloying agent." *Id.* at 37. The Government pointed to alloy 4643 as an example of an alloy that is heat-treatable notwithstanding the Aluminum Association's classification of 4XXX-series alloys as non-heat-treatable. *Id.* at 37-38. Thus, the Government contends, Valeo has not shown "why its proprietary aluminum alloy" is "precluded from being considered a 3XXX-series aluminum based on its heat-treatability." *Id.* at 38.

Defendant-Intervenors contend that because substantial evidence supports Commerce's determination that Valeo's T-series aluminum sheet is a clad product, "Valeo's arguments concerning 'heat-treatable' alloys are irrelevant." Def-Ints.' Opp'n at 17-18. Defendant-Intervenors also contend that Commerce has previously recognized that the ITC's reference to 6XXX-series alloys pertained solely to "not clad aluminum sheet" and, thus, "do not encompass" Valeo's clad product. *Id.* at 17. Defendant-Intervenors argue that although Commerce may consider ITC determinations in a (k)(1) analysis, such determinations "cannot overcome the plain scope language or [Commerce's] own scope interpretation." *Id.* at 19.

### B. Analysis

Commerce's determination that Valeo's T-series aluminum sheet is a clad product is supported by substantial evidence. However, Commerce's response to Valeo's argument concerning the heat-treatability of 3XXX-series alloys requires further explanation.

In the underlying proceeding, Valeo presented Commerce with definitions of clad products and heat-treated products that appeared to be in conflict. *See* Final Scope Ruling at 11-12. On the one hand, Valeo argued, a clad product contains "discrete layers of distinct metals and alloys that are metallurgically bonded." *Id.* at 11. On the other hand, Valeo argued, a heat-treated product may begin with "layers that bond during the heat-treatment, resulting in ... a new alloy with a unique chemistry." *Id.* at 12. The DIPs presented Commerce with evidence that a clad product can contain some "diffusion between the core and cladding layer" as a result of "thermal treatment." *Id.* at 12 & n.96 (citing First DIPs Cmts. at 9; Third DIPs Cmts. at 4). Commerce accepted the DIPs position as backed by industry standards, *id.*, and found, based on record evidence, that Valeo's T-series aluminum

sheet constitutes a clad product, *id.* at 12-13. Valeo does not identify record evidence undermining Commerce's findings. Thus, Commerce's determination that Valeo's product is a clad product is supported by substantial evidence.

That finding does not, however, end the inquiry. If Commerce continues to find, on **\*1340** remand, that the scope terms are reasonably interpreted to include unregistered alloys, Commerce must further address Valeo's arguments regarding heat-treatment.

Commerce explained that "the Aluminum Association 'determines which of the eight groupings (or series) into which the alloy falls based on its aluminum content and/or principal alloying agent" and *not* heat-treatability. Final Scope Ruling at 17 & n.127 (citing Weritz Decl.). Commerce's reliance on the Weritz Declaration fails as a matter of law for the reasons set forth above. Moreover, while it may be true that the Aluminum Association would consider the principal alloying element to determine the alloy group for an alloy submitted for a registered designation, *see* Teal Sheets at 31, that alone is not substantial evidence for Commerce's finding that heat-treatability is irrelevant.

Commerce attempted to support its explanation with evidence purportedly showing that alloy 4643 is heat-treatable, despite 4XXX-series alloys being classified as non-heat-treatable by the Aluminum Association. Final Scope Ruling at 17 & n.128 (citing Valeo Rebuttal Cmts., Exs. 1, 3). Commerce thus found that heat-treatment does not preclude characterization as a 3XXX-series alloy even if such alloys are otherwise characterized as non-heat-treatable. *See id.* (finding that, even if Valeo's product "was heat-treated, ... record evidence contradicts Valeo's conclusion that a heat-treatable alloy that otherwise meets the criteria of [a 3xxx-series alloy] would be precluded from being classified as such"). Commerce's reliance on 4XXX-series alloys to find heat-treatability non-dispositive as to alloy series is unpersuasive.

Exhibit 3 to Valeo's Rebuttal Comments explains that certain 4XXX-series alloys are heat-treatable (such as alloy 4643) whereas others (such as alloys 4043 and 4047) are not. Valeo Rebuttal Cmts., Ex. 3 at 1-2; *see also id.,* Ex. 1 (listing "[c]old work" as the "[s]trengthening method" for 4XXX series alloys with the notation "some heat treat," indicating that some 4XXX-series alloys are heat-treated). Information provided by the DIPs likewise states that 4XXX-series alloys are "the *only* alloy series that consists of both heat-treatable *and* not heat-treatable alloys." Second DIPs Cmts. at 8

(emphasis added). Commerce's explanation did not account for this industry-recognized characteristic of 4XXX-series alloys. Moreover, to the extent that the record shows that 3XXX-series alloys are not heat-treatable,[28] unlike 4XXX-series alloys, the record does not indicate that there are exceptions within the 3XXX-series alloys. *See id.* Thus, it appears that heat-treatability could be relevant to whether an alloy may be considered a 3XXX-series alloy and covered by the scope of the *China CAAS Orders.*

To the extent that Commerce also construed the ITC's determination to indicate that heat-treatability was irrelevant to scope coverage beyond the 6XXX-series alloys, that reasoning is misplaced. *See* Final Scope Ruling at 18. The ITC listed 6XXX-series alloys as an example of excluded heat-treated sheet—not the universe thereof. *See* USITC Pub. 4861 at I-18 ("[H]owever, heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope.").

 **\*1341**  Underlying the court's difficulty in discerning the path of Commerce's reasoning is the lack of any explanation by Commerce regarding the meaning of the phrases "heat-treated" or "heat-treatable" for purposes of understanding the relevance of thermal treatment to classification as a 3XXX-series alloy. Commerce appeared to consider the question whether the scope contains an *exclusion* for heat-treatable 3XXX-series alloys, *see* Final Scope Ruling at 18 (finding no such exclusion), when the key question is whether a heat-treated (or heat-treatable) clad sheet *can be classified as* having a 3XXX-series core and therefore be in-scope.[29] On remand, to the extent necessary to its determination, Commerce must address evidence that Valeo's product undergoes heat-treatment, *see* Fourth Ruling Req. at 4; Third Ruling Req., Attach. 2 at 4, and reconcile such evidence with evidence indicating that 3XXX-series alloys are non-heat-treatable, *see* USITC Pub. 4861 at I-13.[30]

### III. Commerce's *Ex-Parte* Meetings and Memoranda

#### A. Parties' Contentions

As noted above, Commerce held two *ex-parte* meetings with DIPs and placed summaries of the meetings on the record. June 17 *Ex Parte* Mem.; Apr. 22 *Ex Parte* Mem. Valeo contends that the memoranda Commerce placed on the record failed to adequately disclose the factual information presented at the meetings. Pl.'s Mem. at 36-39. With respect to the April 22 *Ex Parte* Memorandum, Valeo contends that the

underlying meeting involved discussions about an ongoing, related administrative review and that the memorandum should have included the review questionnaire responses discussed at the meeting. *Id.* at 37; *see also* Pl.'s Reply at 20 (arguing that the court should remand this matter for Commerce to provide "a meaningful discussion of the subject matter of those meetings").

