NONCONFIDENTIAL

**2024-1189**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**VALEO NORTH AMERICA, INC.,**

**Plaintiff-Appellant,**

**v.**

**UNITED STATES, ALERIS ROLLED PRODUCTS, INC., ARCONIC CO., COMMONWEALTH ROLLED PRODUCTS, INC., CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC, JUPITER ALUMINUM CO., JW ALUMINUM COMPANY, NOVELIS CORPORATION, ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP,**

**Defendants-Appellees,**

Appeal from the United States Court of International Trade
in Case No. 1:21-cv-00581, Chief Judge Mark A. Barnett.

**BRIEF OF DEFENDANTS-APPELLEES ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS (ALERIS ROLLED PRODUCTS, INC., ARCONIC CO., COMMONWEALTH ROLLED PRODUCTS, INC., CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC, JUPITER ALUMINUM CO., JW ALUMINUM COMPANY AND NOVELIS CORPORATION)**

**JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400**

**Counsel to Defendants-Appellees**

**April 5, 2024**

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1189 |
| **Short Case Caption** | Valeo North America, Inc. v. United States |
| **Filing Party/Entity** | Defendants-Appellees the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation) |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/05/2024

Signature:   /s/ John M. Herrmann

Name:   John M. Herrmann

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| The Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group | N/A | N/A |
| Aleris Rolled Products, Inc. | N/A | Novelis closed on its acquisition of Aleris Corporation ("Aleris") on April 14, 2020. Novelis Inc. is a subsidiary of Hindalco Industries Limited. Hindalco's stock is publicly traded on the Bombay Stock Exchange, the National Stock Exchange of India Limited, and the Luxembourg Stock Exchange. Aleris Rolled Products, Inc. is a "U.S. Hold Separate Asset" pursuant to Novelis Inc.'s Form 10-K for fiscal year ending Mar. 31, 2020. |
| Arconic Corporation | N/A | Arconic Corporation is a public company trading on the New York Stock Exchange under the symbol "ARNC." |
| Commonwealth Rolled Products Inc. | N/A | N/A |
| Constellium Rolled Products Ravenswood, LLC | N/A | Constellium Rolled Products Ravenswood, LLC is a subsidiary of Constellium SE, a public company traded under the New York Stock Exchange symbol of "CSTM" |
| Jupiter Aluminum Company | N/A | N/A |
| JW Aluminum Company | N/A | N/A |
| Novelis Corporation | N/A | Novelis Inc., the parent of Novelis Corporation, is a subsidiary of Hindalco Industries Limited. Hindalco's stock is publicly traded on the Bombay Stock Exchange, the National Stock Exchange of India Limited, and the Luxembourg Stock Exchange |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable       ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable       ☐    Additional pages attached

| N/A |  |  |
|---|---|---|
|  |  |  |

Save for Filing

**CONFIDENTIAL      NONCONFIDENTIAL**
**MATERIAL OMITTED**

<u>Table of Contents</u>

<u>Page</u>

INTRODUCTION ........................................................................................1

STATEMENT OF RELATED CASES ......................................................1

STATEMENT OF THE CASE....................................................................2

     A.     Background .................................................................................4

     B.     Valeo's Scope Ruling Request.................................................7

     C.     Valeo Incorrectly Asserts That Its Imports Are Properly
             Classified Under HTSUS Subheading 7606.12.3091 .........8

          1.     Contrary to Its Initial Claim, Valeo's [ proprietary
              records     ] Confirmed That Valeo
              Understood Its Brazing Sheet Was a Clad Product .................10

          2.     Valeo Incorrectly Characterizes the Relevance of
               Note 6 to Chapter 76 of the HTSUS .........................12

     D.     The United States International Trade Commission's
             Injury Investigation .................................................................13

     E.     Commerce's Final Scope Ruling.........................................17

     F.     The CIT's Remand of Commerce's Final Scope Ruling
             in *Valeo I* .................................................................17

     G.     Commerce's *Remand Redetermination*................................21

     H.     The CIT's Affirmance of Commerce's *Remand
             Redetermination* in *Valeo II* .................................................24

I.     STANDARD OF REVIEW................................................................29

NONCONFIDENTIAL

Table of Contents
(continued)

Page

II.   COMMERCE'S DETERMINATION THAT THE SCOPE LANGUAGE IS AMBIGUOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................... 31

    A.   The *Remand Redetermination's* Conclusion That the Scope Language Is Ambiguous Is Supported by Substantial Evidence ........................................................... 32

    B.   Commerce's Interpretation of the Term "Common" Is Supported by Substantial Evidence ........................................... 35

III.   COMMERCE'S RELIANCE ON A SEPARATE RATE DETERMINATION FROM THE UNDERLYING LESS-THAN-FAIR-VALUE INVESTIGATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE ............................................. 37

    A.   The Premise Underlying Valeo's Argument Is Wrong ....................... 37

    B.   (K)(1) Sources Are Not Limited to Those That Are Publicly Available at the Time the Order Was Issued ....................... 39

    C.   The CIT Properly Analyzed Commerce's Reliance on Its Separate Rate Determination ............................................... 41

IV.   COMMERCE'S FINDINGS ON REMAND THAT THE PRODUCT AT ISSUE IS NOT "HEAT-TREATABLE" OR SUBJECTED TO A "HEAT-TREATMENT" PROCESS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................ 43

V.   COMMERCE'S DETERMINATION NOT TO REVOKE ITS INSTRUCTIONS SUSPENDING THE LIQUIDATION OF VALEO'S ENTRIES IS IN ACCORDANCE WITH LAW ....................... 47

**NONCONFIDENTIAL**

<u>Table of Contents</u>
(continued)

Page

The confidential material deleted from pages i, 7, and 10-12 consists of business proprietary information submitted to the U.S. Department of Commerce by Plaintiff-Appellant Valeo North America, Inc. ("Valeo's") under administrative protective order, Appxi-xi, the disclosure of which is protected by statute, 19 U.S.C. § 1677f, or descriptions of such information that Defendants-Appellees have treated as confidential in order to protect Valeo's business proprietary information.

The confidential material deleted from page 23 consists of third party business proprietary information released by the U.S. Department of Commerce  under administrative protective order, Appxi-xi, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ArcelorMittal Stainless Belgium N.V. v. United States*,
694 F.3d 82 (Fed. Cir. 2012) ...............................................................18

*Badger-Powhatan, Div. of Figgie International, Inc. v. United States*,
808 F.2d 823 (Fed. Cir. 1986) ...................................................... 47-48

*Cabot Corp. v. United States*,
788 F.2d 1539 (Fed. Cir. 1986) ..................................................... 47-48

*Chemtall, Inc. v. United States*,
878 F.3d 1012 (Fed. Cir. 2017) ..................................................... 11-12

*China Custom Mfg. Inc. v. United States*,
61 F.4th 956 (Fed. Cir 2023) .....................................................31, 43

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .................................................... 29-30

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ..........................................................30

*Global Commodity Group LLC v. United States*,
709 F.3d 1134 (Fed. Cir. 2013) ..........................................................29

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ...........................................................30

*Mid Continental Nail Corporation v. United States*,
725 F.3d 1295 (Fed Cir 2013) ..................................................... 39-43

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ........................................... 29, 30-31

*SolarWorld Ams., Inc. v. United States*,
910 F.3d 1216 (Fed. Cir. 2018) ..........................................................30

*Star Pipe Prods. v. United States*,
  981 F.3d 1067 (Fed. Cir. 2020) ........................................... 39-40, 42-43

*United Steel and Fasteners, Inc. v. United States*,
  947 F.3d 794 (Fed. Cir. 2020) ................................................ 26

*U.S. Steel Group v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996) ............................................... 30

*Universal Camera Corp v. NLRB*,
  340 U.S. 474 (1951) .......................................................... 29

*Valeo North America, Inc. v. United States*,
  610 F. Supp. 3d 1322 (Ct. Int'l Trade 2022) ("*Valeo I*")
  (Appx00003-00017) ........................................................ *passim*

*Valeo North America, Inc. v. United States*,
  663 F. Supp. 3d 1343 {Slip Op. 23-157}
  (Ct. Int'l Trade 2023) ("*Valeo II*") (Appx00018-00038) .......................... *passim*

*Walgreen Co. v. United States*,
  620 F.3d 1350 (Fed. Cir. 2010) ............................................ 39-40

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................ 29

19 C.F.R. § 351.225(d) ....................................................... 3, 17-19, 28

19 C.F.R. § 351.225(e) ....................................................... *passim*

19 C.F.R. § 351.225(k)(1) .................................................... *passim*

19 C.F.R. § 351.225(k)(2) .................................................... 21, 24, 28, 38

19 C.F.R. § 351.225(l)(1) .................................................... 48-49

## Administrative Determinations

*Common Alloy Aluminum Sheet From the People's Republic of
  China: Antidumping Duty Order*, 84 Fed. Reg. 2,813
  (Dep't Commerce Feb. 8, 2019) ("*AD Order*") .......................................... *passim*

