2024-1189

UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

VALEO NORTH AMERICA, INC.,
*Plaintiff-Appellant*,

v.

UNITED STATES, ALERIS ROLLED PRODUCTS, INC., ARCONIC CO., COMMONWEALTH ROLLED PRODUCTS INC., CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC, JUPITER ALUMINUM CO., JW ALUMINUM COMPANY, NOVELIS CORPORATION, ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP,
*Defendants-Appellees*.

Appeal from the United States Court of International Trade
Case No. 21-cv-00581, Chief Judge Mark A. Barnett

# CORRECTED BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES JR.
Assistant Director

ALISON S. VICKS
Senior Trial Counsel
U.S. Department of Justice
Civil Division
PO Box 480
Ben Franklin Station
Washington D.C. 20044
Email: Alison.S.Vicks@usdoj.gov

April 10, 2024

*Attorneys for Defendant-Appellee United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

STATEMENT OF RELATED CASES ... 1

STATEMENT OF THE ISSUES ... 1

STATEMENT OF THE CASE SETTING OUT RELEVANT FACTS ... 1

I. The Antidumping And Countervailing Duty Orders ... 1

II. Legal Framework For Scope Proceedings ... 2

III. The Scope Ruling Proceeding In This Appeal ... 6

IV. Course Of Proceedings ... 7

A. First CIT Decision Remanding The Case ... 7

B. Remand Proceedings ... 9

1. Whether The *Orders* Cover Unregistered Alloys ... 10

2. Heat-Treatment ... 12

3. Suspension Of Liquidation ... 13

C. Second CIT Decision Sustaining Commerce's Scope Ruling ... 13

SUMMARY OF THE ARGUMENT ... 14

ARGUMENT ... 16

I. Standard Of Review ... 16

II. The Scope Language Is Ambiguous As To Whether Commerce Intended The *Orders* To Be Limited To Registered Alloys..........................18

A. The Determination That The Scope Is Ambiguous Contains No Legal Error And Should Be Sustained..........................................18

B. Commerce Reasonably and Lawfully Concluded That "As Designated By" Is Ambiguous As To Whether The Scope Covers Unregistered Alloys ..............................................................20

C. Valeo Waived Arguments That Commerce Failed To Appropriately Interpret The Term "Common" Within The Scope Language ............23

III. Commerce Correctly Conducted A (k)(1) Analysis And Proceeded To A (k)(2) Analysis.........................................................................................24

A. Commerce's Determination That The (k)(1) Analysis Was Not Dispositive Is Supported By Substantial Evidence On The Record ..........................................................................................24

1. Commerce Properly Considered A Separate Rate Determination From The Underlying Investigation .................25

B. Commerce Properly Considered The *Teal Sheets* In Its Its (k)(1) Analysis.........................................................................................31

IV. Commerce Properly Determined That Valeo's T-series Aluminum Sheet Is Not Heat Treatable.....................................................................32

V. Commerce's Determination Not To Revoke Its Customs Instructions Is In Accordance With Law ........................................................................34

CONCLUSION..........................................................................................................37

CERTIFICATE OF COMPLIANCE ......................................................................39

# TABLE OF AUTHORITIES

Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015) ........ 16

*ArcelorMittal Stainless Belg. N.V. v. United States*,
694 F.3d 82 (Fed. Cir. 2012) ........ passim

*Cabot Corp. v. United States*,
788 F.2d 1539 (Fed. Cir. 1986) ........ 37

*Duferco Steel, Inc. v. United States*,
296 F.3d 1087 (Fed. Cir. 2002) ........ 3

*Fedmet Res. Corp. v. United States*,
755 F.3d 912 (Fed. Cir. 2014) ........ 4, 6, 27

*Glob. Commodity Grp. LLC v. United States*,
709 F.3d 1134 (Fed. Cir. 2013) ........ 17

*King Supply Co. v. United States*,
674 F.3d 1343 (Fed. Cir. 2012) ........ 5, 6

*Meridian Prods., LLC v. United States*,
851 F.3d 1375 (Fed. Cir. 2017) ........ passim

*Mid Continent Nail Corp. v. United States*,
725 F.3d 1295 (Fed. Cir. 2013) ........ 17, 28

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) ........ 4, 17, 23

*Sango Int'l, L.P. v. United States*,
484 F.3d 1371 (Fed. Cir. 2007) ........ 4

*Star Pipe Prods. v. United States*,
981 F.3d 1067 (Fed. Cir. 2020) ........ 28

*Tak Fat Trading Co. v. United States*,
396 F.3d 1378 (Fed. Cir. 2005) ........ 4

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013) ....................16

*United Steel & Fasteners, Inc. v. United States*,
947 F.3d 794 (Fed. Cir. 2020) .................... 4, 6, 36

*Valeo N. Am., Inc. v. United States*,
610 F. Supp. 3d 1322 (Ct. Int'l Trade 2022)....................8

*Walgreen Co. of Deerfield v. United States*,
620 F.3d 1350 (Fed. Cir. 2010) ....................17

*Whirlpool Corp. v. United States*,
890 F.3d 1302 (Fed. Cir. 2018) ....................5

*Wirth Ltd. v. United States*,
5 F. Supp. 2d 968 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999).....5

Statutes

19 U.S.C. § 1673e(a)(2) ....................2

19 U.S.C. § 1677(25) ....................3

Regulations

19 C.F.R. § 351.225 .................... passim

Other Authorities

*Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-than-Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*,
83 Fed. Reg. 29088-03 (June 22, 2018)....................25

*Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Final Determination of Sales at Less-Than-Fair-Value*, 83 Fed. Reg. 57421-01 (Nov. 15, 2018)....................25

*Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157-02 (Dep't of Commerce Feb. 8, 2019)....................2

*Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813-02 (Dep't of Commerce Feb. 8, 2019)....................2

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021)....................3

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of this Court, counsel for defendant-appellee, the United States, is unaware of any appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. Counsel is also not aware of any other case pending in this or any other court or agency that may directly affect or be affected by the decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether the determination of the U.S. Department of Commerce (Commerce) that the aluminum sheet imported by Valeo North America, Inc. (Valeo) is covered by the antidumping duty and countervailing duty orders on aluminum sheet from the People's Republic of China (China) is lawful, when Commerce correctly applied its regulation first to find the scope of the orders ambiguous, and second to consider various other sources.

