# United States Court of Appeals for the Federal Circuit

---

**VALEO NORTH AMERICA, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, ALERIS ROLLED PRODUCTS, INC., ARCONIC CO., COMMONWEALTH ROLLED PRODUCTS INC., CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC, JUPITER ALUMINUM CO., JW ALUMINUM COMPANY, NOVELIS CORPORATION, ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP,**
*Defendants-Appellees*

---

2024-1189

---

Appeal from the United States Court of International Trade in No. 1:21-cv-00581-MAB, Chief Judge Mark A. Barnett.

---

Decided: August 12, 2025

---

PIERCE LEE, Crowell & Moring LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DANIEL CANNISTRA; WERONIKA BUKOWSKI, New York, NY.

KYLE SHANE BECKRICH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

JOHN M. HERRMANN, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Aleris Rolled Products, Inc., Arconic Co., Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Co., JW Aluminum Company, Novelis Corporation, Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group. Also represented by JOSHUA MOREY, PAUL C. ROSENTHAL.

---

Before TARANTO, HUGHES, and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

This case involves the scope of antidumping and countervailing duty orders on common alloy aluminum sheets from the People's Republic of China. Valeo North America appeals the Court of International Trade's affirmance of the United States Department of Commerce's ruling on the scope of those orders. Specifically, Commerce determined that the scope of the orders encompassed Valeo's product, T-series aluminum sheets imported from China. For the following reasons, we affirm.

## BACKGROUND

When Commerce finds that "foreign merchandise is . . . sold in the United States at less than its fair value," and the United States International Trade Commission determines that a domestic industry is, or is threatened to be, materially injured, Commerce must impose an antidumping duty "equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the [foreign] merchandise." 19 U.S.C. § 1673.

Similarly, countervailing duties shall be imposed if "a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," and a United States domestic industry is, or is threatened to be, materially injured. *Id.* § 1671.

Antidumping and countervailing duty orders contain narrative descriptions defining the merchandise covered. These orders "must be written in general terms." 19 C.F.R. § 351.225(a) (2020).[1] And as Commerce has acknowledged, sometimes "[i]ssues arise as to whether a particular product is included within the scope of an of an antidumping or countervailing duty order." *Id.* When such questions arise, Commerce's regulations—specifically 19 C.F.R. § 351.225—direct it to issue "scope rulings" that clarify whether the product is within the scope. *Id.* Interested parties may apply for a scope ruling, or Commerce may self-initiate a scope inquiry. *Id.* § 351.225(b)–(c).

Commerce begins its analysis with the language of the order that is subject to interpretation. *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 84 (Fed. Cir. 2012). This step is "sometimes referred to as the '(k)(0)' inquiry because it precedes the" regulatory framework set forth in 19 C.F.R. § 351.225(k). *Vandewater Int'l Inc. v. United States*, 130 F.4th 981, 985 (Fed. Cir. 2025). Under its regulations, if Commerce finds the meaning of the scope language at issue clear, the proceedings terminate. *Id.* at 984–85. On the other hand, if Commerce finds the scope language ambiguous, it looks to two sets of factors spelled out in 19 C.F.R. § 351.225(k)(1) and (k)(2).

[1] We cite to the 2020 version of this regulation for the remainder of this opinion. The 2020 version applied during the proceedings below. Commerce has since amended this regulation.

Commerce first considers the (k)(1) factors, including "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission" at (k)(1) to resolve the scope inquiry. 19 C.F.R. § 351.225(k)(1). If these "criteria are not dispositive," Commerce then considers the (k)(2) factors: (1) "[t]he physical characteristics of the product"; (2) "[t]he expectations of the ultimate purchasers"; (3) "[t]he ultimate use of the product"; (4) "[t]he channels of trade in which the product is sold"; and (5) "[t]he manner in which the product is advertised and displayed." *Id.* § 351.225(k)(2).