The Government contends that Valeo waived any challenges to the June 17 *Ex Parte* Memorandum by failing to specify the deficiencies in the memorandum. Def.'s Opp'n at 39 n.6. The Government also contends that Commerce's April 22 *Ex Parte* Memorandum complied with statutory, regulatory, and other agency requirements. *Id.* at 40. The Government further contends that factual information from the administrative review was never placed on the record of this proceeding, and Commerce did not rely on such information in reaching its decision. *Id.* at 40-42.

In its reply brief, Valeo contends that Commerce's scope proceedings are governed by the Government in the Sunshine Act ("the Act"), 5 U.S.C. § 557(d)(1)(A),[31] **\*1342** and the *ex parte* communications were unlawful pursuant thereto. Pl.'s Reply at 21-23. Valeo did not respond to the Government's argument regarding waiver.

### B. Analysis

The statute requires Commerce to "maintain a record of any *ex parte* meeting between ... interested parties" and the agency "if information relating to [the relevant] proceeding was presented or discussed at such meeting." 19 U.S.C. § 1677f(a)(3). "The record of such an *ex parte* meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted. The record of the *ex parte* meeting shall be included in the record of the proceeding." *Id.; cf.* 19 C.F.R. § 351.104(a) (requiring placement of *ex parte* memoranda on the administrative record). Commerce has issued a policy statement requiring *ex parte* memoranda to "be drafted expeditiously in all cases, reviewed by a person in attendance at the meeting, and placed in the record as soon as possible, so that parties may comment effectively on the factual matters presented." *Policy Statement Regarding Issuance of Ex-Parte Memoranda,* 66 Fed. Reg. 16,906, 16,906 (Dep't Commerce Mar. 28, 2001). Additionally, "memoranda are required whether or not the factual information received was received previously, is

expected to be received later in the proceeding, or is expected to be used or relied on." *Id.*

Valeo waived its challenge to the June 17 *Ex Parte* Memorandum by failing to present substantive arguments challenging the insufficiency of the memorandum. *See United States v. Great Am. Ins. Co. of New York,* 738 F.3d 1320, 1328 (Fed. Cir. 2013). Additionally, the memorandum appears sufficient on its face. The statute requires Commerce to summarize "the matters discussed or submitted." 19 U.S.C. § 1677f(a)(3). Commerce's June 17 *Ex Parte* Memorandum summarized the "matters discussed" as the DIPs "May 28, 2020, comments on the Valeo Group's scope request." June 17 *Ex Parte* Mem. Valeo has not shown that the statute requires more.

Valeo's challenge to the April 22 *Ex Parte* Memorandum also fails. Therein, Commerce explained that, during the meeting, the DIPs discussed how a respondent's sales database in an administrative review of the underlying antidumping order related to the scope proceeding. Apr. 22 *Ex Parte* Mem. at 1. In a subsequent letter, Commerce further explained that counsel for the DIPs "did not submit any facts or reference any documents not currently on the record of the first administrative review of the antidumping duty order" and noted that the DIPs "inquired about the logistics of filing information from one segment of a proceeding to another segment of the same proceeding." May 27 Commerce Ltr. at 1-2. The agency officials in attendance referred the DIPs to the relevant agency office and further indicated that the scope ruling would be based on its own record. *See id.* Valeo asserts, without supporting authority, that "[t]he statute requires a complete and fulsome discussion of the facts presented at an *ex-parte* meeting," Pl.'s Mem. at 37, but the statute does not use those terms. While Valeo might prefer more information, the statute simply requires a "summary of the **\*1343** matters discussed." 19 U.S.C. § 1677f(a)(3). Commerce complied with that requirement and Valeo fails to identify any deficiency in Commerce's memorandum.

Valeo's reliance on the Government in the Sunshine Act, Pl.'s Reply at 21-23, is wholly misplaced.[32] The Act prohibits *ex parte* communications in certain agency proceedings. *See* 5 U.S.C. § 557(d)(1)(A)-(B). The Act applies "when a hearing is required to be conducted in accordance with section 556 of this title," *id.* § 557(a), "except to the extent required for the disposition of *ex parte* matters as authorized by law," *id.* § 557(d)(1). Commerce hearings are not, however, "subject to the provisions of subchapter II of chapter 5 of Title 5,"

which includes sections 556 and 557. 19 U.S.C. § 1677c(b); *see also* 19 C.F.R. § 351.310(d)(2) ("The hearing is not subject to 5 U.S.C. §§ 551-559 ....").[33] Moreover, both 19 U.S.C. § 1516a(b)(2)(A)(i)[34] and 19 U.S.C. § 1677f(a)(3) contemplate the occurrence of *ex parte* meetings.

At the hearing, the court asked Valeo to reconcile its reliance on the Act with the above-mentioned authorities that appear to emphatically preclude such reliance. Valeo suggested that its argument presupposed the requirement for a hearing pursuant to a scope inquiry. Oral Arg. 1:38:25-1:38:30. As explained above, however, whether Commerce conducts a hearing is beside the point because any hearing is not subject to the statutory provision—5 U.S.C. § 556—that triggers application of the Government in the Sunshine Act, *see* 5 U.S.C. § 557(a), (d)(1). Accordingly, Valeo's argument is completely lacking in merit.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Scope Ruling is remanded to the agency for further consideration in accordance with the terms of this opinion; it is further

**ORDERED** that the agency shall file its redetermination on remand on or before March 21, 2023; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

**All Citations**

610 F.Supp.3d 1322

## Footnotes

1    The administrative record associated with Commerce's scope determination is contained in public and confidential administrative records filed in the antidumping and countervailing proceedings underlying the *China CAAS Orders*. Because the relevant parts of the administrative records are identical, the court cites to the documents filed in the ADD proceeding. *See* Public ADD Index ("PR"), ECF No. 18-3; Public CVD Index, ECF No. 18-2; Confid. ADD Index ("CR"), ECF No. 18-5; Confid. CVD Index, ECF No. 18-4. Valeo submitted joint appendices containing all record documents cited in the Parties' respective Rule 56.2 briefs. *See* Confid. J.A. ("CJA"), ECF No. 40; Public J.A., ECF No. 41. The court references the confidential documents.

2    The public version of the Final Scope Ruling is filed at ECF No. 18-6.

3    Defendant-Intervenors consist of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members: Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation. Defendant-Intervenors incorporated by reference some of the Government's arguments and presented additional arguments on certain issues. *See* Def-Ints.' Opp'n at 13-21.

4    Commerce recently revised its scope regulations; the revisions apply "to scope inquiries for which a scope ruling application is filed ... on or after the effective date" of November 4, 2021. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,300, 52,327 (Dep't Commerce Sept. 20, 2021). The court cites to the prior regulations that were in effect when Valeo submitted its complete scope application.

5    To be dispositive, the (k)(1) factors "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question." *Sango Int'l L.P. v. United States,* 484 F.3d 1371, 1379 (Fed. Cir. 2007).

6    The (k)(2) factors include: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2).

7    Parties agree that the phrase "as designated by the Aluminum Association" used in the sentence to describe "not clad aluminum sheet" also modifies the phrase "3XXX-series core" appearing in the next sentence describing "clad aluminum sheet." Oral Arg. 2:10-3:20 (reflecting the timestamp from the recording on file with the court).

8    Because Valeo filed its Fourth Ruling Request after 5:00pm on March 23, 2021, Commerce considered the submission "to be filed on March 24, 2021." Final Scope Ruling at 1 n.1.