**NONCONFIDENTIAL**

*Common Alloy Aluminum Sheet From the People's Republic of
China: Countervailing Duty Order*, 84 Fed. Reg. 2,157
(Dep't Commerce Feb. 6, 2019) ("*CVD Order*")........................................ 2-3, 4

*Common Alloy Aluminum Sheet From the People's Republic of
China: Initiation of Less-Than-Fair-Value and Countervailing
Duty Investigations*, 82 Fed. Reg. 57,214
(Dep't Commerce Dec. 4, 2017)........................................................................34

*Final Results of Redetermination Pursuant to Court Remand;
Valeo North America, Inc. v. United States*,
Ct. No. 21-00581 (Dep't Commerce June 20, 2023)
("*Remand Redetermination*") (Appx00039-00162) ...................................*passim*

Memorandum to Scot Fullerton, *Antidumping and Countervailing
Duty Orders on Aluminum Sheet from the People's Republic of
China; Final Scope Ruling Determination: Valeo's Heat-Treated
T-Series Aluminum Sheet* (Oct. 15, 2021)) ("*Final Scope Ruling*")............*passim*

**Miscellaneous**

2020 HTSUS Basic Edition is available at:
https://hts.usitc.gov/view/release?release=2020HTSABasicB............................6

NONCONFIDENTIAL

## INTRODUCTION

Defendants-Appellees the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (hereinafter, "Defendants-Appellees" or the "Domestic Industry") submit this brief in response to the opening brief submitted on behalf of Plaintiff-Appellant Valeo North America, Inc. (hereinafter, "Valeo" or "Appellant"). Valeo challenges certain aspects of the U.S. Department of Commerce's (hereinafter, "Commerce") remand redetermination that concluded certain clad aluminum sheet imported into the United States by Valeo (described by Valeo as "Heat-Treated T-Series Aluminum Sheet") falls within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China.

Defendants-Appellees disagree with Plaintiff-Appellant's statement of the case and facts, and statement of the standard of review. As such, Defendants-Appellees provide those statements below. *See* Fed. R. App. 28(b).

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Defendants-Appellees state that no other appeal in or from the same civil action or proceeding in the U.S. Court of International Trade was previously before the U.S. Court of Appeals for the Federal Circuit or any other appellate court.

NONCONFIDENTIAL

## STATEMENT OF THE CASE

Defendants-Appellees disagree with the statement of the case and facts as presented in Valeo's opening brief and believe the following more accurately describes the case before this Court. This appeal concerns whether the Commerce Department's determination that a product imported into the United States by Valeo falls within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from China (collectively, the "Orders") is supported by substantial evidence and otherwise in accordance with law. The Orders include identical definitions that describe merchandise that falls within the Orders' scope. That language, in relevant part, states:

> The merchandise covered by this order is aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this order includes both not clad aluminum sheet, **as well as multi-alloy, clad aluminum sheet**. With respect to not clad aluminum sheet, common alloy sheet is **manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association**. With respect to multi-alloy, **clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core**.

*Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813, 2,815 (Dep't Commerce Feb. 8,

2019) (emphases added) (hereinafter, "*AD Order*"); *see also Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157, 2,158 (Dep't Commerce Feb. 6, 2019) (same) (hereinafter, "*CVD Order*").

On May 1, 2020, Valeo submitted a request to Commerce for a ruling on whether a product it characterized as "Heat-Treated T-Series Aluminum Sheet" (although Commerce's analysis demonstrates Valeo's characterization of the imported product is inaccurate) falls within the Orders' scope. After rejecting Valeo's initial scope ruling request (for failure to comply with the agency's regulations), as well as two subsequent requests (due to failure to include all information necessary for Commerce to issue a scope ruling), Commerce issued a scope ruling on October 15, 2021, pursuant to 19 C.F.R. § 351.225(d), finding that the product identified by Valeo fell within the Orders' scope based on the scope language and sources identified in 19 C.F.R. § 351.225(k)(1).

Valeo challenged Commerce's scope ruling before the U.S. Court of International Trade ("CIT"), which remanded the final scope ruling and instructed Commerce to reconsider certain issues. *See Valeo North America, Inc. v. United States*, 610 F. Supp. 3d 1322, 1334-38 (Ct. Int'l Trade 2022) (hereinafter, "*Valeo I*") (Appx00003-00017). After initiating a scope inquiry during the remand proceedings, pursuant to 19 C.F.R. § 351.225(e), Commerce subsequently issued a

remand redetermination and continued to find that the clad aluminum sheet product imported into the United States by Valeo falls within the Orders' scope. *See Final Results of Redetermination Pursuant to Court Remand; Valeo North America, Inc. v. United States*, Ct. No. 21-00581 (Dep't Commerce June 20, 2023) (hereinafter, "*Remand Redetermination*") (Appx00039-00162).   In November 2023, the CIT affirmed Commerce's remand redetermination. *See Valeo North America, Inc. v. United States*, 663 F. Supp. 3d 1343, 1348 {Slip Op. 23-157} (Ct. Int'l Trade 2023) (hereinafter, "*Valeo II*") (Appx00018-00038).   Valeo now appeals from the final judgment issued by the CIT in *Valeo II*.

## A.   <u>Background</u>

In   early   February   2019,   Commerce   published   antidumping   and countervailing duty orders on imports of common alloy aluminum sheet ("CAAS") from China. *See CVD Order*, 84 Fed. Reg. at 2,157; *AD Order*, 84 Fed. Reg. at 2,813.[1]  The Orders defined the scope as follows:

> The merchandise covered by this order is aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With

---

[1]   For convenience, Domestic Industry will cite only to the *AD Order*, as the scope definition in each order is identical.

respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

Common alloy sheet may be made to ASTM specification B209–14, but can also be made to other specifications. Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope. Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the common alloy sheet.

Excluded from the scope of this order is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H–19, H–41, H–48, or H–391 temper. In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans. Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set for the above.

> Common alloy sheet is currently classifiable under HTSUS subheadings 7606.11.3060, 7606.11.6000, 7606.12.3090, 7606.12.6000, 7606.91.3090, 7606.91.6080, 7606.92.3090, and 7606.92.6080. Further, merchandise that falls within the scope of this order may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3030, 7606.91.3060, 7606.91.6040, 7606.92.3060, 7606.92.6040, 7607.11.9090. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this order is dispositive.

*AD Order*, 84 Fed. Reg. at 2,815. The scope language makes no reference to "heat treatment," but does indicate that "annealing" common alloy aluminum sheet in a third country "would not {} remove the merchandise from the scope of the order." *Id.*

Effective January 1, 2020, one of the Harmonized Tariff Schedule of the United States ("HTSUS") statistical subheadings identified in the scope definition – specifically, HTSUS subheading 7606.12.3090 – that provided for not clad aluminum alloy sheet and strip with a thickness exceeding 0.2 millimeters and 6.3 millimeters or less (not including can stock), was sub-divided into two new subheadings.[2]   In particular, the two new subheadings were: (1) HTSUS subheading 7606.12.3091, which provides for "heat-treatable industrial alloys of a

---

[2]   The January 1, 2020 revision modified the HTSUS to incorporate changes decided by the Section 484(f) Committee and that are contained in Basic Edition of that year.   The 2020 HTSUS Basic Edition is available at: https://hts.usitc.gov/view/release?release=2020HTSABasicB.

**CONFIDENTIAL**    NONCONFIDENTIAL
**MATERIAL OMITTED**

kind described in statistical note 6" to Chapter 76; and (2) HTSUS subheading 7606.12.3096, which provides for the remaining merchandise previously covered under HTSUS subheading 7606.12.3090. The category for clad aluminum alloy sheet, which is also identified in the Orders' scope – *i.e.*, HTSUS subheading 7606.12.6000 – was not modified and remained unchanged.

**B.    Valeo's Scope Ruling Request**

On May 1, 2020, Valeo requested a scope ruling concerning a product it characterized as "heat-treated T-series aluminum sheet." *See* Appx00177. The product description in Valeo's request, however, demonstrated that the product at issue was in fact a form of brazing sheet, which is a clad aluminum sheet product that falls within the Orders' scope. In particular, Valeo's description of the merchandise indicated the imported brazing sheet at issue is an aluminum sheet product with "discrete layers," including "high silicon content and low melting temperature" outer layers, which were subjected to a hot-rolling process and annealed. Appx00180, Appx00183. Further, Valeo admitted that the "major alloying element {in the core of the clad product at issue} is manganese, not magnesium," with the "center layer {} composed of manganese ranging from [ # ]" to "[ # ] percent." Appx00185 (emphasis in original). Valeo's description is significant because it indicates that the core of the brazing sheet

product for which it requested a scope ruling is manufactured from a 3xxx-series alloy (*i.e.*, an alloy that has manganese as its principal alloying element).