2. Whether Commerce properly determined not to revoke its initial instructions to Customs and Border Protection (CBP) to commence suspension of liquidation during the pendency of any appeals.

## STATEMENT OF THE CASE SETTING OUT RELEVANT FACTS

### I. The Antidumping And Countervailing Duty Orders

In February 2019, Commerce published antidumping and countervailing duty orders on common alloy aluminum sheet from China. *See Common Alloy*

*Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813-02 (Dep't of Commerce Feb. 8, 2019); *Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157-02 (Dep't of Commerce Feb. 8, 2019) (collectively, *Orders*). The scope of the *Orders* covers both multi-alloy, clad and not clad aluminum common alloy sheet, which is "a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width." *Orders*, 84 Fed. Reg. at 2,815. In relevant part, the scope specifies:

> With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

*Id.*

II. Legal Framework For Scope Proceedings

When Commerce issues an antidumping duty order, it defines the scope and "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." 19 U.S.C. § 1673e(a)(2). It is well-established that the scope must be written in general terms because it concerns the overall "class or kind" of merchandise subject to the order. *Meridian Prods., LLC v. United States*, 851 F.3d

1375, 1379 (Fed. Cir. 2017) (discussing 19 C.F.R. § 351.225(a) and 19 U.S.C. § 1677(25)). Hence, Commerce is often called upon to determine whether a certain product is included within the scope of its orders, and does so by issuing a scope ruling. *Id.*; *see* 19 C.F.R. § 351.225(a);[1] *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002). When Commerce confronts such a question, it follows the analytical framework in its regulations. 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing orders.").

The first step in determining whether a certain product is within the scope of an order is considering the language of the order itself, sometimes referred to as the "(k)(0)" inquiry because it precedes the analyses under sections (k)(1) and (k)(2) of Commerce's regulation. *See Meridian Prods.*, 851 F.3d at 1381 (explaining that "case law has added another layer to the inquiry" such that Commerce "must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation") (citations omitted). Scope language is deemed "unambiguous" if the relevant terms have "a single clearly defined or stated

[1] Commerce revised this regulation in 2021, but the revision does not apply to this case. *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021). Throughout this brief, all citations to section 351.225 refer to the previous version of the regulation.

meaning." *Id.* at 1381 n.7 (citation omitted). Importantly, the threshold to show that Commerce justifiably found ambiguity is low. *Id.* at 1381 n.6 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

Second, if the scope language does not unambiguously answer the question, Commerce engages in an interpretive analysis using the sources enumerated in 19 C.F.R. § 351.225(k)(1). These include descriptions of the merchandise contained in the petition, the initial investigation, prior Commerce determinations (including scope determinations), and those of the International Trade Commission (ITC). *Meridian Prods.*, 851 F.3d at 1382. If the descriptions of the subject merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the products fall within the order's scope. 19 C.F.R. § 351.225(d); *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they "definitively answer the scope question." *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007). This Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as a question of fact. *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020).

If Commerce finds the (k)(1) sources non-dispositive, it will initiate a scope inquiry pursuant to 19 C.F.R. § 351.225(e) to consider the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2). *See, e.g.*, *Fedmet Res. Corp. v. United*

*States*, 755 F.3d 912, 918 (Fed. Cir. 2014). These criteria are: (i) "The physical characteristics of the product"; (ii) "The expectations of the ultimate purchasers"; (iii) "The ultimate use of the product"; (iv) "The channels of trade in which the product is sold"; and (v) "The manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2). The criteria help to "determine whether a product is sufficiently similar as merchandise unambiguously within the scope of an order as to conclude the two are merchandise of the same class or kind." *Wirth Ltd. v. United States*, 5 F. Supp. 2d 968, 981 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999). Commerce has discretion in how to balance the criteria. *Meridian Prods.*, 851 F.3d at 1382 (citations omitted).

The question of whether the scope is ambiguous presents a question of law that courts review *de novo*, whereas the question of whether a product meets the scope terms presents a question of fact reviewed for substantial evidence. *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods.*, 851 F.3d at 1382). At the same time, because the meaning and scope of orders are particularly within Commerce's expertise and special competence, this Court grants Commerce "substantial deference with regard to its interpretation of its own Orders." *Id.* (citing *Meridian Prods.*, 851 F.3d at 1381-82); *King Supply Co. v. United States*,674 F.3d 1343, 1348 (Fed. Cir. 2012) (citations omitted). Deference is also appropriate because scope cases are "highly

fact-intensive and case-specific." *Fedmet Res. Corp.*, 755 F.3d at 918 (quoting *King Supply*, 674 F.3d at 1345). Parties challenging Commerce scope determinations thus confront a high barrier to reversal. *United Steel & Fasteners*, 947 F.3d at 798 (citations omitted).

Commerce may suspend liquidation of relevant entries starting on the day that a final scope ruling is issued under 19 C.F.R. § 351.225(d). 19 C.F.R. § 351.225(l)(3); *United Steel & Fasteners*, 947 F.3d at 800-03. The regulations further provide that an ongoing suspension of liquidation continues if the Secretary conducts a scope inquiry. 19 C.F.R. § 351.225(l)(1) ("When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.").

III. <u>The Scope Ruling Proceeding In This Appeal</u>

On May 1, 2020, Valeo requested a scope ruling and, specifically, that Commerce find Valeo's imports of certain T-series aluminum sheet from China outside the scope of the *Orders*. Appx00177-261. Valeo thereafter submitted three additional scope ruling requests providing further information requested by Commerce. Appx00459-545, Appx0645-761, Appx00792-1228.

On October 15, 2021, Commerce issued a final scope determination pursuant to 19 C.F.R. § 351.225(d). Appx01246-68 (Final Scope Ruling). Commerce found, first, that the scope language and (k)(1) sources were dispositive as to whether Valeo's aluminum sheet is subject merchandise based on Valeo's complete scope ruling application. Appx01255. Commerce determined that Valeo's aluminum sheet from China was within the scope of the *Orders* because it is a multi-alloy, clad aluminum sheet and the principal alloying element of the core is manganese, consistent with a 3XXX-series alloy covered by the scope of the *Orders*. Appx01256-61. Commerce also rejected the contention that Valeo's product could be considered heat-treated instead of clad, Appx01257-58, or that heat-treated or heat-treatable alloys were otherwise outside the scope. Appx01261-64.