I

Here, Valeo sought a scope ruling on whether its T-series aluminum sheet is within Commerce's 2019 Orders[2] on common aluminum alloy sheet imported from China. The Orders cover:

> [A]luminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, **3XXX-**, or 5XXX-**series alloy as designated by the Aluminum Association**. With respect to multi-alloy,

---

[2] *Common Alloy Aluminum Sheet From the People's Republic of China*, 84 Fed. Reg. 2813 (Dep't Commerce Feb. 8, 2019) (antidumping duty order); *Common Alloy Aluminum Sheet From the People's Republic of China*, 84 Fed. Reg. 2157 (Dep't Commerce Feb. 6, 2019) (countervailing duty order) (collectively, the "Orders").

> clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

84 Fed. Reg. at 2815; 84 Fed. Reg. at 2158 (emphasis added to indicate disputed language in scope order).

Much of the dispute in this appeal involves the language "3XXX-. . . series alloy as designated by the Aluminum Association." Thus, some background on the Aluminum Association is helpful. The Aluminum Association is a private organization that publishes an industry standard in the form of "a numerical designation system for wrought aluminum and wrought aluminum alloys" known as the "Teal Sheets." Appellant's Br. 6; Oral Arg. at 7:40–8:25, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=24-1189_05052025.mp3. The Teal Sheets "is the defining source for designations and chemical composition limits for wrought aluminum and wrought aluminum alloys and is relied upon in a number of standards and specifications worldwide." Appellant's Br. 6. The Teal Sheets uses a four-digit numerical code that conveys information about the alloy where "[t]he first digit in the grade number indicates the general family, which share a major alloying component." *Id.* When referring to the family collectively, "the last three digits are shown as the letter X." *Id.* The last three digits "contemplate a unique, *registered* alloy." *Id.* (emphasis added).

Registering an alloy with the Aluminum Association is voluntary but provides potential customers with information about the composition of an alloy so customers can know what they are getting and if the alloy is suitable for their particular purposes. *See* Oral Arg. at 7:40–8:25; J.A. 867.

The dispute here involves the 3XXX-series alloy, which has a major alloying component of manganese. Valeo acknowledges that "the aluminum core of [its] T-series

sheet has a major alloying element of manganese" but contends it is not designated a 3XXX-series alloy by the Aluminum Association because it is not *registered* with the Association. Appellant's Br. 7.

On October 15, 2021, Commerce issued a final scope ruling determining "that the scope of the Orders includes T-series aluminum sheet imported by Valeo." J.A. 1246 (italics removed). Commerce explained that "the description of the subject merchandise, the scope language, and prior rulings, are, together, dispositive as to whether the product at issue is subject merchandise, in accordance with 19 CFR [§] 351.225(k)(1)," and therefore it is "unnecessary to consider the additional factors specified in 19 CFR [§] 351.225(k)(2)." J.A. 1255.

Commerce rejected Valeo's argument that a product must be registered with the Aluminum Association to fall within the scope of the Orders, reasoning that "the phrase 'as designated' refers to the *series* of the aluminum alloy because, without this phrase, the scope language would be unclear as to what is meant by a 1xxx, 3xxx, or 5xxx-series alloy." J.A. 1259. To support its position, Commerce explained that "[t]he plain scope language uses the term 'series alloy' rather than 'specific alloy,'" therefore the Orders referred to an alloy series rather than a specific registered four-digit alloy. J.A. 1260.

Valeo also argued its T-series products should be excluded from the Orders because the T-series sheets are heat-treated, and the Aluminum Association classifies 3XXX-series alloys as non-heat-treatable. Commerce disagreed, concluding "Valeo has not demonstrated that the phases of diffused alloys within T-series aluminum sheet are not separate layers of a composite clad product." J.A. 1258. Continuing, Commerce explained that Valeo had not "supported its claim that heat-treatability would preclude an aluminum alloy with a principal alloying agent

of manganese from being considered a 3xxx-series aluminum." J.A. 1262.

In accordance with its decision, Commerce instructed Customs and Border Protection to suspend liquidation and to require a cash deposit of estimated duties at the applicable rate for the T-series aluminum sheet pursuant to 19 C.F.R. § 351.225.

II

Valeo appealed Commerce's determination to the Court of International Trade. Valeo argued Commerce: (1) exceeded the bounds of a (k)(1) analysis; and (2) failed to adequately support its findings that the term 3XXX-series covers unregistered alloys, that the T-series aluminum sheet is a clad product rather than a heat-treated product, or that any heat-treatment does not prevent the T-series aluminum sheet from being classified as a 3XXX-series alloy. *Valeo N. Am., Inc. v. United States*, 610 F. Supp. 3d 1322, 1333 (Ct. Int'l Trade 2022) ("*Valeo I*"). The Trade Court agreed with Valeo's first argument, concluding "Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence." *Id.* at 1335.