9    On November 30, 2021, Valeo voluntarily dismissed an action commenced pursuant to 28 U.S.C. § 1581 (i) in which Valeo sought to compel Commerce to issue its scope ruling and to obtain a declaratory judgment that Commerce's extensions were unlawful. *See* Notice of Dismissal, *Valeo N. Am., Inc. v. United States,* Court No. 21-cv-00426 (Nov. 30, 2021); Compl. ¶¶ 28-37, *Valeo N. Am., Inc. v. United States,* Court No. 21-cv-00426 (Aug. 17, 2021). While Valeo's reply brief alluded to the asserted completeness of the First Ruling Request, Valeo did not raise substantive claims or arguments concerning any alleged unlawfulness of Commerce's extensions in this litigation. *See* Compl. ¶¶ 49-79 (setting out Valeo's claims); Pl.'s Mem. at 13 (summary of Valeo's arguments in which Valeo asserted, without more, that it "wait[ed] more than 18 months for a determination that Commerce is required to conduct in 45 days").

10    The DIPs cited to an Aluminum Association standards publication stating that "[t]he composition of the cladding may be subsequently altered by diffusion between the core and cladding due to thermal treatment." First DIPs Cmts. at 9 (quoting First DIPs Cmts., Attach. 2 at 6-4 n.1). Attachment 2 consists of a publication titled "Aluminum standards and data 2017," issued by the Aluminum Association.

11    Commerce first found that Valeo's product is a " 'multi-alloy' product" based on Valeo's description of the product as one that contains "intermediate input layers of an outer layer of aluminum alloy 4045 that has a principal alloying element of silicon and an inner layer of a proprietary aluminum alloy that has a principal alloying element of manganese." Final Scope Ruling at 12. Valeo does not contest this finding.

12    Exhibit 3 consists of the January 2015 version of the Aluminum Association's Teal Sheets. The record also contains the August 2018 version of the Aluminum Association's Teal Sheets, which the court references and cites herein. First DIPs Cmts., Attach. 5 ("Teal Sheets").

13    Commerce disagreed with Valeo that the explicit inclusion of proprietary alloys in the scopes of other ADD and CVD orders supports a narrower interpretation of the underlying order that lacks such language. Final Scope Ruling at 15; *see also Common Alloy Aluminum Sheet From Bahrain, et al.,* 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (ADD orders) ("*Bahrain CAAS Order*"); *Aluminum Extrusions from the People's Republic of China,* 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) (ADD order) ("*China Extrusions Order*"). The *Bahrain CAAS Order* contains certain language identical to the *China CAAS Orders* with the following addition: "The use of a proprietary alloy or non-proprietary alloy that is not specifically registered by the Aluminum Association as a discrete 1xxx-, 3xxx-, or 5xxx-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope." *Bahrain CAAS Order,* 86 Fed. Reg. at 22,143. The *China Extrusions Order* covers, *inter alia,* "aluminum extrusions ... made from aluminum alloys having metallic elements corresponding to the alloy

series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)." 76 Fed. Reg. at 30,650.

14    For the referenced information, see *Common Alloy Aluminum Sheet from China,* Inv. Nos. 701-TA-591 and 731-TA-1399, USITC Pub. 4861 (Jan. 2019) (Final) ("USITC Pub. 4861") at I-18, *available at* https://www.usitc.gov/publications/701_731/pub4861.pdf (last visited Dec. 21, 2022).

15    Commerce does not cite to the source of this information but describes it as the "Preliminary Scope Memorandum." The court understands this reference to mean the preliminary scope memorandum from the investigation underlying the *China CAAS Orders. See* Commerce Factual Info., Attach. 4 (Scope Cmts. Prelim. Decision Mem. (June 15, 2018)) at 6.

16    All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and all citations to the U.S. code are to the 2018 edition, unless otherwise specified.

17    Valeo points to various pages and footnotes in the Final Scope Ruling to support its contention. Pl.'s Mem. at 19 (citing Final Scope Ruling at 11 n.86, 12 n.100, 13 n.102, 14 n.111, 18 nn.133-34). Valeo also cites page 16, note 127 of the Final Scope Ruling, which appears to be a typographical error that should instead point to page 17, note 127. *See* Pl.'s Mem. at 19.

18    Valeo further contends that the scope of the *Bahrain CAAS Order* supports its position. Pl.'s Mem. at 25-26 (citing Fourth Ruling Req. at 9). The proper interpretation of the *Bahrain CAAS Order* is not before the court. There are differences between the respective scopes, moreover, and thus, this is not a situation where Commerce has offered different interpretations of identical language. *Cf. ArcelorMittal,* 694 F.3d at 88-90 (faulting Commerce for interpreting language contained in the scope of an order covering certain stainless steel plate to be ambiguous when Commerce found the same language in an order covering cut-to-length carbon steel plate to be unambiguous).

19    The Government also contends that Commerce would have used limiting language if the agency had intended to limit the scope to registered designations. Def.'s Opp'n at 31. What Commerce *could have stated* is beside the point. The issue before the court is whether Commerce reasonably interpreted the scope language the agency *did* use.

20    At the hearing, the Government pointed to additional documentation to demonstrate use of alloy series regardless of registration status, including a document titled "Aluminum Alloys 101" published by the Aluminum Association. Oral Arg. 11:00-11:35 (citing First Ruling Req., Ex. 4 ("Aluminum Alloys 101")). In addition to being impermissibly *post hoc,* the Government's reliance on Aluminum Alloys 101 is misplaced. While the document discusses various alloy series, the document prefaces its discussion with the explanation that "[a]lloys are assigned a four-digit number, in which the first digit identifies a general class, or series, characterized by its main alloying elements." Aluminum Alloys 101 at 1. While the Government emphasizes the latter assertion, it overlooks the first clause indicating that the alloy series designation is but one number in a four-digit number assigned by the Aluminum Association. *See id.* Thus, even the Government's *post hoc* reasoning does not show that the information contained in Aluminum Alloys 101 is understood in the industry to apply to unregistered alloys.

21    This interpretation of the way the term "designation" is used in the Recommendation is consistent with Appendix A to the Teal Sheets, which explains the use and assignment of designations. *See* Teal Sheets at 33. As explained therein, "[d]esignations for a new alloy registration" are assigned based on whether the alloy has "chemical composition limits that are identical to a registered designation," represents a variation or modification of an existing alloy designation or constitutes "[a] new original designation." *Id.* The Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys

also uses the term designation to refer to a number consistent with the Recommendation that is the product of a registration with the Aluminum Association and subsequent assignment by the Aluminum Association. *See id.* at 34.

22    In that case, Commerce had relied on a standards publication produced by the American Society for Testing and Materials as evidence of trade usage. *See* Final Results of Redetermination Pursuant to Remand at 6-8 & n.4, *ArcelorMittal,* 35 CIT 796 (2011) (No. 08-434), ECF No. 60 (docket location for the agency decision reviewed in *ArcelorMittal,* 694 F.3d 82).

23    The current version of Commerce's regulation contains a new provision permitting Commerce to "consider secondary interpretive sources under paragraph (k)(1) ..., such as any other determinations of [Commerce] or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, *and any other relevant record evidence.''* 19 C.F.R. § 351.225(k)(1)(ii) (eff. Nov. 4, 2021) (emphasis added). As mentioned above, however, Commerce's Final Scope Ruling is governed by the previous version of the regulation, which lacks this provision.