**C.    Valeo Incorrectly Asserts That Its Imports Are Properly Classified Under HTSUS Subheading 7606.12.3091**

Valeo also asserted in its initial scope ruling request – and again in its opening brief before this Court – that the correct HTSUS classification for the imported brazing sheet is HTSUS subheading 7606.12.3091.  *See* Appx00180; Valeo Br. at 5 ("The T-series sheet is classified under HTSUS subheading 7606.12.3091 (aluminum alloys, not clad, heat-treatable industrial alloys).").

The statistical subheading identified by Valeo provides for "aluminum plates, sheet and strip, of a thickness exceeding 0.2 mm; rectangular (including squares) of aluminum alloys; **not clad**; with a thickness of 6.3 mm or less; other; heat-treatable industrial alloys of a kind described in statistical note 6" of Chapter 76.  Appx00289.  Further, note 6 to Chapter 76 explains that "{f}or the purposes of statistical reporting numbers," including HTSUS subheading 7606.12.3091, "'heat-treatable industrial alloys' refers to aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys." Appx00287.

Valeo's claimed HTSUS classification (*i.e.*, subheading 7606.12.3091) was (and is) clearly erroneous, however, based on Valeo's description of the imported merchandise as a clad product with an outer layer having a high silicon content and the inner (or core) layer involving an alloy with manganese as the principal alloying element (*i.e.*, a 3xxx-series alloy). Appx00180, Appx00183. Valeo similarly admits in its brief submitted to this Court that the imported product contains a "core" layer, demonstrating that the product at issue is a clad product consisting of a core and cladding layers. *See* Valeo Br. at 5 (stating that the product's "aluminum core is a proprietary alloy that is unregistered with the Aluminum Association").

Contrary to Valeo's assertions, clad aluminum sheet (including brazing sheet) is properly classified under HTSUS subheading 7606.12.6000, the provision for "Aluminum plates, sheets and strip, of a thickness exceeding 0.2 mm: Rectangular (including square): . . . Of aluminum alloys: . . . Clad." *See* Appx00267-00268, Appx00284-00290, Appx00299-00329.

On May 27, 2020, Defendants-Appellees submitted comments to Commerce addressing Valeo's scope application, explaining that because Valeo's brazing sheet product is clad aluminum sheet with a 3XXX-series aluminum alloy core, it is covered by the plain language of the Orders' scope. *See generally* Appx00262-00454. Defendants-Appellees also urged Commerce to make a referral to U.S.

CONFIDENTIAL       NONCONFIDENTIAL
MATERIAL OMITTED

Customs and Border Protection to determine how Valeo had been classifying its

brazing sheet imports, given the company's claim that the proper classification was

under subheading HTSUS subheading 7606.12.3091.  *See* Appx00268.

### 1.  Contrary to Its Initial Claim, Valeo's [ proprietary records ] Confirmed That Valeo Understood Its Brazing Sheet Was a Clad Product

On June 30, 2020, after Commerce rejected Valeo's scope application as

incomplete and Valeo re-submitted its scope application, Valeo filed an amended

administrative protective order ("APO") application that included a copy of a

sample U.S. Customs and Border Protection ("CBP") Form 7501 Entry Summary

dated [ date ] to demonstrate its standing as an importer of the product at

issue.  *See* Appx00620-00625.  Contrary to Valeo's claim before this Court that the

imported product is classifiable under HTSUS subheading 7606.12.3091, the

[ proprietary records ] submitted to Commerce by Valeo showed that the company

[ action ] the brazing sheet for which it requested a scope ruling [

proprietary action taken

] *See* Appx00624.

In a supplemental questionnaire, Commerce instructed Valeo to clarify this

apparent discrepancy by:

(1) Confirming "the accurate tariff subheading(s) used to import" Valeo's merchandise and to "explain why this is the appropriate subheading";

**CONFIDENTIAL    NONCONFIDENTIAL
MATERIAL OMITTED**

(2) "{E}xplain{ing} why the product appears to have entered under HTSUS [ code        ]" in the event Valeo continued to claim that the correct classification is under HTSUS subheading 7606.12.3091; and

(3) Submitting "a copy of a CF 7501 *from 2020* showing an importation of" the so-called "heat-treated T-series aluminum sheet."

Appx00642 (emphasis added).

In response to Commerce's questionnaire, Valeo stated that it believed the correct classification of the imported product was HTSUS subheading 7606.12.3091, despite the company previously [ action ] the so-called "heat-treated T-series aluminum sheet" [                code                ] Appx00743-00744. Significantly, Valeo admitted that it had "been classifying its heat-treated T-series sheet under [ code        ]," but claimed that because HTSUS subheading 7606.12.3091 was created in January 2020, "Valeo could not use the classification prior to that" date. Appx00744.

Contrary to Valeo's claims, however, changes to the statistical reporting numbers in the HTSUS (*i.e.*, changes at the level of the ninth and tenth digits) have no legal significance for purposes of classification. *See, e.g., Chemtall, Inc. v. United States*, 878 F.3d 1012, 1026 (Fed. Cir. 2017) ("The first problem with Chemtall's argument is that the tenth-digit statistical suffixes . . . are not statutory. . . . The suffixes provide subdivisions for statistical analysis purposes, but are not

**CONFIDENTIAL         NONCONFIDENTIAL
MATERIAL OMITTED**

intended to change the substantive tariff schedule."). If Valeo's imports of brazing sheet were not classified under HTSUS subheading 7606.12.3090 before January 1, 2020 (when that subheading was sub-divided into statistical subheadings 7606.12.3091 and 7606.12.3096), then the brazing sheet imported by Valeo was not properly classifiable under either of the two newly established statistical breakouts after the modifications to the HTSUS took effect on January 1, 2020. *See* Appx00744-00745.

Moreover, Valeo's explanation of the reasoning for why it entered its so-called "heat-treated T-series aluminum sheet" under HTSUS subheading [    code    ] in [    date    ] *i.e.*, that HTSUS statistical subheading 7606.12.3091 had not yet been created, turned out to be wrong. Valeo submitted an [ proprietary records ] from [    timing    ] before initially filing its scope ruling request with Commerce, and several months after the HTSUS had been modified, in which Valeo [    proprietary actions taken

] *See* Appx00755-00756.

## 2.    Valeo Incorrectly Characterizes the Relevance of Note 6 to Chapter 76 of the HTSUS

In its opening brief, Valeo asserts "there are other definitional sources specific to the industry Commerce ignored" that indicate that the term "designate" in the scope refers only to alloys that are registered with the Aluminum

Association.   Valeo Br. at 31.   Valeo's brief continues on to quote note 6 to HTSUS Chapter 76 and asserts that:

> "{f}or the purposes of statistical reporting numbers," **including HTSUS subheading 7606.12.3091 (the heading under which the T-series sheet is classified)**, "'heat-treatable industrial alloys' refers to aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys."

_Id._ (emphasis added) (citing Appx00957).   While this chapter note is applicable to HTSUS subheading 7606.12.3091, it is not applicable to the correct HTSUS classification for Valeo's merchandise – _i.e._, HTSUS subheading 7606.12.6000. Appx00287.   Thus, chapter note addressed by Valeo is not applicable to its imports.[3]

### D.   The United States International Trade Commission's Injury Investigation

Valeo's conduct during the United States International Trade Commission's (hereinafter "ITC") injury investigation demonstrates it was well aware that its imported brazing sheet was within the Orders' scope, regardless of whether the core alloy was "proprietary" or specifically registered with the Aluminum

---

[3]   As discussed below in section III.A., Commerce reasonably rejected Valeo's argument regarding the HTSUS chapter notes.

Association.   In public testimony before the ITC during the preliminary phase of

the agency's investigation, a Valeo official testified that:

> Common alloy sheet cannot be used to replace the sophisticated brazing sheet that we import from China or other markets, for these specialized applications.
>
> . . .
>
> We need three layer alloys with a sacrificial and multilayer material, whose only function is corrosion resistance.
>
> . . .
>
> So what is so special about the alloys that we use? Like we say, ***we use proprietary alloys*** and processes developed by the aluminum manufacturers to meet the demanding requirements of the automotive sector.   In nearly all cases, the common 3000 series alloys have been replaced with high strength, highly corrosion resistant proprietary alloys developed specifically for the automotive market.
>
> Like I said before, the two main physical characteristics are the mechanical strength and the corrosion resistance. And the two main elements that allow us to achieve that are copper and manganese.