Following issuance of the Final Scope Ruling, Commerce notified interested parties and CBP of its determination, and directed CBP to suspend liquidation of entries. *See* Appx01388-91; Appx01392-94.

## IV. Course Of Proceedings

### A. First CIT Decision Remanding The Case

Valeo timely sought judicial review of Commerce's final scope ruling before the Court of International Trade.

On December 21, 2022, the trial court remanded the final scope ruling to Commerce for further consideration. Appx00003-17 (*Valeo N. Am., Inc. v. United States*, 610 F. Supp. 3d 1322 (Ct. Int'l Trade 2022) (*Valeo I*)). The trial court held that Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and was unsupported by substantial evidence. Appx00008. With regard to the language of the scope referring to "3XXX-series," the trial court observed that "[t]he phrase '3XXX-series is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,' which is also undefined." *Id.* The trial court held that,

> The scope is ambiguous . . . as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association.

*Id.* The court held that Commerce's reliance on an industry publication, the *Teal Sheets*, was appropriate (Valeo had argued against Commerce's reliance on the *Teal Sheet*s to interpret the scope during the briefing on the Final Scope Ruling), but that Commerce failed to account for the publication as a whole. Appx00008-09. The trial court also held that Commerce's reliance on a declaration to help interpret the scope was unlawful. Appx00009. The court concluded, "[i]n sum, Commerce's interpretation of the phrase '3XXX-series' in conjunction with 'as

designated by the Aluminum Association' to include unregistered aluminum alloys with a major alloying element of manganese . . . [was] unsupported by substantial evidence." Appx00009. The trial court ordered that if Commerce, on remand, continued to rely on (k)(1) sources, it must reconsider and further explain its ruling pursuant to 19 C.F.R. § 351.225(d) consistent with the trial court's opinion, or, alternatively, Commerce could determine to conduct a scope inquiry pursuant to 19 C.F.R. § 351.225(e). Appx00009-10.

The trial court also held that Commerce's determination that Valeo's product is a clad product *was* supported by substantial evidence, but that, on remand, "to the extent necessary to its determination [as to scope], Commerce must address evidence that Valeo's product undergoes heat-treatment" and "reconcile such evidence with evidence indicating that 3XXX-series alloys are not heat-treatable." Appx00010-11.

B. Remand Proceedings

On remand, Commerce considered whether the scope was ambiguous, reviewed record information under 19 C.F.R. § 351.225(k)(1) and other relevant information concerning trade usage, and determined that the (k)(1) factors were not dispositive as to whether Valeo's aluminum sheet is covered by the *Orders*. Appx01395-97 (Initiation of Formal Scope Inquiry). In accordance with the Remand Order, Commerce initiated a scope inquiry under 19 C.F.R. § 351.225(e)

and properly found the scope was ambiguous, conducted a proper (k)(1) analysis finding that its (k)(1) analysis was not dispositive, and then proceeded to consider 19 C.F.R. § 351.225(k)(2) factors. *Id.*; Appx00043 (Final Results of Redetermination Pursuant to Court Remand (Remand Results) at 3). After review of the record (k)(2) factors, Commerce again concluded that that Valeo's T-series aluminum sheet is within the scope of the *Orders*. Appx00043-44.

1. Whether The *Orders* Cover Unregistered Alloys

Commerce first evaluated whether the scope language was ambiguous. Appx00079-82. Commerce lawfully concluded that the scope was ambiguous after looking at the plain language of the scope, which is necessarily written in general terms, as well as evidence of trade usage provided in the *Teal Sheets*. *Id.* Commerce then lawfully proceeded to conduct a (k)(1) analysis.

In conducting its (k)(1) analysis, Commerce considered whether (k)(1) factors and other information on trade usage was dispositive to determine whether the *Orders* cover unregistered alloys that nevertheless have a primary alloying element corresponding to the Aluminum Association's alloy groups listed in the scope. Appx00081. First, Commerce determined that the *Teal Sheets*, as a whole, supported the interpretation that the scope refers only to registered alloys that have four-digit designations assigned by the Aluminum Association. Appx00081-82.

Commerce also looked at determinations it made during the original investigation and found that a separate rate determination that it made during the original investigation indicated that Commerce understood the scope to cover unregistered alloys that have a primary alloying element corresponding to the Aluminum Association's alloy groups. Appx00082-84. Specifically, during the original investigation, as part of its separate rate application to support that it "has exported, or has sold for export, subject merchandise to the United States during the period of investigation," an exporter produced sales documentation showing that it had sold an unregistered proprietary alloy. Apppx00083. Commerce granted the exporter a separate rate during the original investigations, showing that Commerce considered sales of an unregistered alloy to be subject merchandise. Appx00084. On remand, Commerce appropriately and reasonably considered this information, which is (k)(1) record information from the original investigation. When weighing this information, however, Commerce reasonably determined that the separate rate given to an unregistered alloy was not dispositive as to whether the scope covered unregistered alloys because there was not explicit analysis of this determination during the original investigation. Appx00085-93.

Thus, after considering the contradictory (k)(1) sources and their respective weights, Commerce reasonably determined that the (k)(1) sources were not dispositive and proceeded with its (k)(2) analysis in accordance with the

regulations. Appx00093. Under Commerce's (k)(2) analysis examining the physical characteristics of the merchandise, the expectations of the ultimate purchasers, the ultimate use of the product, the channels of trade in which the product is sold, and the manner in which the product is advertised and displayed, Commerce determined that Valeo's aluminum sheet is covered by the scope of the *Orders*. Appx00093-108.