The Trade Court first acknowledged "[t]he phrase '3XXX-series' is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,' which is also undefined." *Id.* In light of this, the Trade Court concluded "[t]he scope is ambiguous" because it is unclear if "Commerce intended the scope to cover any alloy [corresponding to a series] . . . (including unregistered alloys)." *Id.* The Trade Court then criticized Commerce's treatment of the (k)(1) sources, specifically for "fail[ing] to account for the Teal Sheets as a whole," because "Commerce has not identified anything in the Teal Sheets that indicates the Aluminum Association applies th[e series] framework to unregistered alloys." *Id.* at 1335–36. The Trade Court concluded that Commerce's interpretation

lacked substantial evidence support, vacated Commerce's scope order, and remanded for Commerce to reconsider and further explain its ruling in line with 19 C.F.R. § 351.225.

The Trade Court held that Commerce's determination that Valeo's T-series aluminum sheet is a clad product is supported by substantial evidence. *Valeo I*, 610 F. Supp. 3d at 1339. Nevertheless, the court explained "the key question is whether a heat-treated (or heat-treatable) clad sheet *can be classified as* having a 3XXX-series core and therefore be in-scope." *Id.* at 1341. On remand, the Trade Court directed Commerce to consider "evidence that Valeo's product undergoes heat-treatment . . . and reconcile such evidence with evidence indicating that 3XXX-series alloys are non-heat-treatable." *Id.*

III

On remand, Commerce again considered the language of the scope order and whether the language "as designated by the Aluminum Association" excluded unregistered alloys. Explaining that "'3XXX-series' is an industry-specific term defined only by the industry publication Teal Sheets," Commerce acknowledged that the "as designated by" language was susceptible to two "differing but plausible interpretations." J.A. 80–81 (emphasis omitted). Commerce further explained that the "Teal Sheets, as a whole, uses the word 'designation' to refer to alloys with a four-digit designation from the Aluminum Association [i.e., registered alloys]" but that "the dictionary definition of the term 'designate' does not require the term to be used in reference to a four-digit alloy." J.A. 80. Therefore, Commerce concluded that "the scope is ambiguous" and proceeded to consider the (k)(1) factors. J.A. 81.

As part of its (k)(1) analysis, Commerce considered a prior rate determination (which was confidential and involved a different party). Commerce concluded that the prior rate determination supported that 3XXX-series "cover[s] any alloy that contains a major alloying element

corresponding to the Aluminum Association's alloy groups (including unregistered alloys)." J.A. 82–83. But Commerce explained "the (k)(1) sources are contradictory and the respective weight of the (k)(1) sources is not sufficient to clearly demonstrate preeminence over the other available (k)(1) sources," so it found "the (k)(1) sources on the record are not dispositive in resolving the scope ambiguity." J.A. 86.

Therefore, on February 15, 2023, Commerce initiated a broader scope inquiry under 19 C.F.R. § 351.225(k)(2), which is necessary when the (k)(1) criteria are not dispositive. After considering the (k)(2) factors, Commerce "continue[d] to find that the scope of the Orders covers Valeo's T-series Sheet." J.A. 44 (italics removed). Valeo does not challenge Commerce's analysis of the (k)(2) factors on appeal. Rather, Valeo contends that Commerce should have never reached (k)(2) and should have resolved the scope in its favor based on the language of the Orders or the (k)(1) factors.

## IV

Valeo again appealed to the Trade Court. The Trade Court sustained Commerce's scope redetermination that Valeo's products fall within the Orders' scope. *See Valeo N. Am., Inc. v. United States*, 663 F. Supp. 3d 1343, 1355–56 (Ct. Int'l Trade 2023) ("*Valeo II*").