24    Commerce's reliance on the Weritz Declaration stands in contrast to Commerce's reliance on the Aluminum Association's 2017 Aluminum standards and data publication to define "clad" with respect to the extent of diffusion. *See* Final Scope Ruling at 12-13 & nn.100, 102 (citing First DIPs Cmts., Attach. 2, Table 6.1). The cited publication predates the scope proceeding, represents the product of a committee composed of persons from an array of companies, and was prepared "as a guide to aid the manufacturer, the consumer, and the general public." First DIPs Cmts., Attach. 2 (acknowledgment and notice/disclaimer).

25    Valeo's arguments that Commerce exceeded the bounds of a (k)(1) analysis are premised on Commerce's reliance on the Teal Sheets and purported consideration of the physical characteristics of the T-series aluminum sheet. *See* Pl.'s Mem. at 19. Except to the extent discussed herein, Commerce's determination complied with 19 C.F.R. § 351.225(k)(1) and (d). Valeo itself submitted a copy of the Teal Sheets to support its scope application. *See* Second Ruling Req. at 7-8, Ex. 3. And while "[t]he physical characteristics of the product" constitutes a (k)(2) factor, 19 C.F.R. § 351.225(k)(2)(i), a complete scope application must contain "[a] detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number," *id.* § 351.225(c)(1)(i). Commerce's request for additional product information and consideration of such information included in Valeo's submissions in order to issue a ruling complied with section 351.225(d).

26    In its reply, Valeo argued that Statistical Note 6 to Chapter 76 provides further evidence that the phrase "as designated" has a narrow meaning in the industry. Pl.'s Reply at 10-11 (citing Fourth Ruling Req., Ex. SUPP-4, ECF pp. 789-91 (Chapter 76 and accompanying Notes)). Valeo did not present this argument to Commerce or include it in its moving brief and, therefore, the court will not address it in the first instance.

27    The court does not reach Valeo's arguments concerning the meaning of the term "common." *See* Pl.'s Mem. at 21-22. Valeo's arguments implicate the meaning of the scope terms subject to the remand and thus, the court will defer resolution of them, to the extent they remain live, until Commerce issues its remand redetermination.

28    The Aluminum Alloys 101 publication lists 3XXX-series alloys under the heading "Non Heat-Treatable Alloys." Aluminum Alloys 101 at 2-3; *cf.* USITC Pub. 4861 at I-13 (describing 3XXX-series alloys as non-heat-treatable).

29    Commerce's reliance on the Second Weritz Declaration to find that the term "heat-treatable" does not apply to 3XXX-series alloys and to find the absence of an exclusion for heat-treatable 3XXX-series alloys, *see* Final Scope Ruling at 18 & nn.133, 137 (citing Second Weritz Decl. ¶ 7), suffers from the same problems the court recognized in relation to Commerce's reliance on the Weritz Declaration. The Second Weritz Declaration is

not a type of document included in the (k)(1) sources and Commerce did not address the propriety of relying on a declaration authored and placed on the record by an interested party.

30    The ITC described two heat-treating processes (annealing and solution heat-treatment and aging) and stated that heat-treated alloys are excluded from the scope. USITC Pub. 4861 at I-18.

31    On September 13, 1976, Congress enacted "An Act to provide that meetings of Government agencies shall be open to the public, and for other purposes," P.L. No. 94-409, 90 Stat 1241 (1976), referred to as the "Government in the Sunshine Act." The Act was codified at 5 U.S.C. § 552(b) and further amended 5 U.S.C. § 557 to include subsection (d)(1), the provision on which Valeo relies.

32    Valeo raised the argument for the first time in its reply brief. At the hearing, however, the court afforded the Government and Defendant-Intervenors the opportunity to address the issue. Oral Arg. 1:40:20-1:45:25.

33    Valeo points to 19 C.F.R. § 351.310(c) as authority to request a hearing in a scope proceeding but does not address 19 C.F.R. § 351.310(d)(2). *See* Pl.'s Reply at 22.

34    Pursuant to 19 U.S.C. § 1516a(b)(2)(A)(i), the administrative record compiled in a scope proceeding may include a "record of *ex parte* meetings required to be kept by section 1677f(a)(3)."

---

End of Document                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Slip Op. 23-**157**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VALEO NORTH AMERICA, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Court No. 21-00581 |
| and | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's scope redetermination on remand for the antidumping duty and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China.]

Dated: November 8, 2023

<u>Daniel J. Cannistra</u> and <u>Pierce Lee</u>, Crowell & Moring LLP, of Washington, DC, for Plaintiff.

<u>Alison S. Vicks</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>JonZachary Forbes</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>John M. Herrmann</u>, <u>Paul C. Rosenthal</u>, and <u>Joshua R. Morey</u>, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") scope redetermination on

remand for the antidumping duty ("ADD") and countervailing duty ("CVD") orders on

common alloy aluminum sheet ("CAAS") from the People's Republic of China ("China").

*See* Confid. Final Results of Redetermination Pursuant to Court Remand ("Scope

Redetermination"), ECF No. 61-1; *Common Alloy Aluminum Sheet From the People's*

*Republic of China*, 84 Fed. Reg. 2,813 (Dep't Commerce Feb. 8, 2019) (ADD order);

*Common Alloy Aluminum Sheet From the People's Republic of China*, 84 Fed. Reg.

2,157 (Dep't Commerce Feb. 6, 2019) (CVD order) (together, "the *China CAAS*

*Orders*").[1]  The scope of the *China CAAS Orders* covers, *inter alia*:

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled
> aluminum product having a thickness of 6.3 mm or less, but greater than
> 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet
> within the scope of this order includes both not clad aluminum sheet, as
> well as multi-alloy, clad aluminum sheet.  With respect to not clad
> aluminum sheet, common alloy sheet is manufactured from a 1XXX-,
> 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.
> With respect to multi-alloy, clad aluminum sheet, common alloy sheet is
> produced from a 3XXX-series core, to which cladding layers are applied to
> either one or both sides of the core.

---

[1] The administrative records associated with Commerce's original scope ruling and the
ruling issued on remand are contained in public and confidential administrative records
filed in the ADD and CVD proceedings associated with the *China CAAS Orders*.
Because the relevant parts of the administrative records are identical, the court cites to
the documents filed in the ADD proceeding: Public ADD Index ("PR"), ECF No. 18-3;
Confid. ADD Index ("CR"), ECF No. 18-5; Public ADD Remand Record, ECF No. 64-1;
Confid. ADD Remand Record, ECF No. 64-2.  Valeo filed joint appendices containing
the record documents cited in parties' comments on the Scope Redetermination.  *See*
Public Remand J.A., ECF Nos. 72, 72-1–72-6; Confid. Remand J.A. ("CRJA"), ECF
Nos. 73 (table of contents listing eight documents), 73-1 (docs. 1–5), 73-2 through 73-5
(doc. 6), 73-6 (docs. 7–8).

84 Fed. Reg. at 2,815; 84 Fed. Reg. at 2,158.

 Commerce previously found that Plaintiff Valeo North America, Inc.'s ("Valeo") T-series aluminum sheet is covered by the scope of the *China CAAS Orders* because it is a clad aluminum product with a 3XXX-series core. *See* Confid. Final Scope Ruling Determination: Valeo's Heat Treated T-Series Aluminum Sheet, A-570-073, C-570-074 (Oct. 15, 2021) ("Final Scope Ruling") at 10–11, CR 15, PR 40, CRJA Doc. 3. Commerce issued its decision pursuant to an analysis of the sources set forth in 19 C.F.R. § 351.225(k)(1) (2020).[2] *Id.* at 10.