Appx00306-00308 (emphasis added).

Additional testimony by the Valeo official emphasized the proprietary nature

and higher copper content of the core alloy used in the imported brazing sheet:

> This one basically shows you the chemical composition of two of our proprietary alloys.   And you can see the main element is copper.   Like Mr. Cannistra mentioned, you can clearly see that the copper content in our alloys

> is almost 10 times higher than the common 3000 alloy.
> And this is what we use for the core.
>
> Our brazing sheet is composed of a proprietary core alloy
> and one or more layers of braze clad.

Appx00308.

The Valeo official's testimony describing the imported brazing sheet is nearly identical to the descriptions of the so-called "T-series heat-treated aluminum sheet" in Valeo's scope application. This is not surprising, however, because both descriptions appear to involve the same product.

During the ITC's preliminary injury hearing, Valeo representatives were very clear that the imported brazing sheet that was the focus of their testimony was a clad product. In explaining why public import statistics showed that brazing sheet is higher priced than other in-scope CAAS, Valeo's counsel explained:

> {T}he brazing sheet is exclusively on the clad side. So
> we just began with a separation between clad and unclad.
>
> But as we pointed out, we're at the upper bound of the
> clad side . . . .

Appx00309. Further, in responding to a question from an ITC official concerning whether the brazing sheet imported by Valeo was classified under a unique statistical subheading in the HTSUS that is specific to the clad sheet product imported by Valeo, Valeo's attorney confirmed that it is not:

> There is – – there is not.  It is separated by thickness, alloyed or not alloyed, and clad or not clad.  Those are the only degrees of separation.
>
> . . .
>
> The closest separation is between clad and not clad, us being in the clad category exclusively.

Appx00310.

During the ITC's preliminary proceedings, Valeo argued that brazing sheet should be considered a separate like product from the remainder of in-scope merchandise.  Appx00315-00329.  This is particularly relevant because the ITC's finding of a separate like product is made only with respect to merchandise that is within the scope of the investigation.[4]  In seeking to advance its argument that brazing sheet should be found to be a separate like product, Valeo highlighted differences in the chemical composition of brazing sheet and CAAS based on the use of "{p}roprietary alloys super-saturated with elements to develop special properties" – once again highlighting Valeo's clear understanding that the proprietary nature of the core alloy did not remove the brazing sheet from the scope of the case.  Appx00319.  Valeo did not pursue its argument concerning the like product in the ITC's final phase injury proceedings.

---

[4]  In other words, Valeo did not argue the Commission should expand the domestic like product beyond the scope of the investigation.

### E.    Commerce's Final Scope Ruling

On October 15, 2021, following Valeo's submission of responses to Commerce's additional questions and re-filing of its scope application, pursuant to 19 C.F.R. § 351.225(d), Commerce issued the final scope ruling concluding that the brazing sheet imported by Valeo is covered by the plain language of the Orders' scope.    *See* Appx01246-01268 (Memorandum to Scot Fullerton, *Antidumping and Countervailing Duty Orders on Aluminum Sheet from the People's Republic of China; Final Scope Ruling Determination: Valeo's Heat-Treated T-Series Aluminum Sheet* (Oct. 15, 2021)) (hereinafter, "*Final Scope Ruling*").    On October 22, 2021, one week after completing the *Final Scope Ruling*, Commerce issued instructions to U.S. Customs and Border Protection ("CBP") instructing the agency to continue suspending liquidation of entries of Valeo's T-series aluminum sheet that were determined to fall within the scope of the Orders.    Appx01392-01394.

### F.    The CIT's Remand of Commerce's Final Scope Ruling in *Valeo I*

In challenging Commerce's *Final Scope Ruling* before the CIT, Valeo raised two principal issues that are relevant to this appeal.    First, Valeo argued that Commerce's analysis exceeded the bounds of an analysis under 19 C.F.R. § 351.225(k)(1) due to the agency's reliance on sources that go beyond the sources the agency is permitted to consider under its regulations.    Second, Valeo

NONCONFIDENTIAL

challenged as unsupported by substantial evidence Commerce's determinations that: (a) the phrase "3xxx-series" covers alloys that are not registered by the Aluminum Association; (b) the product imported by Valeo is a clad product and is not heat-treated; and (c) any heat treatment operations conducted by the manufacturer of the imported product do not remove it from classification of a 3xxx-series alloy.[5]

On December 21, 2022, the CIT issued an opinion addressing Valeo's claims and remanding the *Final Scope Ruling* to Commerce for further consideration. *See generally* Appx00007-00011. The CIT concluded that the *Final Scope Ruling* exceeded the limits of a scope ruling analysis conducted pursuant to 19 C.F.R. § 351.225(k)(1), which by regulation is limited to an analysis of the plain language of the scope definition, as well as descriptions of the merchandise contained in the petition, Commerce's initial investigation, and the determinations of Commerce and the ITC.[6] *See* 19 C.F.R. § 351.225(k)(1), (d). In particular, the CIT found that Commerce's reliance on a declaration executed by an

---

[5]  Valeo also argued below that Commerce failed to disclose factual information presented to the agency in purportedly unlawful *ex parte* meetings. Appx00011-00013. Because Valeo has not raised this issue before this Court, Defendants-Appellees do not address the issue further.

[6]  In addition to these sources, judicial precedent confirms that Commerce may also consider trade usage to interpret scope terms. *See, e.g., ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 n.8 (Fed. Cir. 2012) (affirming Commerce's reliance on a standards publication issued by the American Society for Testing and Materials as evidence of trade usage).

industry official, submitted to the agency on behalf of the Defendants-Appellees, in interpreting the meaning of "3xxx-series alloy" and "as designated by the Aluminum Association" was not a permissible (k)(1) source.  Appx00009.  In addition, the CIT found Commerce's analysis of the Aluminum Association's so-called "Teal Sheets," a publication that sets out the general classification scheme for aluminum alloys (by principal alloying element) and also identifies the specific elemental composition of individual aluminum alloys that are registered with the Aluminum Association, as well as a product characteristics memorandum prepared by Commerce at the outset of its less-than-fair-value investigation, did not constitute substantial evidence in support of its finding that the product imported by Valeo is within the Orders' scope.  Appx00008-00010.

In remanding Commerce's analysis, the CIT instructed the agency that if it

> continues to rely on (k)(1) sources, it must reconsider and further explain its ruling pursuant to 19 C.F.R. § 351.225(d) consistent with this opinion.  Alternatively, Commerce may determine to conduct a scope inquiry pursuant to 19 C.F.R. § 351.225(e).

Appx00009-00010 (footnote omitted).

The CIT next addressed Valeo's arguments that the imported product at issue is not a clad product, as well as that the imported product cannot be properly characterized as involving a 3xxx-series alloy because the product is subjected to a heat-treatment process (whereas all 3xxx-series alloys are not heat-treatable).  With

respect to Valeo's arguments that the imported product is not a clad product, the CIT affirmed Commerce's finding in the *Final Scope Ruling* that the product imported by Valeo is a clad product. Specifically, the CIT found that industry standards supported a conclusion that some diffusion between the core and the cladding layers as a result of subjecting a clad product to a thermal treatment does not support a conclusion that the diffusion precludes the product from being characterized as a clad product. Appx00010-00011. Based on Valeo's failure to identify any record evidence undermining Commerce's finding that the imported product is properly characterized as a clad product, as well as the affirmative record evidence supporting Commerce's determination, the CIT concluded that the agency's determination was supported by substantial evidence. Appx00011.

With respect to Valeo's contention that the imported product was subjected to heat-treatment, however, the CIT found that additional analysis was necessary by Commerce. Specifically, the CIT stated:

> to the extent the record shows that 3XXX-series alloys
> are not heat-treatable, . . ., the record does not indicate
> that there are exceptions within the 3XXX-series alloys.
> Thus, it appears that heat-treatability could be relevant to
> whether an alloy may be considered a 3XXX-series alloy
> and covered by the scope of the China CAAS Orders.

Appx00011 (citation and footnote omitted).  In remanding this issue to Commerce, the CIT encouraged the agency to explain the meaning of the phrases "heat-treated" and "heat-treatable" to help it in evaluating Valeo's arguments.  *Id.*

### G.   Commerce's *Remand Redetermination*

During the course of its remand proceedings, Commerce determined that the factors under 19 C.F.R. § 351.225(k)(1) were not dispositive in addressing Valeo's scope ruling request and, accordingly, initiated a scope inquiry pursuant to 19 C.F.R. § 351.225(e) and undertook an analysis of the various factors set out in 19 C.F.R. § 351.225(k)(2).  In connection with that analysis, and consistent with the direction provided by the CIT in *Valeo I*, Commerce's *Remand Redetermination*: (1) addressed – and rejected – Valeo's arguments that the imported product cannot be considered a 3xxx-series alloy because it is subjected to heat-treatments and 3xxx-series alloys are not heat treatable; (2) analyzed and concluded that it could not determine whether the product imported by Valeo falls within the scope based on sources identified under 19 C.F.R. § 351.225(k)(1); and (3) analyzed the various relevant factors identified in 19 C.F.R. § 351.225(k)(2) and concluded the product identified by Valeo falls within the Orders' scope.  Appx00043-00044, Appx00061-00077; Appx00093-00108.