2. Heat-Treatment

With regard to the analysis of heat-treatment, Commerce reviewed record information to determine a definition of heat-treatment most relevant for the purposes of classifying aluminum alloys under the scope. Appx00061-65 (Remand Results at 21-25). Commerce observed that there were two definitions: a broad definition of heat-treatment that described several types of treatment where heat is applied to strengthen an alloy, which could include annealing,[2] and a narrower definition that describes a particular process of heating and quenching, a process called "solution heat-treatment." *Id.* Based on its analysis and record information, Commerce determined that the correct definition for heat-treatment and "heat-

[2] Annealing is "a thermal treatment to soften metal by removal of stress resulting from cold working or by coalescing precipitates from solid solution." Appx00064. Annealing can be used to strengthen any aluminum alloy, whereas only some alloys can be strengthened by solution heat-treatment. Appx00064-65.

treatable" is the narrower definition – a synonym for "solution heat-treatment." Appx00063-65.

Proceeding from that definition, Commerce determined that Valeo's T-series sheet is not properly considered heat-treated because record information indicates that it does not undergo solution heat-treatment. Appx00065-69. Commerce found that the evidence on the record demonstrated that Valeo's T-series sheet is a clad product that undergoes a combination of annealing and cold-working for purposes of understanding whether it is covered by the scope of the *Orders*. Appx00068-69. Commerce concluded that it was no longer necessary to determine whether a heat-treated (or heat-treatable) clad sheet could have a 3XXX-series core, and thus be covered by the *Orders*, because Valeo's T-series sheet is not a heat-treated (or heat-treatable) sheet. Appx00069.

3. Suspension Of Liquidation

Finally, Commerce declined to revoke its prior customs instructions transmitted following the final scope ruling pursuant to 19 C.F.R. § 351.225(l)(3). Appx00111-12; Appx01388.

C. Second CIT Decision Sustaining Commerce's Scope Ruling

On November 8, 2023, the trial court sustained Commerce's remand redetermination, holding that Commerce provided a reasoned explanation for why it determined that the *Teal Sheets* were not dispositive. *See* Appx00026-29.

Further, the Court held that Commerce did not commit error by considering a separate rate determination made in the original investigation to help interpret the scope under its (k)(1) analysis, which provides for consideration of prior determinations of the agency. Appx00031-33. The trial court further held that Commerce's extensive analysis of heat-treatment and its determination that Valeo's T-series aluminum sheet is not heat-treatable were supported by substantial evidence. Appx00033-34. Therefore, because Valeo did not challenge the specific findings of Commerce's (k)(2) analysis, the trial court sustained Commerce's scope remand redetermination that Valeo's T-Series sheet is covered by the *Orders*. The trial court also held that Commerce lawfully did not revoke suspension of liquidation.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce lawfully conducted a scope inquiry under 19 C.F.R. § 351.225, and its conclusion that Valeo's proprietary T-sheet aluminum alloy sheet is subject to the scope of the *Orders* is supported by substantial evidence on the record.

Commerce followed its established regulatory process when determining that Valeo's imported aluminum sheet is covered by the *Orders*. In *Valeo I*, the trial court found that the scope was ambiguous as to whether it covered unregistered alloys. On remand, Commerce agreed the scope was ambiguous. Specifically,

after considering the plain language of the scope and relevant trade usage information, the *Teal Sheets*, Commerce explained that the scope's language could still indicate that the scope included unregistered alloys such as Valeo's T-series sheet, even if Commerce agreed that the *Teal Sheets* weighed in favor of finding that the scope covers only registered alloys. Commerce thus reasonably and lawfully found ambiguity and proceeded to conduct a full (k)(1) analysis.

In its (k)(1) analysis, Commerce explained that it considered a previous determination to give a separate rate to an exporter of an unregistered alloy during the original investigations. It did this because the separate rate determination demonstrated how Commerce viewed the scope language during the investigation. Although Valeo contends that Commerce should not have relied on a separate rate determination, Commerce reasonably explained how it was probative of what the scope was intended to cover at the time of the investigation.

Valeo next contends that Commerce should not have conducted a (k)(2) analysis because it allegedly did not follow its own regulatory process prior to the (k)(2) analysis. But the record demonstrates that during the remand, Commerce: (1) considered whether the scope was ambiguous; (2) properly evaluated the key terms at issue noting that scope language is necessarily written in general terms, while also taking into consideration evidence of trade usage; (3) analyzed multiple sources of appropriate record information, which pointed to different conclusions;

and (4) reasonably determined that record evidence under its (k)(1) analysis was not dispositive to resolve the identified ambiguity in the scope, before proceeding to its (k)(2) analysis. This is the process set forth in the regulations and this Court's precedent. Valeo disagrees with Commerce's weighing of the record evidence but has demonstrated no legal error in Commerce's process or conclusion, nor has Valeo challenged the findings that Commerce made in its (k)(2) analysis.

Finally, Valeo is wrong that Commerce should revoke its customs instructions commencing the suspension of liquidation of entries issued pursuant to its original scope ruling. Commerce's decision not to revoke its original customs instructions was in accordance with the regulations and this Court's precedent.

## ARGUMENT

### I. Standard Of Review

This Court reviews decisions of the Court of International Trade *de novo*, "apply[ing] anew the same standard used by the [CIT]." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (alterations in original). Under that standard, this Court upholds Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States,* 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that the appellate court reviews *de novo*. *Meridian Prods.*, 851 F.3d at 1382. If the scope is unambiguous, the plain meaning of the Orders' language governs. *Id.* at 1381. Only a low threshold is needed to show that Commerce has justifiably found an ambiguity. *See ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 89 (Fed. Cir. 2012) (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002). If the scope is determined to be unambiguous, the question of whether a product meets the unambiguous scope terms is reviewed for substantial evidence. *Meridian Prods.*, 851 F.3d at 1382.

The Court grants "'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms,' and does not 'change the scope of the order.'" *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (citing *Glob. Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). After all, the interpretation of its own orders is "at the very heart of [Commerce's] expertise." *Walgreen Co. of Deerfield v. United States*, 620 F.3d 1350, 1355 (Fed. Cir. 2010).