Valeo appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court's rulings de novo, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). "[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." *Meridian Prods., LLC*

*v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017). We review Commerce's analysis of the (k)(1) and (k)(2) factors against the product in question for substantial evidence. *Id.*

Valeo challenges Commerce's scope order based on three arguments. First, Valeo contends that the language of the Orders and the Teal Sheets "unambiguously excludes Valeo's T-series Aluminum Sheet." Appellant's Br. 23 (capitalization normalized). Valeo would thus end the scope determination here at (k)(0). But, even if this court disagrees with Valeo on the (k)(0) analysis, Valeo asserts that Commerce's (k)(1) analysis cannot stand because Commerce erred when it relied on the prior confidential rate determination. Separate from its challenge to the scope determination, Valeo asserts that (1) Commerce's determination that the T-series is within scope of the Orders is unsupported by substantial evidence because the T-series is heat-treated; and (2) Commerce unlawfully failed to revoke its previous Customs instructions after the Trade Court vacated and remanded Commerce's initial scope determination. We address the scope determination arguments first, followed by Valeo's challenges based on heat treatment and the liquidation instructions.

## I

Valeo argues Commerce erred in failing to resolve the scope determination in its favor at (k)(0). According to Valeo, "the scope language of the Orders unambiguously excludes Valeo's T-series aluminum sheet." Appellant's Br. 23 (capitalization normalized).

Scope terms are "unambiguous if they have a single clearly defined or stated meaning." *Meridian Prods.*, 851 F.3d at 1381 n.7 (internal quotation marks and citation omitted). We agree with the Trade Court that the scope of the Orders does not unambiguously resolve whether Commerce intended the scope to cover unregistered alloys, like Valeo's, at the (k)(0) phase.

Valeo argues that "[r]ead in conjunction with the Teal Sheets, the scope language itself defines what is meant by 'as designated.'" Appellant's Br. 25. According to Valeo, the language "as designated by the Aluminum Association" refers only to alloys registered with the Aluminum Association.

We disagree. As a threshold matter, the Orders do not define what is meant by "as designated by the Aluminum Association." Because the text of the Orders themselves provides little guidance, we consider the source of the designations: the Teal Sheets.

The Teal Sheets also does not unambiguously define what is meant by "as designated" because the Teal Sheets refers both to designated alloys as well as registered alloys. *See, e.g.,* J.A. 900 ("To be elig[i]ble for registration, an aluminum or aluminum alloy shall be offered for sale . . . ."); J.A. 899 ("Deactivation of registered alloys" (capitalization normalized)); J.A. 897 ("Variations of wrought aluminum and wrought aluminum alloys registered in accordance with this Recommendation . . . ."). *But see* J.A. 897 ("A numerical designation assigned in conformance with this Recommendation should only be used to indicate an aluminum or aluminum alloy having chemical composition limits identical to those registered with [the Aluminum Association]."); *id.* (specifying that "[t]he alloy designation in the 2xxx through 8xxx groups is determined by the alloying element . . . present in the greatest mean percentage"); J.A. 899 ("Use of designations" and "Assignment of designations" (capitalization normalized)). Analogous to principles guiding statutory interpretation, we commonly understand that "the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (citing A. Scalia & B. Garner, *Reading Law* 170–71 (2012)). For at least this reason, a strong argument can be made that the Teal Sheets uses the phrase "designated" to mean something different from "registration,"

undermining Valeo's argument that "designated" unambiguously means registered.

Moreover, the Orders' language, "as designated by the Aluminum Association," could use "designated" in a common sense manner[3] simply to refer to the Teal Sheets. As Commerce explained, "the term 'designate' is a general term that may be used in the common vernacular," J.A. 80, or the Orders could use "designated" to refer to specific registrations made by the Aluminum Association. We therefore reject Valeo's argument that the language of the Orders unambiguously excludes its product because the Orders' language and the Teal Sheets does not establish "a single clearly defined or stated meaning." *Meridian Prods.*, 851 F.3d at 1381 n.7 (citation omitted). Therefore, we hold that the term "as designated by the Aluminum Association" is ambiguous.