 In *Valeo North America, Inc. v. United States* ("*Valeo I*"), 46 CIT __, 610 F. Supp. 3d 1322 (2022),[3] the court remanded Commerce's Final Scope Ruling. While the court sustained Commerce's determination that Valeo's T-series aluminum sheet is a multi-alloy, clad product as supported by substantial evidence, *id.* at 1339, the court remanded Commerce's determination that Valeo's product has a 3XXX-series core, *id.* at 1335. The court concluded that the phrase "3XXX-series" in conjunction with "as designated by the Aluminum Association" is ambiguous as to whether Commerce intended the scope to cover unregistered alloys, such as Valeo's, with "a major alloying element corresponding to the Aluminum Association's alloy groups" or "whether

---

[2] Commerce recently revised its scope regulations; the revisions apply "to scope inquiries for which a scope ruling application is filed . . . on or after the effective date" of November 4, 2021. *Regulations To Improve Admin. and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,300, 52,327 (Dep't Commerce Sept. 20, 2021). The court cites to the prior regulations that were in effect when Valeo submitted its complete scope application.

[3] *Valeo I* presents background information on this case, familiarity with which is presumed.

Commerce intended the scope to be limited to registered alloys within the enumerated

series with four-digit designations assigned by the Aluminum Association." *Id*. at 1335.

The court also held that Commerce "exceeded the limits of a (k)(1) analysis" when it

interpreted the scope to include unregistered alloys, *id.*, and, further, instructed

Commerce to "address evidence that Valeo's product undergoes heat-treatment" and

"reconcile such evidence with evidence indicating that 3XXX-series alloys are non-heat-

treatable," *id.* at 1341.

On June 20, 2023, Commerce filed its Scope Redetermination.  Therein,

Commerce concluded that it was unable to resolve the scope inquiry pursuant to 19

C.F.R. § 351.225(k)(1) and, thus, considered the factors enumerated in 19 C.F.R.

§ 351.225(k)(2).  Scope Redetermination at 3.  After considering the (k)(2) factors,

Commerce again concluded that Valeo's T-series sheet is covered by the scope of the

*China CAAS Orders*.  *See id.* at 3–4, 122.

Valeo filed comments opposing Commerce's Scope Redetermination.  Confid. Pl.

[Valeo's]  Cmts. on Remand Redetermination ("Valeo's Cmts."), ECF No. 66.  Broadly

speaking, Valeo challenges various agency conclusions underlying Commerce's

decision to consider the (k)(2) factors but does not challenge Commerce's findings with

respect to the (k)(2) factors.  *See id.* at 3–13.  Valeo also presents arguments regarding

the relevance of heat-treatment to Commerce's Scope Redetermination.  *Id.* at 13–16.

Lastly, Valeo challenges Commerce's decision not to revoke the instructions the agency

sent to U.S. Customs and Border Protection ("CBP") following issuance of the Final

Scope Ruling.  *Id.* at 16–18.

Court No. 21-00581                                                          Page 5

Defendant United States ("the Government") and Defendant-Intervenors[4] filed comments in support of Commerce's Scope Redetermination.  Def.'s Cmts. Supporting Remand Redetermination ("Def.'s Cmts."), ECF No. 70; Def.-Ints.' Resp. to [Valeo's] Cmts. on Remand Redetermination ("Def.-Ints.' Cmts."), ECF No. 71.  For the following reasons, the court will sustain Commerce's Scope Redetermination.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"[W]hether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that [the court] review[s] de novo."  *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017).  Whether a product is covered by the language of the scope is "a question of fact reviewed for substantial evidence."  *Id.*

---

[4] Defendant-Intervenors consist of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members: Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation.

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and all citations to the U.S. code are to the 2018 edition, unless otherwise specified.

**DISCUSSION**

### I.    Legal Framework for Scope Determinations

Because the descriptions of merchandise covered by the scope of an antidumping or countervailing duty order must be written in general terms, questions may arise as to whether a particular product is included within the scope of an order. *See* 19 C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it to issue "scope rulings" that clarify whether the product is in-scope.  *Id.* Although there are no specific statutory provisions that govern Commerce's interpretation of the scope of an order, Commerce is guided by case law and agency regulations.  *See Meridian Prods., 851 F.3d at 1381; 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  *See, e.g.*, *OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope language is unambiguous, "the plain meaning of the language governs."  *Id.* (citation omitted).  If, however, the language is ambiguous, Commerce interprets the scope "with the aid of" the sources set forth in 19 C.F.R. § 351.225(k)(1).  *Meridian Prods.*, 851 F.3d at 1382 (citation omitted).  Subsection (k)(1) directs Commerce to consider the descriptions of the subject merchandise in the petition, initial investigation, and prior determinations by Commerce (including prior scope determinations) or the U.S. International Trade Commission.  19 C.F.R. § 351.225(k)(1).  If the (k)(1) sources are dispositive, Commerce may issue its ruling based solely on the party's application and

the (k)(1) sources.  19 C.F.R. § 351.225(d).[6]  In all other cases, Commerce will initiate a

scope inquiry and may consider the factors enumerated in subsection (k)(2) of the

regulation.  *See Meridian Prods*., 851 F.3d at 1382 (citing 19 C.F.R. § 351.225(k)(2));[7]

*see also* 19 C.F.R. § 351.225(e) (providing for Commerce to initiate a scope inquiry).

## II.    Ambiguity Regarding Governing Standards

Valeo first contends that "Commerce unlawfully claims the plain language of the

scope [is] ambiguous."  Valeo's Cmts. at 3 & n.2 (citing Scope Redetermination at 38).

As the Government points out, however, the court previously concluded that the scope

is "ambiguous as to whether it covers an unregistered alloy such as Valeo's T-series

sheet and therefore a (k)(1) analysis was warranted."  Def.'s Cmts. at 6; *cf.* Def.-Ints.'

Cmts. at 1–2 (stating same).[8]

In *Valeo I*, the court explained that "[t]he phrase '3XXX-series' is not defined in

the scope except in reference to the phrase 'as designated by the Aluminum

Association,' which is also undefined."  610 F. Supp. 3d at 1335.  The court held that the

scope is, however, ambiguous as to whether that phrase indicates Commerce's intent

"to cover any alloy that contains a major alloying element corresponding to the

---

[6] To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question."  *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).

[7] The (k)(2) factors include: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).

[8] The Government further notes that, to the extent Valeo argues that Commerce "should have found certain sources to be dispositive in its (k)(1) analysis," that argument is addressed elsewhere in the Government's comments.  Def.'s Cmts. at 6.

Court No. 21-00581                                                      Page 8

Aluminum Association's alloy groups (including unregistered alloys), or whether

Commerce intended the scope to be limited to registered alloys within the enumerated

series with four-digit designations assigned by the Aluminum Association."  *Id.*  Thus, in

compliance with the court's holding, Commerce first addressed whether the ambiguity

may be resolved pursuant to a (k)(1) analysis.  *See* Scope Redetermination at 38–53.

Valeo also contends that Commerce erred to the extent that the agency "found

the source for the applicable industry standard ambiguous."  Valeo's Cmts. at 3.

Commerce, however, reviewed the *Teal Sheets* publication by the Aluminum

Association first among the sources available.  *See* Scope Redetermination at 39–42.[9]

To the extent Valeo argues that the phrase "as designated by the Aluminum

Association" is unambiguous, *see* Valeo's Cmts. at 3; *see also id.* at 12 (asserting that

the *Teal Sheets* provides the "plain meaning of 'as designated by the Aluminum

Association'"), the court has addressed, and rejected, that position, *see Valeo I*, 610 F.