In addressing the significance of Valeo's claims that the imported product is subjected to heat treatment, Commerce concluded: (i) the most appropriate

definition for "heat treatment" is a solution heat-treatment process that involves heating a coil to a particular temperature and then quenching the metal to cool it rapidly; and (ii) the product imported by Valeo does not undergo solution heat-treatment, but instead is subjected to cold-working (or strain hardening) and annealing operations, as reflected by Valeo's identification of temper designations for the imported product that do not correspond with the unique temper designations for products that undergo a solution heat-treatment process. *See* Appx00063, Appx00065-66. Based on these conclusions, Commerce determined that "the tempering processes that Valeo's {product} undergoes (*e.g.*, cold working and partial annealing) are consistent with those of a non-heat-treatable alloy." Appx00067. Further, based on its determination that the record evidence was insufficient to demonstrate that the product imported by Valeo undergoes solution heat-treatment, Commerce determined that it need not address whether a heat-treated (or heat-treatable) clad sheet can be classified as having a 3XXX-series core. Appx00069.

Commerce's *Remand Redetermination* next analyzed whether the so-called (k)(1) sources are dispositive in determining whether the imported product identified by Valeo falls within the Orders' scope. Appx00078-93. In particular, Commerce analyzed two (k)(1) sources: (1) the Aluminum Association's Teal Sheets; and (2) the agency's separate rate determination in the original

CONFIDENTIAL    NONCONFIDENTIAL
MATERIAL OMITTED

antidumping investigation.    *See* Appx00079-82 (Teal Sheets), Appx00082-84

(separate rate determination).    With respect to the Teal Sheets, Commerce

concluded that the meaning of the scope term "3XXX-series" is limited to

registered alloys identified with a four-digit designation assigned by the Aluminum

Association.    Appx00082.    With respect to the agency's separate determination,

however, Commerce determined that the meaning of "3XXX-series" covers any

alloy that contains manganese as the major alloying element – including

unregistered alloys.    Appx00082-83.    In reaching this conclusion, Commerce

observed that in the documentation accompanying the separate rate requests

involved in the agency's separate rate determinations:

> both Jiangsu Alcha and Alcha International identified
> their sale of [ #### ] alloy as subject merchandise.  The
> first digit of [ #### ] is a [ # ], indicating that the major
> alloying element of [ #### ] is [ element ].  However,
> the four-digit alloy designation [ #### ] does not
> correspond with any of the registered alloys in Teal
> Sheets.  Accordingly, [ alloy # ] alloy is an unregistered
> alloy that has a major alloying element of [ element ].

Appx00083.  Based on the inconsistent interpretations of "3XXX-series" from the

two sources, and its determination that one source did not clearly support a

particularly outcome, Commerce concluded that the (k)(1) sources were not

dispositive.  Appx00086, Appx00091.

Having concluded that the (k)(1) sources on the record were not dispositive in resolving the ambiguity in the scope term "3XXX-series alloy," Commerce proceeded to examine the various factors identified in 19 C.F.R. § 351.225(k)(2), including: (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchaser; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.   Appx00093.   Analyzing the factors as a whole, Commerce determined that four of the five factors (*i.e.*, every factor but the channels of trade) supported a finding that the product imported by Valeo and merchandise unambiguously covered by the Orders' scope are the same class or kind of merchandise.  Appx00108.  Further, Commerce concluded that the record evidence with respect to the channels of trade analysis was insufficient to make a finding.  *Id.*   Based on these findings, Commerce concluded that the record supported a determination that the product imported by Valeo is included within the Orders' scope. *Id.*

### H.    The CIT's Affirmance of Commerce's *Remand Redetermination* in *Valeo II*

In affirming the *Remand Redetermination*, the CIT rejected three principal arguments raised by Valeo.   First, the CIT rejected Valeo's argument that Commerce acted unlawfully in determining that the plain language of the scope is

ambiguous, noting that the CIT had already made such a finding in *Valeo I*. Appx00024 ("In *Valeo I*, the court explained that '{t}he phrase "3XXX-series" is not defined in the scope except in reference to the phrase "as designated by the Aluminum Association," which is also undefined.'") (citing *Valeo I*, 610 F. Supp. 3d at 1335 (Appx00008)). In particular, the CIT determined that, consistent with *Valeo I*, Commerce properly addressed whether the ambiguity regarding the phrase "as designated by the Aluminum Association" is suitable for resolution pursuant to 19 C.F.R. § 351.225(k)(1). Appx00025. The CIT also rejected Valeo's argument that Commerce erred in considering the Aluminum Association's Teal Sheets as a (k)(1) source, rather than as a definitional source. Specifically, the CIT observed that Commerce characterized both the Teal Sheets and the separate rate determination as (k)(1) sources, while also recognizing that the Teal Sheets provide evidence of trade usage. Appx00027. The CIT also rejected Valeo's arguments that Commerce improperly considered an agency determination on whether a Chinese entity was eligible for a separate rate because it was not a proper (k)(1) source. Appx00031-33.

Second, with respect to Valeo's contentions that the imported product possesses a core layer that is heat-treatable (and, therefore, not classifiable as a 3XXX-series alloy), the CIT concluded that Valeo "does not present a cogent challenge" to Commerce's findings – and that "{a}t most, Valeo appears to argue

for a broader interpretation of the term 'heat-treatable' that would capture the type of thermal processing its product undergoes." Appx00034. Based on Valeo's failure to challenge the specific factual findings made by Commerce regarding the meaning of the phrase "heat-treatment," the CIT affirmed the agency's "extensive analysis" of that phrase as well as Commerce's application of its findings regarding heat-treatment to the product imported by Valeo as supported by substantial evidence. *Id.*

Third, the CIT also rejected Valeo's arguments that Commerce was required to revoke its instructions to U.S. Customs and Border Protection ("CBP") suspending the liquidation of entries of the product at issue following the publication of the *Final Scope Ruling*. In doing so, the CIT reviewed Commerce's regulations and observed that the regulations explicitly provide for the continuation of the suspension of liquidation where liquidation is already suspended for a product subject to a scope inquiry pursuant to 19 C.F.R. § 351.225(e)), and also distinguished as inapposite judicial precedent that (as discussed below in section VI) Valeo continues to rely on before this Court. Appx00035-37 (stating that "{u}nlike in {*United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 800-01 (Fed. Cir. 2020)}, at no point in this remand proceeding did Commerce instruct CBP to suspend liquidation of, or collect cash deposits on, entries made prior to the date on which Commerce determined that Valeo's product fell within the scope");

Valeo Br. at 46.  Based on its finding that Valeo identified no authority to support its contention that the CIT's order remanding the *Final Scope Ruling* invalidated Commerce's instructions to CBP suspending the liquidation of relevant entries, the CIT declined to take any action to require Commerce to modify those instructions. Appx00037-38.

## SUMMARY OF THE ARGUMENT

Valeo's opening brief makes the bold – and unsubstantiated – claim that Commerce's *Remand Redetermination* "would overturn more than 10 years of black letter law related to scope inquiries."  Like multiple statements of fact and legal arguments presented by Valeo, including its contention that the imported product at issue is not a clad aluminum sheet product, Valeo's assertion is overstated and incorrect.  Equally flawed is Valeo's contention that "this Court affords no deference to the CIT or Commerce when considering whether the scope language of an antidumping or countervailing duty order is unambiguous."  To the contrary, multiple decisions of this Court make clear that the Court gives "substantial deference" to Commerce's scope determinations (matters that are within the agency's unique expertise).  Decisions of this Court have also stated explicitly that the Court considers the "informed judgment" of the U.S. Court of International Trade in reviewing scope rulings.

Valeo's legal arguments are also wrong.  The record makes clear that while the CIT identified instances where Commerce's *Final Scope Ruling* (conducted pursuant to 19 C.F.R. § 351.225(d)) was not supported by substantial evidence, the agency appropriately conducted a scope inquiry during its remand proceedings after determining that the meaning of the phrases "3xxx-series" in combination with "as designated by the Aluminum Association" were ambiguous.  Commerce conducted an extensive analysis of the record before it and determined on remand that an analysis of the factors set out in 19 C.F.R. § 351.225(k)(2) supports a finding that the clad sheet product imported by Valeo falls within the Orders' scope – a finding that Valeo conspicuously does not challenge on appeal.