## II. The Scope Language Is Ambiguous As To Whether Commerce Intended The *Orders* To Be Limited To Registered Alloys

### A. The Determination That The Scope Is Ambiguous Contains No Legal Error And Should Be Sustained

The trial court did not err in finding the scope ambiguous. The trial court first observed, in assessing whether the relevant scope language "common alloy sheet [ . . . ] manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association[,]" (Appx00004), is ambiguous, that the scope itself does not define key phrases. Appx00008 ("The phrase '3XXX-series' is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,' which is also undefined."). The trial court thus recognized that, in the first instance, comprehending what these terms are intended to cover requires reference to *something* that indicates what "as designated by the Aluminum Association" means. The terms "1XXX-, 3XXX-, or 5XXX-series alloy" need to be understood in the context of proper trade usage, at the very least, *ArcelorMittal*, 694 F.3d at 88, and the trial court determined that the proffered trade usage – the *Teal Sheets* – did not unambiguously provide an understanding of the scope. Appx00008.

Valeo argues that Commerce acted unlawfully on remand by determining that the scope language is ambiguous, Valeo Br. at 21 ("As a threshold matter, Commerce found that the scope language was ambiguous."), an argument that

directly contradicts Valeo's other assertions that Commerce must determine whether a scope is ambiguous. Indeed, this Court's precedent requires Commerce to consider whether the scope is ambiguous. *Meridian Prods.*, 851 F.3d at 1381. Thus, Commerce did not err when weighing record evidence on remand to determine that the scope was ambiguous. *Id.*

Valeo's real contention appears to be that the ambiguity in the scope is resolved by the trial court's analysis of the *Teal Sheets* in *Valeo I*, Valeo Br. 24-25, but Valeo is wrong. In Valeo's view, the language of the *Orders* when read with the *Teal Sheets* supports only one interpretation of the scope. The trial court correctly rejected this position in *Valeo I* and determined that the scope is ambiguous as to whether it covers an unregistered alloy such as Valeo's T-series sheet. Appx00008. As recognized by the trial court in the Remand Order, the *Teal Sheets* contains both the general series grouping (*i.e.*, the language indicating that the 3XXX-series designates aluminum sheets with a primary alloying element of manganese) that Commerce had relied on *as well as* the designations of registered alloys. *Id.* Thus, in *Valeo I*, the trial court was unpersuaded by Commerce's reliance on only the series-groupings in the *Teal Sheets* to support that the scope included unregistered alloys. *Id.* (finding that Commerce's interpretation "fails to account for the *Teal Sheets* as a whole."). On remand, therefore, Commerce needed to consider the presence of the specific alloy registrations when interpreting

the scope. Apppx00009-10. As discussed below, Commerce did so and concurred with the trial court's determination that the scope language was ambiguous. Appx00081 (finding the scope language ambiguous consistent with the Remand Order).

### B. Commerce Reasonably and Lawfully Concluded That "As Designated By" Is Ambiguous As To Whether The Scope Covers Unregistered Alloys

Commerce also reasonably concluded that the language "as designated by" in the scope language does not resolve the ambiguity of whether the scope language of "1XXX-, 3XXX-, or 5XXX- series alloy as designated by the Aluminum Association" covers unregistered alloys such as Valeo's with a primary alloying element corresponding to the in-scope alloy series (*i.e.*, the scope's reference to 1XXX, etc). Appx00078-81. To understand "as designated by the Aluminum Association" in the scope, Commerce considered the *Teal Sheets* as a whole. Appx00081. First, Commerce found that, when taken as a whole, the *Teal Sheets* support the conclusion that the scope covers only registered alloys. Appx00081-82. Commerce also explained, however, that the phrase "as designated by the Aluminum Association" could reasonably be interpreted as directing to the location of the alloy series definitions where one could interpret a 3XXX-series alloy as any alloy having a primary alloying agent of manganese. *See* Appx00081 (Remand Results at 41). In other words, pursuant to the *Teal*

*Sheets*, the first of the four digits in the designation system indicates the alloy group, also called the series, and so a "3XXX- series" in the scope could refer to an alloy with a primary alloying element of manganese, even if that alloy is not registered. *See* Appx00079-80

Moreover, in evaluating the meaning of "as designated by," Commerce also considered other sources of trade usage offered by the domestic industry, consistent with *ArcelorMittal*. Appx00086-88, Appx00153-54; *ArcelorMittal*, 694 F.3d at 88 ("[A]ntidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry."). Commerce considered the trade usage and concluded that there is a general interpretation of the term "as designated by" that is a reasonable alternative interpretation to an interpretation that indicates that only registered alloys are in-scope. Appx00079-82. Therefore, Commerce reasonably continued to find ambiguity in the scope as identified by the trial court and, as such, lawfully proceeded with a more fulsome analysis of record (k)(1) factors. Appx00079-82 (Remand Results at 39-42).

Valeo argues that the Aluminum Association's alloy designations and chemical composition publication, the *Teal Sheets*, is a definitional source that resolves any ambiguity in the scope language, and that the language "as designated by the Aluminum Association" unambiguously refers only to registered alloys and

not unregistered alloys with a principal alloying element corresponding to an Aluminum Association alloy group. *See* Valeo Br. at 24-25. As we explained above, however, the *Teal Sheets* does not resolve the ambiguity because the phrase "as designated by" can reasonably by interpreted to include registered or unregistered alloys, based on the *Teal Sheets* including both the series-alloy designation framework as well as specific four-digit designations for registered alloys. Appx00080-81. Moreover, Valeo does not present sufficient evidence to dispositively demonstrate that the *Teal Sheets* establish an unambiguous definition when considering other (k)(1) sources that Commerce weighed as well as the fact that the scope is written in general terms per 19 C.F.R. § 351.225(a); instead, Valeo just disagrees with how Commerce weighed the *Teal Sheets*. But Commerce lawfully and reasonably concluded that the *Teal Sheets* do not resolve ambiguity in the scope.

In short, Valeo's disagreement with how the trial court or Commerce interpreted, or weighed, the *Teal Sheets* does not establish that the *scope language itself* is unambiguous. There is no legal error in the trial court's or Commerce's determination that the plain language of the *Orders* is ambiguous as to whether it covers unregistered alloys like Valeo's aluminum sheet, and that determination should be sustained. *ArcelorMittal*, 694 F.3d at 89 ("Only a 'low threshold [is]

needed to show that Commerce here justifiably found an ambiguity[.]'") (citing *Novosteel*, 284 F.3d at 1272).