II

Having rejected Valeo's argument that the language of the scope order unambiguously excludes its product, we turn to Valeo's (k)(1) arguments. Valeo challenges Commerce's reliance on the separate rate determination as a (k)(1) source, asserting that (k)(1) sources must be public, and, in any event, the separate rate determination is not a proper interpretive source, as "it lacks any discussion about a scope issue." Appellant's Br. 38. We decline to resolve this question because, even assuming Commerce erred in considering this separate rate determination, Commerce acknowledged the "minimal analysis regarding whether companies were exporters of subject merchandise" in the separate rate determination and agreed the lack of

---

[3] *See, e.g.*, *Designation*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act of choosing someone or something for a particular purpose or of giving the person or thing a particular description.").

analysis "detracts from the weight that should be given to this (k)(1) source." J.A. 85–86. In other words, Commerce considered the limited discussion in determining how much weight to assign this source before concluding "the respective weight of the (k)(1) sources is not sufficient to clearly demonstrate preeminence." J.A. 86. Because Commerce concluded the (k)(1) sources are "not dispositive," any alleged error is likely harmless. *Id.*; *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings."). We find Valeo's arguments related to the separate rate determination unpersuasive.

Given Valeo does not challenge Commerce's analysis at the (k)(2) stage and we are not persuaded that Commerce's determinations at the (k)(0) and (k)(1) stages are unlawful, harmful, or unsupported by substantial evidence, we affirm the Trade Court's decision sustaining Commerce's scope ruling.

III

We are also unconvinced by Valeo's argument that its T-series aluminum sheet falls outside the Orders' scope because it is heat-treated. "The question of whether the product at issue meets the unambiguous scope terms is a question of fact that we review for substantial evidence." *Vandewater*, 130 F.4th at 991. Valeo does not challenge the scope of the Orders in this regard, but rather disputes Commerce's determination that the T-series are within the Orders' scope.

Valeo challenges "whether [the] T-series sheet is manufactured from a 3xxx-series core," which implicates heat-treatment "because the term '3xxx-series' refers to non-heat-treatable alloys." Appellant's Br. 43; *see also* J.A. 1251 (Commerce's Final Scope Ruling) (Valeo arguing its "T-series aluminum sheet is heat-treated multiple times which precludes classification as a 1xxx, 3xxx, or 5xxx

series aluminum, as those aluminum alloys are not heat-treatable”). Commerce concluded that “Valeo’s T-series sheet does not undergo solution heat-treatment, and that the tempering processes used on Valeo’s T-series sheet are inconsistent with those of a heat-treatable alloy.” J.A. 66–67.

Although Valeo points us to evidence supporting a broader definition of heat-treatment and evidence that the 3XXX-series alloys are non-heat-treatable, Valeo does not explain why the evidence Commerce relied on in reaching its conclusion is not substantial evidence. Commerce explained it “adopt[ed] the narrower definition of heat-treatment to mean a synonym for solution heat-treatment” because “the broader definition of ‘heat-treatment,’ which includes several types of thermal treatments including annealing, is inconsistent with the statement in *Aluminum Alloys 101* that only certain series of aluminum are heat-treatable.” J.A. 65; *see also* J.A. 62–65 (analyzing the record evidence regarding heat-treatment). As Valeo fails to explain why this evidence is not “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,” substantial evidence supports Commerce’s finding. *Meridian Prods.*, 851 F.3d at 1381.

IV

Finally, Valeo asserts Commerce must revoke the instructions to Customs directing suspension of liquidation. Valeo contends that when Commerce initiates a broader scope inquiry “under [§ 351.225] subsection (e), it may only issue Customs instructions when the [subsection (e) scope] inquiry has been *initiated*.” Appellant’s Br. 46. Valeo essentially contends that because Commerce initiated a subsection (e) inquiry in February 2023, following remand from the Trade Court, Commerce was required to revoke the suspension instructions it had issued to Customs in October 2021.

The provisions of the regulation governing when the Secretary should initiate a (k)(2) inquiry are relevant here:

> (d) Ruling based upon the application. If the Secretary can determine, based *solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1)* of this section, whether a product is included within the scope of an order or a suspended investigation, the Secretary will issue a final ruling as to whether the product is included within the order or suspended investigation. . . .
>
> (e) Ruling where further inquiry is warranted. If the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, the Secretary will notify by mail all parties on the Department's scope service list of the initiation of a scope inquiry.