Supp. 3d at 1335.  To the extent Valeo instead argues that Commerce should have

found the *Teal Sheets* dispositive, the court addresses below the evidence supporting

Commerce's Scope Redetermination.

### III.    Commerce's Consideration of the *Teal Sheets* and Interpretation of the Phrase "as Designated by the Aluminum Association"

Valeo contends that Commerce erred in considering "Aluminum Association

specifications as a (k)(1) source rather than a definitional source."  Valeo's Cmts. at 4 &

---

[9] "The *Teal Sheets* contain 'designations and chemical composition limits for wrought aluminum and wrought aluminum alloys registered with The Aluminum Association.'" *Valeo I*, 610 F. Supp. 3d at 1335 (citation and emphasis omitted).

# ADDENDUM

# **TABLE OF CONTENTS**

**Addendum Page**

Judgment (Nov. 8, 2023), ECF No 75............................Appx00001–00002

Opinion and Order,
    610 F. Supp. 3d 1322 (CIT 2022) .............................Appx00003–00017

Opinion and Order,
    Slip Op. 23-157 (CIT Nov. 8, 2023)...........................Appx00018–00038

n.3 (citing Scope Redetermination at 44).  The Government contends that "[t]here are

several possible interpretations of the argument being advanced by Valeo" and that

each should be rejected.  Def.'s Cmts. at 6.  Defendant-Intervenors contend that

Commerce's regulations do not "elevate information submitted in connection with a

scope ruling application" over the (k)(1) sources.  Def.-Ints.' Cmts. at 3.

     In *Valeo I*, the court explained that the *Teal Sheets*, when considered in its

entirety, suggests that the "use of '3' in '3XXX' in the list of alloy groups indicates a

major alloying element of manganese while contemplating the addition of three more

digits to complete the four-digit designation."  610 F. Supp. 3d at 1335.[10]  While

Commerce previously relied "on the *Teal Sheets* to interpret '3XXX-series' to include

unregistered alloys," the court faulted Commerce for not identifying "anything in the *Teal

Sheets* that indicates the Aluminum Association applies [its four-digit] framework to

unregistered alloys."  *Id.* at 1335–36.

     On remand, Commerce recognized that the *Teal Sheets* offers guidance on

"industry usage of the term '3XXX-series,'" Scope Redetermination at 45, and

considered the *Teal Sheets* prior to any other source, *see id.* at 39–42.  Commerce

explained that although "[t]he term '3XXX-series' is an industry-specific term defined

only by the industry publication *Teal Sheets*[,] . . . the term 'designate' is a general term

---

[10] The Aluminum Association uses "a four-digit numerical system for designating
registered aluminum alloys," pursuant to which "[t]he first of the four digits in the
designation system indicates the alloy group, also called the series."  Final Scope
Ruling at 11.  The alloys are "grouped by majoring alloying elements," for example, a
3XXX series alloy has a major alloying element of manganese.  *Id.*

that may be used in the common vernacular" and not solely in relation to the *Teal Sheets*. *Id*. at 40. While Commerce ultimately found that the *Teal Sheets* "weighs in favor of finding that the scope of the [*China CAAS Orders*] is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association," *id*. at 42, Commerce also concluded that the *Teal Sheets* was not dispositive of the proper scope interpretation, *see id*. at 38–42. Commerce therefore went on to consider the agency's separate rate determination[11] in the underlying ADD investigation, discussed in more detail below, and found that source weighed against the information contained in the *Teal Sheets*. *See id*. at 42–46.

While, at times, Commerce described the *Teal Sheets* together with the separate rate determination as (k)(1) sources, *see, e.g.*, *id*. at 44, the agency also recognized that the *Teal Sheets* provides evidence of trade usage of relevant terminology, *see id.* at 45, 51, 53. Commerce explained its weighing of this evidence in connection with the separate rate determination. *See id.* at 45–46. Commerce ultimately found that because "the (k)(1) sources and certain record information concerning trade usage are

_____

[11] In antidumping duty proceedings involving a country, such as China, that Commerce considers to have a nonmarket economy, Commerce employs a rebuttable presumption that all enterprises operating within that country are controlled by the government. *See, e.g.*, Policy Bulletin No. 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005), http://enforcement.trade.gov/policy/bull05-1.pdf. Commerce assigns each exporter of subject merchandise a single countrywide rate unless the exporter "demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities." *Id.* An exporter that fulfills this requirement is eligible for a "separate rate" that "is usually either an individually calculated rate or a weighted-average rate based on the rates of the investigated companies, excluding any rates that are zero, *de minimis*, or based entirely on facts available." *Id.*

contradictory and the respective weights of these sources are not sufficient to clearly

demonstrate preeminence over the other available record information[,] . . . the (k)(1)

sources are not dispositive."  *Id*. at 53; *see also id*. at 100–02 (discussing Commerce's

weighing of the evidence).  Thus, whether characterized as evidence of trade usage or

as a (k)(1) source, Commerce considered the *Teal Sheets* and explained why the

information contained therein was not dispositive.  It is not the court's role to "reweigh

the evidence."  *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir.

2018) (citing *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed.

Cir. 2015)).

   To the extent that Valeo argues that Commerce should have found the *Teal

Sheets* dispositive of the meaning of the phrase "as designated by the Aluminum

Association," the court considers this argument in connection with Valeo's subsequent

argument that Commerce wrongly interpreted this phrase.  *See* Valeo's Cmts. at 9, 12.

Valeo contends that Commerce "unlawfully define[d] the term 'designate' as a general

term without industry-specific meaning."  *Id*. at 9.  Valeo relies on the *Teal Sheets* and

Statistical Note 6 to Chapter 76 of the Harmonized Tariff Schedule of the United States

("HTSUS") to support its contentions, *id*. at 10–11, but those contentions are misplaced.

   Commerce acknowledged that the *Teal Sheets* uses the term "designation" to

identify "alloys with a four-digit designation from the Aluminum Association," but went on

to explain that the scope uses the term "designate," which may be defined differently as

"to point out the location of."  Scope Redetermination at 40 & n.267 (citing *Designate*,

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/designate (retrieved

by Commerce May 5, 2023)).  Commerce thus found that the term "designate" in the

scope does not necessarily refer "to a four-digit alloy designation from the Aluminum

Association."  *Id.* at 40.  Instead, Commerce explained, "the term 'designate' *could* be

understood" to refer to "any alloy with a primary alloying element corresponding to the

alloy series" such that the term identifies "the location of the alloy series definitions

where we could interpret . . . a 3XXX-series alloy as having a major alloying agent of

manganese."  *Id.* at 41 (emphasis added).  Thus, while Commerce recognized that the

*Teal Sheets* supports interpreting the scope to cover registered alloys with a four-digit

designation, *see id.* at 41–42, Commerce offered a reasoned explanation for its

conclusion that the *Teal Sheets* was not dispositive, *id.* at 44–45, 113.  The possibility of

drawing two inconsistent conclusions from the evidence does not preclude the agency's

finding from being supported by substantial evidence.  *Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

> Commerce also addressed Valeo's reliance on Statistical Note 6, which states:
>
> For the purposes of statistical reporting numbers 7604.21.0010,
> 7604.29.1010, 7604.29.3060, 7604.29.5050, 7606.12.3025 and
> 7606.12.3091, "heat-treatable industrial alloys" refers to aluminum
> containing by weight 3.0 percent or less of magnesium and 3.0 percent or
> less of silicon, *and/or are designated as series 6xxx in the Aluminum*
> *Association's specifications of registered alloys*.