Valeo's challenges to the process and substance of the *Remand Redetermination* should be rejected.  While Valeo asserts that a single (k)(1) source requires a determination in its favor, its argument invites this Court to re-weigh Commerce's analysis of the evidence – an invitation that this Court should decline to pursue.  For the reasons discussed below, Defendants-Appellants respectfully urge this Court to reject Valeo's challenges to the *Remand Redetermination* and to find Commerce's conclusions to be supported by substantial evidence and otherwise in accordance with law.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews Commerce's final determinations by applying anew the same standard applied by the CIT, that is prescribed in 19 U.S.C. § 1516a(b)(1)(B)(i).  *See Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013).  Consistent with the statute, this Court will:

> Hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . .

19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence means "'more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Suramerica de Aleanciones Laminadas C.A. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  To qualify as substantial evidence, the administrative record "'must do more than create a suspicion of the existence of the fact to be established.'"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp v. NLRB*, 340 U.S. 474, 477 (1951).  "When performing a substantial evidence review, . . . we give

great weight to the informed opinion of the {CIT}. Indeed, it is nearly always the starting point of our analysis." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (internal quotation marks and citations omitted).

Importantly, the court may not reweigh the evidence and assume the role of Commerce as the finder of fact. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *see also SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) ("SolarWorld also invites us to reweigh the evidence already considered by Commerce . . . . However, we may not reweigh the evidence in this case."). "'This court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379 (Fed. Cir. 2015) (quoting *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1331, 1333 (Fed. Cir. 2011)). Nor is it appropriate for the court to substitute its judgment or its interpretation of the evidence for that of the agency. *Matsushita Elec. Indus. Co.*, 750 F.2d at 936. The role of the court is not to question the agency's decisions about the weight or quality of the evidence. *See U.S. Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence). "Under the substantial evidence standard, when adequate evidence exists on both sides of an

issue, assigning evidentiary weight falls exclusively within the authority of {the agency}." *Nippon Steel Corp.*, 458 F.3d at 1358 (bracketed material added).

Valeo incorrectly asserts that "this Court affords no deference to the CIT or Commerce when considering whether the scope language of an antidumping or countervailing duty order is unambiguous." Valeo Br. at 19. While the applicable standard of review results in this Court "repeat{ing} much of the {CIT's} work," this Court "do{es} not ignore the trial court's informed judgment" and also gives "substantial deference to Commerce's interpretation of its own duty orders 'because the meaning and scope of those orders are issues particularly within the expertise and special competence of Commerce.'" *China Custom Mfg. Inc. v. United States*, 61 F.4th 956, 961 (Fed. Cir 2023) (citing and quoting *Sunpreme Inc. v. United States*, 946 F. 3d 1300, 1308 (Fed. Cir. 2000) (*en banc*)). Thus, the Court should reject Valeo's incorrect assertions regarding the standard of review.

## II. COMMERCE'S DETERMINATION THAT THE SCOPE LANGUAGE IS AMBIGUOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Valeo raises three arguments in challenging Commerce's conclusion that the scope language is ambiguous. Two of those arguments (that the scope language is unambiguous and that trade usage and industry standards support Valeo's preferred interpretation of the scope language) are addressed together below, followed by a

response to Valeo's argument that the *Remand Redetermination* failed to correctly interpret the phrase "common." All three of Valeo's arguments should be rejected.

**A.      The *Remand Redetermination's* Conclusion That the Scope Language Is Ambiguous Is Supported by Substantial Evidence**

As it did below, Valeo argues that Commerce erred in defining the scope term "designated" as a general term, rather than as a specific industry term that should be interpreted based on the Aluminum Association's Teal Sheets. Valeo Br. at 25-26; Appx00028. In particular, Valeo asserts that Commerce "unlawfully ignores the conjunctive 'by' in the scope language and impermissibly broadens the use of the word 'designated," Valeo Br. at 25. Valeo's argument, however, is misplaced.

While the term "3XXX-series" is clearly an industry-specific term, Valeo offers nothing more than a baseless assertion that the term "designated" is also an industry-specific term. Indeed, Valeo goes so far as to contend that "there in only one possible interpretation" of the scope language when analyzed "in the context of trade usage of the relevant industry." Valeo Br. at 28.

Contrary to Valeo's argument, the *Remand Redetermination* addressed the term "designate" in relation to the Aluminum Association, and reasonably determined that the phrase has at least two meanings, stating:

> the term "designate" could be understood not to refer
> only to registered alloys with four-digit designation from

the Aluminum Association but, rather, any alloy with a primary alloying element corresponding to the alloy series (e.g., "3XXX-series alloys" meaning any alloy with a primary alloying element of manganese regardless of registration). Even under the general dictionary definition of the term "designate," the phrase "as designated by the Aluminum Association," would serve a purpose in the scope language. Without this phrase, the scope language would be unclear as to what is meant by a 1XXX, 3XXX, or 5XXX-series alloy. The phrase "as designated by the Aluminum Association" in the scope language, directs us to the location of the alloy series definitions where we could interpret a 1XXX-series aluminum as being commercial pure aluminum, a 3XXX-series alloy as having a major alloying agent of manganese, and a 5XXX-series alloy as having a major alloying agent of magnesium.

Appx00081.

Further, as recognized in the *Remand Redetermination*, the Teal Sheets "use{} the word 'designation' to refer to alloys with a four-digit designation from the Aluminum Association." The *Remand Redetermination*, however, then continues on to contrast the use of the term "designation" in the Teal Sheets with the use of the term "designate" in the scope definition, concluding that "'designate' is a general term that may be used in the common vernacular." Appx00080.

Thus, contrary to Valeo's contentions (Valeo Br. at 25), the *Remand Redetermination* did analyze the meaning of "designated" in relation to the Aluminum Association. While Valeo insists that its reading of the scope language

is the only possible one,[7] it provides no authority in support of its position, and also fails to address the CIT's conclusion that "{t}he possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence." Appx00029.

Valeo also argues that Commerce ignored other industry-specific information in defining "designated" – specifically language in note 6 to Chapter 76 of the Harmonized Tariff Schedule of the United States ("HTSUS"). *See* Valeo Br. at 31. Here, again, Valeo's argument is wrong. Unstated in Valeo's argument is that the statistical note it references was not included in the HTSUS in 2017 when Commerce self-initiated its investigation and defined the scope. *See Common Alloy Aluminum Sheet From the People's Republic of China: Initiation of Less-Than-Fair-Value and Countervailing Duty Investigations*, 82 Fed. Reg. 57,214, 57,218 (Dep't Commerce Dec. 4, 2017). Indeed, the statistical note identified by Valeo was not added to the HTSUS until Revision 8 of the 2019 version of the HTSUS, which was issued by the U.S. International Trade Commission on July 2, 2019 – approximately five months after Commerce published the Orders in early February 2019. As such, the statistical note

---

[7] Valeo Br. at 28 ("Simply put, when interpreting the scope language of the Orders in the context of trade usage of the relevant industry, there is only one possible interpretation.").

identified by Valeo could not have affected the drafting of the scope definition at the time of the Commerce's investigation.

Further, even if the language in statistical note 6 highlighted by Valeo were to be considered, that language is distinguishable from the language in the scope definition at issue here. Specifically, the language identified by Valeo addresses alloys "designated as series 6xxx in the Aluminum Association's specifications *of registered alloys*." Valeo Br. at 31 (emphasis added). In contrast, the language in the scope definition contains no reference to "registered alloys." Indeed, if industry usage of the term "designated" truly had the meaning that Valeo seeks to attribute to it, there would be no need to include explicit language in statistical note 6 providing that the reference to 6xxx-series alloys refers to registered alloys.

### B.   Commerce's Interpretation of the Term "Common" Is Supported by Substantial Evidence

Valeo argues that Commerce failed to interpret appropriately the term "common" as used in the phrase "common alloy aluminum sheet," asserting that the term "should be interpreted with the plain meaning 'known to the community' based on its dictionary definition" and that "this unambiguous term . . . confirms that the scope only covers designated alloys." Valeo Br. at 33. Valeo's argument is wrong.