### C. Valeo Waived Arguments That Commerce Failed To Appropriately Interpret The Term "Common" Within The Scope Language

Valeo contends that the term "common" in common aluminum alloy sheet unambiguously means that the scope covers only registered alloys. *See* Valeo Br. at 33-34. Valeo then faults the trial court for not addressing this argument in its opinion sustaining Commerce's remand redetermination, after the trial court indicated in *Valeo I* that it would "defer resolution [of this issue], to the extent that [it] remain[s] live, until Commerce issues its remand redetermination." *See* Valeo Br. at 34 (citing *Valeo I*, at 1338 n.27, Appx00010 n.27, Appx00016). However, the trial court's language "to the extent that [it] remain[s] live" is key here.

In its comments to the trial court following Commerce's remand redetermination, Valeo did not preserve any argument that Commerce improperly interpreted the word "common" in the scope language. *See generally* Appx01767-89 (Valeo Post-Remand Comments). Accordingly, the Government and the trial court did not further address this argument. Therefore, this Court should find that Valeo has waived this particular argument by not preserving it before the trial court following Commerce's remand redetermination. *See, e.g., Novosteel*, 284 F.3d at 1274 ("[P]arties must give a trial court a fair opportunity to rule on an issue").

If the Court finds, however, that Valeo need not have preserved this issue before the trial court and therefore for appeal, Commerce addressed the argument in its remand redetermination and its conclusion was reasonable. Specifically, Commerce stated that this scope inquiry focuses on whether Valeo's sheet meets the physical description provided in the scope, as the scope covers all products which meet the physical description provided. Appx00140 (Remand Results at 100). Further, according to Merriam Webster, "common" could be interpreted to mean "the best known or most frequently seen kind." *Id.* Therefore, Commerce properly concluded that it is possible to interpret "common" and "3XXX-series alloy" together to mean that alloys with a primary alloying agent of manganese are a frequently seen kind of aluminum alloy. *Id.* Commerce's conclusion that the scope term "common" does not necessitate the interpretation that only registered alloys are included in the scope of the *Orders* is supported by substantial evidence and should be sustained.

## III. Commerce Correctly Conducted A (k)(1) Analysis And Proceeded To A (k)(2) Analysis

### A. Commerce's Determination That The (k)(1) Analysis Was Not Dispositive Is Supported By Substantial Evidence On The Record

On remand, the trial court ordered that if Commerce continued to rely on (k)(1) sources, including the *Teal Sheets* as evidence of trade usage, it must reconsider and further explain its ruling pursuant to 19 C.F.R. § 351.225(d), or

conduct a scope inquiry pursuant to 19 C.F.R. § 351.225(e). Appx00009-10. Commerce did exactly this on remand. Commerce's analysis on remand was that the *Teal Sheets* weighed in favor of interpreting the scope to include registered alloys only. Appx00082. As discussed below, however, Commerce did not find this evidence dispositive because (k)(1) sources, including an actual determination by Commerce during the original investigations, indicated that Commerce considered unregistered alloys to be covered by the scope at the time of the original investigation.

1. Commerce Properly Considered A Separate Rate Determination From The Underlying Investigation

Valeo unpersuasively contends that Commerce's consideration of a separate rate determination from the initial investigation was unlawful. Valeo Br. 35-43. During the underlying investigations, Commerce made a separate rate determination that an exporter (unrelated to Valeo) that was exporting an unregistered alloy during the period of investigation was entitled to a separate rate under the *Orders*. *See Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-than-Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 83 Fed. Reg. 29088-03 (June 22, 2018), and accompanying Preliminary Decision Memorandum (PDM) at 12-17, unchanged at *Antidumping*

*Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Final Determination of Sales at Less-Than-Fair-Value*, 83 Fed. Reg. 57421-01 (Nov. 15, 2018). In other words, during the underlying investigation, Commerce determined to grant a separate rate to unregistered alloys – considering them to be subject merchandise under the *Orders* at the time of the underlying investigations. Appx00143-51 (Remand Results at 103-111). This demonstrates Commerce's previous interpretation of the *Orders*. Commerce therefore properly considered this separate rate analysis within the context of Commerce's (k)(1) analysis. 19 C.F.R. § 351.225(k)(1).

Valeo argues that Commerce improperly treated the separate rate *application* of the exporter as an interpretive (k)(1) source. *See* Valeo Br. at 35-37. This is incorrect. Commerce did not use the separate rate application itself as an interpretive source, but, as expressly allowed by (k)(1), Commerce properly considered the resultant separate rate determination based on the application, which is squarely a "determination[] by Commerce (including prior scope determinations)" that can be used when interpreting the scope. 19 C.F.R. § 351.225(k)(1). The inclusion of the parenthetical "(including prior scope determinations)" to determinations by Commerce indicates that "determinations" is not limited to only formal scope determination. *See id.*

During the initial investigation, Commerce issued a separate rate determination for an unregistered alloy with a primary alloying element corresponding to the Aluminum Association's alloy groups, and the determination that the exporter-producer combination was eligible for a separate rate demonstrates that Commerce considered the sales of unregistered alloy to be, at the time of the underlying investigation, merchandise subject to the investigation. Appx00083-84 (Remand Results at 43-44). In the remand redetermination, Commerce explained that it was considering the separate rate application and determination "because they related to a determination of Commerce and the description of merchandise in the AD investigation." Appx00092 (Remand Results at 52). Thus, when interpreting the scope in this case, Commerce appropriately considered descriptions of the merchandise as contained in the separate rate application and determination during the initial investigation. 19 C.F.R. § 351.225(k)(1); Appx00092-93 (Remand Results at 52-53). Moreover, it is relevant to the scope issue before the Court because it provides direct evidence of Commerce's understanding of the scope during the underlying investigations. *See* Appx0009 (citing *Fedmet Res. Corp.*, 755 F.3d at 921).