19 C.F.R. §§ 351.225(d)–(e) (emphasis added). Commerce issued the October 2021 final scope ruling only with respect to the (k)(1) factors—*i.e.*, in accordance with § 351.225 subsection (d). J.A. 1267. Valeo then appealed that decision to the Trade Court, which simply remanded the matter, after which, on February 15, 2023, Commerce initiated the broader scope inquiry into the (k)(2) factors, under subsection (e).

With this in mind, the most relevant portion of the regulation governing the suspension of liquidation states that:

> (3) *If the Secretary issues a final scope ruling, under either paragraph (d)* or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this

> section will continue. *Where there has been no suspension of liquidation*, the Secretary *will instruct the Customs Service to suspend liquidation* and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

19 C.F.R. § 351.225(l)(3) (emphases added). Here, Commerce issued a final scope ruling pursuant to subsection (d) in October 2021. J.A. 1267. Commerce instructed Customs to suspend liquidation, *see* J.A. 1268, and Valeo has made no argument to us against the propriety of Commerce suspending liquidation when it issues a scope ruling, *see* Appellant's Br. 46–47.

Valeo's argument is that "§ 351.225(l) 'does not allow suspension of liquidation before a scope inquiry'" and Commerce "may only issue Customs instructions when the [subsection (e) scope] inquiry has been *initiated*." Appellant's Br. 46 (quoting *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) ("*USF*")). The initiation date Valeo invokes is the February 2023 date after remand. But this argument is belied by the language of subsection (l), which unambiguously states that:

> (1) When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, *and the product in question is already subject to suspension of liquidation*, that suspension of liquidation will be continued, pending a preliminary or a final

> scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

19 C.F.R. § 351.225(l)(1) (emphasis added). At the time Commerce conducted the scope inquiry—initiated in February 2023 to consider the (k)(2) factors pursuant to subsection (e)—Valeo's products were "already subject to suspension of liquidation." Commerce's October 2021 final scope ruling concluded Valeo's products were within the scope of the Orders and ordered suspension of liquidation, reflecting the recognition that "Commerce may render a scope ruling with or without a 'scope inquiry.'" *USF*, 947 F.3d at 799 (citing 19 C.F.R. § 351.225(e)). The October 2021 suspension was in place in February 2023, so the regulation provided for it to be continued.

Valeo points to the fact that the Trade Court remanded Commerce's October 2021 scope ruling for further consideration. But Valeo does not and cannot show that the Trade Court's remand decision—not a final judgment—vacated the suspension. *See Valeo I*, 610 F. Supp. 3d at 1322–43. And Valeo identifies no authority holding that Commerce's decision to initiate a broader scope inquiry on remand requires revocation of the existing suspension of liquidation. With no such requirement, the regulation on continuation of suspension applies by its terms. We are thus unpersuaded Commerce erred in not revoking its liquidation instructions to Customs and affirm the Trade Court's decision holding the same. *Valeo II*, 663 F. Supp. 3d at 1355 (explaining that "when Commerce initiated the scope inquiry, Valeo's product was 'already subject to suspension of liquidation' and, as such, 'that suspension of liquidation [was] continued, pending a preliminary or a final scope ruling'" (alteration in original) (quoting 19 C.F.R. § 351.225(l)(1))).

Valeo's reliance on *USF* for support is also unpersuasive. In *USF*, Commerce issued instructions suspending

liquidation retroactively to "the date the [antidumping duty] *Order* was issued." 947 F.3d at 798. The Trade Court held retroactive suspension of liquidation was in excess of Commerce's authority, and on remand, "Commerce issued new instructions to suspend liquidation on or after . . . the date when Commerce issued the final scope ruling." *Id.* We affirmed suspension of liquidation from the date of the final scope ruling. We reasoned that subsection (l)(3) operated on a prospective, not retroactive, basis, despite subsection (l)(3)'s silence "as to how far back suspension of liquidation can go when there has been no scope inquiry." *Id.* at 800–01. Here, Commerce issued instructions with its final scope ruling, which is in accord with our holding in *USF*.

## CONCLUSION

We have considered Valeo's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the Trade Court's decision sustaining Commerce's remand determination that Valeo's T-series sheets are within the scope of the Orders.

**AFFIRMED**

Costs

No costs.