Scope Redetermination at 112 & n.585 (emphasis added).  Commerce explained that

Statistical Note 6 is not dispositive of the meaning of the term "designate" because other

sources indicate that "designate" may not necessarily refer "to a four-digit alloy

designation from the Aluminum Association" for purposes of the underlying scope.  *Id.*

at 113.[12]

 The cases on which Valeo relies do not persuade the court that Commerce must

further address the relevance, if any, of Statistical Note 6.  Valeo's Cmts. at 12 (citing

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1305 (Fed. Cir. 2013);

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1073 (Fed. Cir. 2001)).  In

*Eckstrom Industries*, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")

characterized the tariff classification listed in the underlying order as "a factor" for

Commerce to consider "in determining the scope of [an order]."  254 F.3d at 1073.

Here, however, Statistical Note 6 is not referenced in the scope of the *China CAAS*

*Orders*, *see* Scope Redetermination at 4–5, and Commerce explained its reasons for

declining to rely on Statistical Note 6 to define scope terms, *see id.* at 112–13.

 *Mid Continent* is inapposite.  There, the Federal Circuit addressed whether steel

nails imported as part of a "mixed media" tool kit were covered by the scope of an order

that otherwise covered the included nails.  725 F.3d at 1298.  The appellate court

explained that Commerce may consult the HTSUS as part of its mixed media analysis if

---

[12] Defendant-Intervenors argue that Statistical Note 6 was not included in the HTSUS until several months after Commerce published the *China CAAS Orders* and, thus, cannot be considered evidence of Commerce's intent with respect to the meaning of the scope language.  Def.-Ints.' Cmts. at 8.  Defendant-Intervenors also argue that the inclusion of the phrase "of registered alloys" in Statistical Note 6 distinguishes the note from the underlying scope, which does not include that phrase.  *Id.* at 9.  Such arguments go beyond Commerce's rationale with respect to the relevance of Statistical Note 6 and, thus, the court need not further consider them.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

the agency had a prior practice of doing so but expressed no view on the weight to be

afforded that analysis.  *See id*. at 1305.  This case does not involve a mixed media

product and, thus, cases addressing Commerce's analytical approach in such situations

are of little value here.

In sum, Valeo's arguments concerning the *Teal Sheets* and Statistical Note 6

reflect mere disagreement with Commerce's weighing of the evidence.  That approach

mistakes the court's function, which is not to "reweigh the evidence."  *SolarWorld Ams.*,

910 F.3d at 1225.

### IV.    Commerce's Consideration of a Separate Rate Determination

Valeo raises several arguments concerning Commerce's consideration of a

separate rate determination made as part of the investigation's final determination.

None are persuasive.

Valeo first contends that Commerce unlawfully considered a confidential

separate rate *application* by a respondent in the investigation underlying the *China*

*CAAS Orders* to constitute a (k)(1) source.  Valeo's Cmts. at 5.  While Commerce

placed copies of the separate rate application on the record of the remand proceeding,

*see* Scope Redetermination at 42–43 & n.275, Commerce relied on its *determination*

with respect to the separate rate application as a (k)(1) source, *see, e.g.*, *id.* at 42

(referencing the agency's finding based on "Commerce's separate rate determination in

the underlying [ADD] investigation"); *id.* at 44 (inferring Commerce's intent with respect

to the scope language from "Commerce's separate rate determination").

To the extent that Valeo argues that Commerce's separate rate determination is not a permissible (k)(1) source, Valeo offers no reason why language in the regulation referencing "the determinations of the [agency]," 19 C.F.R. § 351.225(k)(1), may not be interpreted to include a separate rate determination which formed part of the final determination in the underlying investigation, *see* Scope Redetermination at 104–05 (addressing the argument). Valeo instead argues that the separate rate determination is not a public document and does not provide ascertainable standards for scope interpretation. *See* Valeo's Cmts. at 6–8. In so doing, Valeo again relies on Federal Circuit opinions governing Commerce's mixed media analysis, which, as stated above, is analytically distinct. *Id.* (citing, *inter alia*, *Mid Continent*, 725 F.3d at 1305; *Star Pipe Prods. v. United States*, 981 F.3d 1067, 1071 (Fed. Cir. 2020)).

Valeo further asserts that the separate rate determination "is not an interpretive source for considering a scope issue because it lacks any discussion about a scope issue," Valeo's Cmts. at 8, and argues that "there is no rational connection between scope and [the separate rate application] that supports the implied determination related to scope," *id.* at 9. Such arguments, however, implicate the weight, if any, to be afforded the separate rate determination, a point with which Valeo appeared to concede. *See id.* (relying on the weight Commerce afforded the separate rate determination to assert that the agency's consideration of the document was in error). The fact that Commerce ultimately decided to give little weight to the separate rate determination does not mean that Commerce may not consider the separate rate

determination at all.  Accordingly, Valeo's arguments regarding Commerce's

consideration of the separate rate determination are not persuasive.[13]

### V.   Relevance of Heat Treatment

Valeo contends that heat treatment is relevant to the question "whether T-series

sheet is manufactured from a 3XXX-series core" because the T-series sheet core "is

heat-treatable" and "3XXX-series alloys are non-heat-treatable."  Valeo's Cmts. at 13.

In *Valeo I*, the court found Commerce's conclusion "that heat-treatment does not

preclude characterization as a 3XXX-series alloy even if such alloys are otherwise

characterized as non-heat-treatable" to be contradicted by evidence indicating that

"3XXX-series alloys are not heat-treatable."  610 F. Supp. 3d at 1340.  The court

therefore directed Commerce, as necessary on remand, to "address evidence that

Valeo's product undergoes heat-treatment" and to reconcile that evidence with

Commerce's conclusion that the core of Valeo's T-series sheet constituted a 3XXX-

series alloy.  *Id.* at 1341 (internal citations omitted).  The court explained that it was

difficult to "discern[] the path of Commerce's reasoning" when Commerce had failed to

define "the phrases 'heat-treated' or 'heat-treatable' for purposes of understanding the

relevance of thermal treatment to classification as a 3XXX-series alloy."  *Id.*

---

[13] Valeo once again argues that the *Teal Sheets* is "the only lawful interpretive source" and "confirm[s]" that the scope is "limited to registered alloys."  Valeo's Cmts. at 13.  For this reason, Valeo asserts that Commerce erred in considering the (k)(2) factors.  *Id.* Valeo's argument, however, simply restates arguments the court has rejected for the reasons already stated.  Valeo raises no arguments concerning Commerce's findings with respect to the (k)(2) factors.

Upon review of the record on remand, Commerce found that the phrase "heat-treatment" means "solution heat-treatment" and that the phrase "heat-treatable alloy" refers to "an alloy that can undergo solution heat-treatment."  Scope Redetermination at 25; *see also id.* at 76.  Commerce subsequently addressed whether Valeo's product undergoes solution heat-treatment and found that it does not.  *See id.* at 25–29, 33–37, 76, 88.  Instead, Commerce determined that Valeo's T-series sheet "undergoes a combination of annealing and cold-working" that did not preclude classification as a 3XXX-series alloy.  *Id.* at 29.