In rejecting Valeo's argument in the *Remand Redetermination*, Commerce reiterated its finding in the *Final Scope Ruling* that the Orders' scope definition includes all products that meet the physical description of the scope and are not excluded. Appx00139-00140. Commerce's analysis then continued on to state that "common" is defined by Merriam Webster as "the best known or most frequently seen kind" and that based on this definition

> it is possible to interpret "common" and "3XXX-series alloy" together to mean that alloys with a primary alloying agency of manganese are a frequently seen kind of aluminum alloy

Appx00140. The *Remand Redetermination* further noted that "there are additional meanings of the word 'common' beyond the interpretation that Valeo advances." *Id.*

While Valeo argues that Commerce's analysis "in effect deprives this scope term of any meaning," that is not an accurate reading of the agency's analysis, which did define "common" and analyzed that term in connection with the scope definition. While Valeo disagrees with Commerce's analysis, the agency did explicitly address its argument and Valeo has not identified any other record information that contradicts Commerce's conclusion. In addition, while Valeo notes that the CIT did not address its arguments in *Valeo I* or *Valeo II*, given that this Court reviews Commerce's determination *de novo*, that Commerce explicitly

NONCONFIDENTIAL

addressed Valeo's argument, and that Valeo has not identified any record information that contradicts Commerce's conclusion, this Court should reject Valeo's argument and find Commerce's analysis to be supported by substantial evidence.

### III. COMMERCE'S RELIANCE ON A SEPARATE RATE DETERMINATION FROM THE UNDERLYING LESS-THAN-FAIR-VALUE INVESTIGATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

#### A.    The Premise Underlying Valeo's Argument Is Wrong

Valeo argues Commerce unlawfully relied on a "third party confidential submission" as a (k)(1) source. *See* Valeo Br. at 35. While Defendants-Appellees address each of the arguments raised by Valeo below, it is important to first note that Valeo's argument is based on an incorrect premise – that Commerce relied on a *"third party"* submission. In fact, Commerce relied on the agency's final determination, a source that is explicitly identified as appropriate for consideration under 19 C.F.R. § 351.225(k)(1), as recognized by the CIT. Appx00031 (stating that "{w}hile Commerce placed copies of the separate rate application on the record of the remand proceeding . . . Commerce relied on its *determination* with respect to the separate rate application as a (k)(1) source") (emphasis in original); 19 C.F.R. § 351.225(k)(1) (identifying "determinations of the Secretary" as a (k)(1) source).

Specifically, as Commerce stated explicitly in the *Remand Redetermination*, the agency found its

> *separate rate determination in the underlying AD investigation* regarding Alcha supports the interpretation that the scope term '3XXX-series' is intended to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).

Appx00082-83 (emphasis added). Commerce also recognized this source was not dispositive in resolving the ambiguity in the scope language and weighed the merits of this and other sources in resolving the ambiguity. Appx00084-00085.[8] Thus, Commerce lawfully relied on its own final separate rate determination in the antidumping investigation, a determination that demonstrates the agency's own understanding of the scope at the time of the determination. Appx00084 ("Commerce's separate rate determination indicates that Commerce understood the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys)").

---

[8]  Valeo appears to claim that Commerce's reliance on the agency's separate determination from the less-than-fair-value investigation is unlawful because the agency did not resolve the ambiguity in favor of that determination. *See* Valeo Br. at 42-43. Commerce, however, weighed the available evidence and sources concerning the scope language and determined they were not dispositive, consistent with the agency's regulatory framework. *See* 19 C.F.R. § 351.225(k)(2) (stating that when (k)(1) sources are "not dispositive," Commerce will examine additional factors).

**B.**    **(K)(1) Sources Are Not Limited to Those That Are Publicly Available at the Time the Order Was Issued**

Valeo claims that (k)(1) sources must be "publicly available at the time the order was issued."  Valeo Br. at 36 (citing *Mid Continental Nail Corporation v. United States*, 725 F.3d 1295, 1304 (Fed Cir. 2013)).  This is incorrect and contrary to the plain language of Commerce's regulations, agency practice, and the judicial precedent identified by Valeo.

Commerce's regulations provide that the agency

> will take into account . . . {t}he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

19 C.F.R. § 351.225(k)(1).  The regulation does not restrict Commerce to consider only sources that are "publicly available" or that were available at the time the underlying order was issued by the agency.  Indeed, the regulation's reference to "prior scope determinations" explicitly identifies determinations by Commerce that are issued subsequent to the agency's publication of the relevant antidumping or countervailing duty order.[9]  Further, all of the various types of determinations

---

[9]    As this Court has noted, "{a}fter an order has issued, importers may seek 'scope rulings' that clarify the scope of an order . . . with respect to particular products.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1298 (Fed. Cir. 2013) (quoting 19 C.F.R. § 351.225(a), (c)).  *See also Star Pipe Prods. v. United States*, 981 F.3d 1067, 1071 (Fed. Cir. 2020); *Walgreen Co. v. United*

(cont'd on next page)

listed in the regulation often involve confidential information – either within the determinations themselves or in the administrative record that underlies them. Indeed, Valeo's own scope ruling request includes confidential information, as did Commerce's *Final Scope Ruling*.  Appx00177-00261, Appx01246-1268.  This circumstance, however, would not preclude Commerce's potential reliance on its scope ruling in this matter in a future scope inquiry.

The judicial authority relied on by Valeo is also inapposite.  The issue in *Mid Continental Nail* was whether

> otherwise-subject merchandise . . . that is packaged and imported together with non-subject merchandise . . . as part of a so-called "mixed media" item . . . is subject to an antidumping order that in terms covers the included merchandise, and makes no exception for mixed media items.

*Id.*, 725 F.3d at 1298.  In answering that question, this Court held that

> the statute and Commerce's regulations do not address mixed media issues specifically, and the statute's mandate for Commerce to write its orders in "such detail as {Commerce} deems necessary," see § 1673e(a)(2), cannot be read to authorize Commerce to provide inadequate notice to regulated parties.

---

*States*, 620 F.3d 1350, 1352 (Fed. Cir. 2010)("'{B}ecause the descriptions of subject merchandise contained in {Commerce's} determinations must be written in general terms' Commerce may issue 'scope rulings' that clarify the scope of an order . . . with respect to particular products.'") (citation omitted).

*Id.* Thus, *Mid-Continent Nail* does not stand for the proposition that all (k)(1) sources must be publicly available at the time the relevant order was published, as claimed by Valeo.

The Court's analysis in *Mid Continental Nail* was focused entirely on the specific circumstances presented by "mixed media" articles, which involve a unique scope inquiry. Indeed, the Court's suggestion that "Commerce must identify published guidance issued prior to the date of the original antidumping order" is specifically directed at situations in which the merchandise at issue is clearly covered by the scope's plain language, and the only question is whether incorporating covered merchandise into a mixed media item, removes the mixed media item from the scope – a situation that would involve "interpreting the order contrary to its literal language." *Id.*, 725 F.3d at 1304. Valeo's assertion that (k)(1) sources must be "be "publicly available at the time the order was issued" in all cases is wrong.

**C.** **The CIT Properly Analyzed Commerce's Reliance on Its Separate Rate Determination**

Valeo next claims the CIT, in *Valeo II*, incorrectly sustained Commerce's reliance on its separate rate determination from the original investigation. *See* Valeo Br. at 37-41. Valeo further argues that Commerce's separate rate determination cannot be considered an "interpretive source" because it does not

itself contain an analysis of the scope. *Id.* at 38. Valeo again cites *Mid Continental Nail* in support of its argument. *Id.* at 39-40.

In *Valeo II*, the CIT found that

> {w}hile Commerce placed copies of the separate rate application on the record of the remand proceeding . . . Commerce relied on its *determination* with respect to the separate rate application as a (k)(1) source.

Appx00031 (emphasis in original). As the CIT correctly recognized, Valeo presented no reason why the reference in Commerce's regulations to "'determinations of the agency' . . . may not be interpreted to include a separate rate determination which formed part of the final determination in the underlying investigation." Appx00032.

The CIT also correctly distinguished Valeo's reliance on certain mixed media cases, which Valeo claimed required (k)(1) sources to be "public" and "provide ascertainable standards." Appx00032. Valeo again cites the same two cases before this Court – *Mid Continent Nail* and *Star Pipe Prods. v. United States*, 981 F. 3d 1067 (Fed. Cir. 2020) ("*Star Pipe*"). Valeo Br. at 39-40. As discussed above, *Mid Continent Nail* is inapposite, and the specific circumstances at issue in the case are not at issue here. Similarly, *Star Pipe* involved the question of whether subject merchandise "meeting the literal 'description' in the antidumping order" can nevertheless be excluded from the order where the subject merchandise

"is packaged and imported together with non-subject merchandise." *Id.*, 981 F.3d at 1071. Thus, just like *Mid Continent Nail*, *Star Pipe* is inapposite and does not establish "foundational principles," as Valeo asserts. Valeo Br. at 40.

Valeo's assertion that Commerce's separate rate determination cannot be an "interpretative" source is also wrong. The agency explained very clearly the relevance of this determination to its interpretation of the Orders' scope:

> Commerce's separate rate determination indicates that Commerce understood the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).