Valeo also incorrectly contends that the separate rate determination is an invalid (k)(1) source because it was not a publicly available document. *See* Valeo Br. at 35-36. The precedent that Valeo relies on concerns mixed-media exceptions

to express antidumping orders, and in both cases, the Federal Circuit held that for Commerce to find that component merchandise that is presumptively covered by an antidumping order is *not* subject to the order, it must rely on publicly available sources to do so, for due process reasons. *Star Pipe Prods. v. United States*, 981 F.3d 1067, 1074 (Fed. Cir. 2020) ("'Published guidance issued prior to the date of the original antidumping order' may suffice to overcome the presumption that the literal language of an antidumping order governs in mixed media cases." (citing *Mid Continent Nail*, 725 F.3d at 1304). These cases do not stand for the proposition that all (k)(1) sources, *e.g.* a separate rate determination, must be supported by only publicly available information, as Valeo contends. Valeo Br. at 37-40. Moreover, these cases are not applicable because this appeal does not involve a mixed-media exception, and Commerce did not interpret the scope contrary to its literal terms; rather, it is attempting to ascertain the meaning of the scope as understood by Commerce at the time of the underlying investigation. As discussed above, the initial investigation is uncontrovertibly allowed to be considered under the plain terms of (k)(1).

Valeo also contends that Commerce's separate rate determination in the underlying AD investigation is not an interpretative (k)(1) source because it does not discuss a scope issue. *See* Valeo Br. at 38-39. This is also incorrect. As explained by Commerce in the remand redetermination, the meaning given to the

scope language during the underlying investigations is reflected throughout the preliminary and final determinations of the AD and CVD investigations and is not limited to just scope determinations. Appx00144 (Remand Results at 104) (explaining that the parenthetical phrase within 19 C.F.R. § 351.225(k)(1), "determinations of the secretary (including prior scope determinations)," indicates that the determinations that Commerce may consider under a (k)(1) analysis are not limited to scope determinations). Thus, ascertaining the meaning given to the scope language during the underlying investigations is not limited to specific scope determinations. *See id.* Rather, the determinations made throughout the course of the underlying investigations, including separate rate determinations, may properly be taken into account in a (k)(1) analysis. The application and Commerce's separate rate determination are indicative of Commerce's and other outside parties' understanding of the scope at the time of the investigation and were reasonably considered under (k)(1).

Commerce's determination that the company was entitled to a separate rate weighs in favor of finding that Commerce understood the proof of sale listing an unregistered alloy to be applicable to "merchandise under consideration." Appx00145. In the Preliminary AD Determination, Commerce stated, "Commerce's policy is to assign all exporters of *merchandise under consideration* that are in an NME country this single rate unless an exporter can demonstrate that

it is sufficiently independent so as to be entitled to a separate rate." Appx00144 (Remand Results at 104) (emphasis in original). In the Final AD Determination, Commerce explained that it "determines whether an exporter has demonstrated an ability to control its own commercial decision-making concerning exportation of the subject merchandise." Appx00144-45. Accordingly, Commerce's separate rate determinations are, in part, dependent upon the meaning Commerce gave the terms "merchandise under consideration" and "subject merchandise" during the underlying AD investigation and what parties understood those terms to mean. *Id.* During the initial investigation, an outside party receiving a separate rate application for an unregistered alloy that has a major alloying element corresponding to the Aluminum Association's alloy groups weighs in favor of finding that Commerce considered the scope of the orders to include unregistered alloys. Appx00084 (Remand Results at 44).

Finally, Valeo argues that Commerce contradicted itself, claiming that Commerce concluded that the unregistered alloy at issue in the separate rate application is not subject to the *Orders*. *See* Valeo Br. at 42-43. In its remand determination, Commerce stated, "[a]ccordingly, because [the company] has not participated in a scope inquiry, it is not possible for Commerce's analysis to infer that [the specific] alloy is included within the scope of the Orders based on [the company]'s non-existent participation in a scope inquiry." Appx00148 (Remand

Results at 108). However, Commerce's cited language is meant only to clarify that it is not procedurally making a separate scope ruling for the other company because the company is not a participant in this litigation or the underlying administrative proceeding, and it has not requested a scope ruling on that product. *Id.*

B. Commerce Properly Considered The *Teal Sheets* In Its Its (k)(1) Analysis

Separately from the ambiguity analysis, Commerce lawfully considered the totality of record evidence before it when conducting its analysis under 19 C.F.R. § 351.225(k)(1). Valeo nonetheless contends that (1) Commerce's separate rate determination is not an appropriate (k)(1) source, which we have shown is wrong above, and that (2) Commerce "misuse[d] the *Teal Sheets* as a quasi-definitional and (k)(1) source." Valeo Br. at 21-23.

With respect to Valeo's contentions that when proceeding from evaluating ambiguity through its (k)(1) analysis, Commerce is strictly limited in which sources to consider based on characterization, the trial court correctly held that the precise characterization of the *Teal Sheets* as a definitional source or as a (k)(1) source was immaterial to Commerce's conclusion. *See* Appx00028 ("[W]hether characterized as evidence of trade usage or as a (k)(1) source, Commerce considered the *Teal Sheets* and explained why the information contained therein was not dispositive. It is not the court's role to 'reweigh the evidence.'"). In

analyzing the (k)(1) sources as discussed further below, Commerce properly considered the record as a whole, including evidence of trade usage, and weighed that evidence in its (k)(1) analysis to determine if there was a dispositive resolution of the ambiguity found in the scope. *See* Appx00084-85 (Remand Results at 44-45 (citing *ArcelorMittal*, 694 F.3d at 88)).

Concluding that this evidence, as a whole, did not dispositively resolve the ambiguity, Commerce lawfully proceeded to a (k)(2) analysis. Appx00093 (Remand Results at 53) (finding that because "the (k)(1) sources and certain record information concerning trade usage are contradictory and the respective weights of these sources are not sufficient to clearly demonstrate preeminence over the other available record information . . . . the (k)(1) sources are not dispositive . . . ")). Therefore, Valeo's contention that there are strict regulatory barriers in what Commerce may consider when evaluating the scope for ambiguity and whether sources are dispositive to a product's inclusion within the scope under 19 C.F.R. § 351.225(k)(1) is unsupported and not consistent with law.