Valeo does not present a cogent challenge to these findings.  While Valeo asserts that "the core layer used in the manufacture of T-Series is heat-treatable," Valeo's Cmts. at 13, Valeo does not address Commerce's findings regarding the type of heat-treatment relevant to characterization of 3XXX-series alloys as non-heat-treatable or Commerce's factual finding that Valeo's product does not undergo solution heat-treatment, *see id.* at 13–16.[14]  Commerce's extensive analysis of heat-treatment and the agency's findings with respect to Valeo's T-series aluminum sheet are supported by substantial evidence.  *See* Scope Redetermination at 21–37, 75–95.

---

[14] At most, Valeo appears to argue for a broader interpretation of the term "heat-treatable" that would capture the type of thermal processing its product undergoes.  *See* Valeo's Cmts. at 13–14 (discussing sources generally characterizing 3XXX-series alloys as non-heat-treatable).  Valeo's broad-based arguments do not, however, address, and, thus, do not undermine, Commerce's reasons for defining the term more narrowly for present purposes, including scope language expressly indicating that annealing would not remove a product from the scope of the *China CAAS Orders*.  Scope Redetermination at 76–78.

Court No. 21-00581                                                    Page 18

### VI.    Suspension of Liquidation

Lastly, Valeo contends that "Commerce must revoke" the instructions the agency

sent to CBP following issuance of the Final Scope Ruling.  Valeo's Cmts. at 16.

Commerce considered—and rejected—this argument.  Scope Redetermination at 121–

22.  The Government and Defendant-Intervenors contend that Valeo's arguments are

misplaced.  Def.'s Cmts. at 17–18; Def.-Ints.' Cmts. at 12–13.  The court agrees.

Commerce's regulatory provisions governing suspension of liquidation are

instructive here.  Subsection (l) states:

> (1) When the [agency] conducts a scope inquiry under paragraph (b) or (e)
> of this section, *and the product in question is already subject to
> suspension of liquidation, that suspension of liquidation will be continued*,
> pending a preliminary or a final scope ruling, at the cash deposit rate that
> would apply if the product were ruled to be included within the scope of
> the order.
>
> ***
>
> (3) If the [agency] issues a final scope ruling, under either paragraph (d) or
> (f)(4) of this section, to the effect that the product in question is included
> within the scope of the order, *any suspension of liquidation under
> paragraph (l)(1) or (l)(2) of this section will continue*.  Where there has
> been no suspension of liquidation, the [agency] will instruct [CBP] to
> suspend liquidation and to require a cash deposit of estimated duties, at
> the applicable rate, for each unliquidated entry of the product entered, or
> withdrawn from warehouse, for consumption on or after the date of
> initiation of the scope inquiry.  If the [agency's] final scope ruling is to the
> effect that the product in question is not included within the scope of the
> order, the [agency] will order any suspension of liquidation on the subject
> product ended and will instruct [CBP] to refund any cash deposits or
> release any bonds relating to this product.

19 C.F.R. § 351.225(l)(1), (3) (emphases added).

Valeo does not argue that Commerce improperly instructed CBP to suspend

liquidation and collect cash deposits following Commerce's affirmative Final Scope

Ruling.  *See* Valeo's Cmts. at 16–18.  Instead, Valeo asserts that the court's opinion in

*Valeo I* undermined the legal basis for the suspension of liquidation and collection of

cash deposits for any entries that were made prior to the date on which Commerce

initiated the formal scope inquiry on remand, i.e., February 15, 2023.  *Id.* at 16 (citing,

*inter alia*, *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed.

Cir. 2020) ("*USF*")).

*USF* addressed the scenario in which Commerce retroactively suspended

liquidation back to the date on which Commerce issued the underlying order following

issuance of an affirmative scope ruling without a scope inquiry.  947 F.3d at 800–01.

While recognizing that the regulation is silent when there has been no scope inquiry, *id.*

at 800, the court nevertheless held that Commerce "exceeded its regulatory authority

under 19 C.F.R. § 351.225(I)(3) by retroactively suspending liquidation to the issuance

date of the [order]," *id.* at 803.[15]

Here, however, when Commerce initiated the scope inquiry, Valeo's product was

"already subject to suspension of liquidation" and, as such, "that suspension of

liquidation [was] continued, pending a preliminary or a final scope ruling."  19 C.F.R.

---

[15] Following the U.S. Court of International Trade's ("CIT") earlier decision in the *USF* litigation that Commerce had exceeded its regulatory authority, Commerce issued revised instructions to suspend liquidation for entries made on or after the date on which Commerce issued its final scope ruling.  *See USF*, 725 F.3d at 798.  The CIT entered judgment, and no party challenged the revised instructions.  *See id.*

§ 351.225(l)(1).  Subsection (l)(3) further provides for the continuation of any

suspension pursuant to subsection (l)(1) when Commerce issues an affirmative scope

ruling pursuant to subsection (f)(4) at the conclusion of a scope inquiry.  *Id.*

§ 351.225(l)(3).  Subsection (f)(4) directs Commerce to "issue a final ruling" concerning

"the product which is the subject of the scope inquiry" conducted pursuant to subsection

(e).  *Id.* § 351.225(f)(4).  While Commerce conducted the scope inquiry during a court-

ordered remand proceeding, that inquiry was nevertheless governed by Commerce's

regulations.  *See, e.g.*, Scope Redetermination at 122 (citing 19 C.F.R. § 351.225(e)).

Unlike in *USF*, at no point in this remand proceeding did Commerce instruct CBP

to suspend liquidation of, or collect cash deposits on, entries made prior to the date on

which Commerce determined that Valeo's product fell within the scope.  Valeo offers no

authority for the proposition that an order remanding Commerce's original scope ruling[16]

invalidates Commerce's prior instructions such that subsection (l)(1) no longer applies.

*See* Valeo's Cmts. at 17 (cursorily declaring continued suspension of liquidation after

*Valeo I* "unlawful").  Notably, subsection (l)(3) directs Commerce to end any suspension

of liquidation only after issuance of a *negative* scope ruling, 19 C.F.R. § 351.225(l)(3),

---

[16] It is well settled "that an order remanding a matter to an administrative agency for
further findings and proceedings is not final."  *Cabot Corp. v. United States*, 788 F.2d
1539, 1542 (Fed. Cir. 1986).  The lack of finality associated with the court's remand
order offers further support for the continuation of any suspension of liquidation during
remand proceedings pending a final decision in the action.  Further, as the Government
notes, requiring modification of "customs instructions as a result of a remand order that
does not provide such direction would present multiple issues beyond the scope
proceeding presently before the [c]ourt," Def.'s Cmts. at 18, including, for example, with
respect to the carefully crafted statutory scheme governing suspension and liquidation
in cases arising under section 1516a, *see* 19 U.S.C. § 1516a(c),(e).

Court No. 21-00581                                                    Page 21

which has not happened here.  Accordingly, the court declines to disturb Commerce's

instructions.

**CONCLUSION**

In accordance with the foregoing, Commerce's Final Scope Ruling, as modified

by the Scope Redetermination, will be sustained.  Judgment will be entered accordingly.

/s/      Mark A. Barnett____
Mark A. Barnett, Chief Judge

Dated: <u>November 8, 2023</u>
         New York, New York

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 8,995 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

*/s/ Weronika Bukowski*
Weronika Bukowski

## CERTIFICATE OF SERVICE

I certify that on January 26, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Weronika Bukowski*
Weronika Bukowski