Appx00084. Thus, contrary to Valeo's assertion, Commerce's separate determination in the original investigation – a "determination of the Secretary" under 19 C.F.R. § 351.225(k)(1) – is relevant and consistent with this Court's grant of "substantial deference to Commerce's interpretation of its own duty orders," which are "particularly within the expertise and special competence of Commerce.'" *China Custom Mfg. Inc.*, 61 F.4th at 961 (citation omitted).

## IV. COMMERCE'S FINDINGS ON REMAND THAT THE PRODUCT AT ISSUE IS NOT "HEAT-TREATABLE" OR SUBJECTED TO A "HEAT-TREATMENT" PROCESS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

As it did in the proceedings before the CIT, Valeo asserts that because the product at issue is manufactured using a "heat treatment process," it cannot

properly be considered to be a 3XXX-series alloy because such alloys are non-heat-treatable. *See*, *e.g.*, Valeo Br. at 43. For the reasons discussed below, this Court should reject Valeo's arguments, just as they were rejected by the CIT. Appx00033-00034.

It is first notable that the scope language does not include the terms "heat-treatment," "heat-treated," or "heat-treatable" when defining the merchandise. *AD Order*, 84 Fed. Reg. at 2,815. Rather the scope focuses on specific alloy groups. *Id.* The only language in the scope definition that refers to any sort of heat-treatment is in reference to merchandise that has been "annealed" in a third country, and that language makes clear annealing does not remove an in-scope product from the scope definition. *Id.*

Nevertheless, in *Valeo I*, the CIT remanded this matter to Commerce with instructions to address evidence that Valeo's product undergoes heat-treatment and to reconcile Valeo's assertions about its product being subject to a heat-treatment process with Commerce's conclusion that the core of the clad product at issue constitutes a 3xxx-series alloy. Appx00010-00011. On remand, Commerce determined that the term "heat-treatment" to mean "solution heat-treatment" and that the term "heat-treatable alloy" means "an alloy that can undergo solution heat-treatment." Appx00065. Commerce then analyzed the product at issue and concluded that it does not undergo a solution heat-treatment process, but rather is

subjected to a "combination of annealing and cold-working" processes that do not

preclude classification of the core as a 3xxx-series alloy.    Appx00069.    In

affirming Commerce's findings, the CIT noted that Valeo's arguments addressing

the *Remand Redetermination* did not comment on Commerce's findings that the

clad sheet product at issue does not undergo solution heat-treatment or the

identification of solution heat-treatment as a process that would preclude a non-

heat-treatable alloy from consideration as a 3xxx-series alloy.  Appx00034.

Before this Court, Valeo renews its argument that Commerce's analysis in

the *Remand Redetermination* is unsupported by substantial evidence.  *See* Valeo

Br. at 44-45.  As with its arguments before the CIT, however, Valeo does not

challenge Commerce's conclusion that "the evidence on the record is insufficient

to demonstrate that Valeo's product undergoes solution heat-treatment."

Appx00068.  Indeed, just as before the CIT

> . . . Valeo does not address Commerce's findings
> regarding the type of heat-treatment relevant to
> characterization of 3XXX-series alloys as non-heat-
> treatable or Commerce's factual finding that Valeo's
> product does not undergo solution heat-treatment.

Appx00034.  Based on Valeo's failure to come forward with any argument

challenging Commerce's findings regarding the definition of "heat-treatable" and

"heat-treatment", as well as its failure to challenge Commerce's conclusion that the

product at issue does not undergo a solution heat-treatment process, this Court should affirm Commerce's findings as supported by substantial evidence.

Further, the argument that Valeo does raise in challenging the *Remand Redetermination* – that Commerce made a "contradictory finding" in stating that "the record does not 'indicate that the scope excludes heat-treatable sheet'" – is irrelevant.  Valeo Br. at 45 (quoting *Remand Redetermination* at 78)).  As noted previously, Commerce's analysis is correct that the scope language does not in any way address aluminum sheet products that have been heat-treated – much less include language specifically excluding such products.  Further, having failed to identify record information to undermine Commerce's conclusion that the product at issue does not involve a heat-treatable alloy or that it was subjected to a heat-treatment process (*i.e.*, a solution heat-treatment process), it is irrelevant whether the scope definition does not exclude heat-treatable sheet.[10]

---

[10]    The *Remand Redetermination* appropriately highlights that the scope definition does not exclude heat-treatable sheet.  Appx00118-00119.  While the Orders explicitly exclude "aluminum can stock" from the scope, this is the only product that is excluded from the scope, and there is no discussion of "heat-treatable sheet" in the scope definition, much less any explicit statement excluding such products from the scope of the Orders.  *See generally Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813, 2,815 (Dep't Commerce Feb. 8, 2019); *Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157, 2,158-59 (Dep't Commerce Feb. 6, 2019).

## V. COMMERCE'S DETERMINATION NOT TO REVOKE ITS INSTRUCTIONS SUSPENDING THE LIQUIDATION OF VALEO'S ENTRIES IS IN ACCORDANCE WITH LAW

Valeo's final challenge of the underlying proceedings asserts that Commerce "must revoke" instructions issued to U.S. Customs and Border Protection in October 2021 suspending the liquidation of entries of Valeo's imports of clad sheet that were found to fall within the scope of the unfair trade orders. *See* Valeo Br. at 45-48. Specifically, Valeo argues that because the CIT remanded Commerce's final scope ruling in *Valeo I*, there was "no lawful basis" for continuing to suspend the liquidation of imports of clad sheet and Commerce "must revoke them." Valeo Br. at 46. In addition, Valeo argues that because Commerce initiated a scope inquiry pursuant to 19 C.F.R. § 351.225(e) during the remand proceedings subsequent to *Valeo I*, it was unlawful for Commerce to have suspended the liquidation of entries including the relevant merchandise prior to that date. *See* Valeo Br. at 46. Valeo's arguments should be rejected.

First, with respect to Valeo's argument that the CIT's decision in *Valeo I* rendered Commerce's scope determination unlawful and precluded the basis for the continued suspension of liquidation, as during the proceedings before the CIT, Valeo's brief before this Court identifies no authority that would support a determination that the CIT's order remanding Commerce's final scope ruling invalidates Commerce's prior suspension of liquidation. As stated by the CIT in

*Valeo II*, "{i}t is well settled 'that an order remanding a matter to an administrative agency for further findings and proceedings is not final.'" Appx00037 (*quoting Cabot Corp. v. United States*, 788 F.2d 1539, 1542 (Fed. Cir. 1986); *see also Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States*, 808 F.2d 823, 825 (Fed. Cir. 1986) ("Adhering to our decision in *Cabot*, we conclude as a matter of law that the trial court's remand order is not a final, appealable adjudication of this case."). Further, as also noted by the CIT,

> {t}he lack of finality associated with the court's remand order offers further support for the continuation of any suspension of liquidation during remand proceedings pending a final decision in the action.

Appx00037.

Second, Valeo's argument that Commerce's initiation of a scope inquiry under 19 C.F.R. § 351.225(e) on February 15, 2023, constituted a new proceeding and that the suspension of liquidation of relevant entries prior to that date is unlawful fails to address relevant language in the agency's regulations that provides for the continued suspension of liquidation where a scope inquiry is initiated pursuant to 19 C.F.R. § 351.225(e) and the merchandise at issue is already subject to the suspension of liquidation. Specifically, Commerce's regulations explicitly provide that

> When {Commerce} conducts a scope inquiry under paragraph (b) or (e) of this section, *and the product in*

> *question is already subject to suspension of liquidation,*
> *that suspension of liquidation will be continued*, pending
> a preliminary or a final scope ruling, at the cash deposit
> rate that would apply if the product were ruled to be
> included within the scope of the order.

19 C.F.R. § 351.225(l)(1) (2021) (emphasis added). Here, when Commerce
initiated a scope ruling pursuant to 19 C.F.R. § 351.225(e) in the course of its
remand proceedings, entries of Valeo's product were already subject to the
suspension of liquidation (as a result of instructions issued by Commerce following
its issuance of an affirmative scope ruling at the conclusion of the agency's
original scope proceedings),

## CONCLUSION

For the foregoing reasons, Defendants-Appellees respectfully request that
this Court affirm the *Remand Redetermination* and the CIT's decision in *Valeo II*.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Aluminum Association
Common Alloy Aluminum Sheet
Trade Enforcement Working Group
and Its Individual Members

Dated: April 5, 2024

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-1189

**Short Case Caption:** Valeo North America Inc. v. United States

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 10,762 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/05/2024          Signature:  /s/ John M. Herrmann

                          Name:  John M. Herrmann

Save for Filing