## IV. Commerce Properly Determined That Valeo's T-series Aluminum Sheet Is Not Heat Treatable

Commerce's determination that Valeo's T-series aluminum sheet is not heat treatable is based on review of record information and is supported by substantial evidence. Commerce explained in detail that, based on the definition of heat-treatment, Valeo's product is not heat-treated and non-heat-treatable. Appx00065-

00077 (Remand Results at 25-37). Based on this determination, Commerce explained that it is not necessary to further consider the question of whether the scope covers heat-treatable alloys for purposes of this scope inquiry. Appx00077.

Valeo, in multiple instances, claims that its T-Series sheet is heat-treatable but otherwise does not present any arguments challenging the definition for heat treatment to solution heat treatment established by Commerce, which Valeo's T-series sheet does not meet. *See* Valeo Br. at 43-45. Thus, Commerce's determination that Valeo's sheet is not heat treated and non-heat-treatable is unchallenged, and it should be sustained. Moreover, Valeo's arguments that the scope covers only non-heat-treatable alloys, *id.*, also supports Commerce's conclusion that Valeo's sheet is covered by the *Orders* because Commerce determined that Valeo's sheet is not heat treated and non-heat-treatable. Appx00077.

Because Valeo does not present any challenge to Commerce's determination that its T-series aluminum sheet is not heat treated and non-heat-treatable, this Court should find that Commerce's determination is supported by substantial evidence. Further, this Court should find that the question of whether the scope covers heat-treatable alloys is moot.

## V. Commerce's Determination Not To Revoke Its Customs Instructions Is In Accordance With Law

Valeo argues that Commerce should have revoked the customs instructions suspending liquidation of entries issued after the final scope ruling dated October 15, 2021, because Commerce initiated a formal scope inquiry under 19 C.F.R. § 351.225(e) on remand. *See* Valeo Br. at 45-48. In particular, Valeo argues that the CIT's remand decision on December 21, 2022 undermined Commerce's October 15, 2021 final scope ruling that Valeo's product was in-scope, thus undermining the suspension of liquidations instructions to customs as well. *Id.* at 45-46. Valeo thus contends that liquidation should not have been suspended prior to Commerce's initiation of the formal scope inquiry on February 15, 2023, during remand. *Id.* at 46. Valeo misreads the regulations.

The regulations plainly read that suspension of liquidation begins on the date of a final scope ruling under (d) and, if suspension is already in place, will continue if a formal scope ruling is initiated. Specifically, 19 C.F.R. § 351.225(l)(3) provides, in relevant part, that "[i]f the Secretary . . . issues a final scope ruling . . . under paragraph (d), [and] [w]here that has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered[.]" The regulations then further provide,

> When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, *and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued*, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

19 C.F.R. § 351.225(l)(1) (emphasis added).

Commerce's final scope ruling under 19 C.F.R. § 351.225(d), finding Valeo's product in-scope, was issued on October 15, 2021. Appx1246-68. Pursuant to 19 C.F.R. § 351.225(l)(3), Commerce then transmitted instructions to CBP to suspend liquidation of entries. *See* Appx01388-91; Appx01392-94. The case was litigated at the CIT, and the trial court remanded for further explanation under (d) or a formal scope inquiry. Appx0009-10.[3] On remand, Commerce continued to proceed under (d) until it properly determined that a formal scope inquiry was necessary. Pursuant to 19 C.F.R. § 351.225(l)(1), the initiation of the scope inquiry continued the suspension of liquidation that was in place pursuant to 19 C.F.R. § 351.225(l)(3) as a result of the initial final scope ruling. *See* Appx000161-62 (Remand Results at 121-22). Valeo's interpretation of the regulations is simply unsupported by the language.

[3] The CIT did *not* find that Valeo's product was actually not in scope, nor did the CIT's remand order direct Commerce to revoke its customs instructions.

Yet Valeo claims that *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) supports its contention that Commerce may not suspend entries pursuant to its affirmative final scope ruling but may only suspend liquidation following the initiation date of a scope inquiry on remand. *See* Valeo Br. at 46. But Valeo's reliance on *United Steel & Fasteners* is misplaced: in that case, this Court held that Commerce may begin suspension of liquidation of the relevant entries starting on the day that the final scope ruling was issued pursuant to 19 C.F.R. § 351.225(d). *See* 947 F.3d at 800-03. As demonstrated above, Commerce did so in this case. Moreover, in *United Steel & Fasteners*, this Court upheld Commerce's suspension of liquidation back to the date of the final scope ruling under (d) even when that suspension was retroactive. *Id.* There are no retroactivity concerns present in this proceeding because the suspension of liquidation has been implemented since the day of the final scope ruling, not some prior date before parties were aware of the scope ruling.

Accordingly, Commerce lawfully determined the initiation of a formal scope inquiry on remand would continue the suspension of liquidation pursuant to the final scope ruling. Appx00162 (Remand Results at 122). Commerce began suspension of liquidation starting on the day the final scope ruling was issued in this case. Although Commerce initiated a broader scope inquiry under 19 C.F.R. § 351.225(e) on remand, that does not disturb Commerce's authority to have

suspended liquidation pursuant to a final scope ruling under 19 C.F.R. § 351.225(d).

Valeo argues that Commerce should itself determine that the Remand Order from the trial court compels Commerce to revoke its customs instructions issued in accordance with 19 C.F.R. § 351.225(l)(3). *See* Valeo Br. at 46-48. However, no language in the Remand Order directs Commerce to revoke its customs instructions. Moreover, the argument that Commerce has an obligation to modify customs instructions as a result of a remand order that does not provide such direction would present multiple issues beyond the instant proceeding. Indeed the trial court correctly noted that, "[i]t is well settled 'that an order remanding a matter to an administrative agency for further findings and proceedings is not final." Appx00037 n.16 (citing *Cabot Corp. v. United States*, 788 F.2d 1539, 1542 (Fed. Cir. 1986)). Instead, as demonstrated above, Commerce's decision not to revoke its customs instructions is in accordance with the law.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

/s/ Reginald T. Blades Jr. by /s/ Claudia Burke
REGINALD T. BLADES JR.
Assistant Director

/s/ Alison S. Vicks
ALISON S. VICKS
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7573
E-mail: Alison.S.Vicks@usdoj.gov

April 10, 2024

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   **X** The brief contains 8,131 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

   The brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   **X** The brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

/s/ Alison Vicks
Alison Vicks